1    O.L.

2    11151 Valley Blvd #4886,

3    El Monte, CA 91734

4    626-208-9665

5    Plaintiff in Pro Se

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   O.L.,                                    No.  2:20-cv-00797-RGK-JDE

12              Plaintiff,

13        v.                                  **SECOND AMENDED COMPLAINT FOR
                                              DAMAGES AND DECLARATORY AND
14   CITY OF EL MONTE; COUNTY OF LOS          INJUNCTIVE RELIEF**
     ANGELES; DAVID REYNOSO;
15   MARTHA TATE; MICHAEL
     BUCKHANNON; ALEX VILLANUEVA;
16   LILIANA JARA; RICHARD RUIZ;
     JACKIE LACEY; PETER CAGNEY;
17   KAREN THORP; JUNE CHUNG; and
     DOES 1 - 10, inclusive,
18
                Defendants.
19                                            **JURY TRIAL IS HEREBY DEMANDED**

20

21        Plaintiff O.L. ("Plaintiff") alleges and complains the following, on information and belief

22   except for information identified as being based on personal knowledge, which allegations are

23   likely to have evidentiary support after a reasonable opportunity for further discovery.

24

25                            <u>**INTRODUCTION**</u>

26        1.      This is a civil rights complaint for damages and declaratory and injunctive relief

27   arising from Defendants' violations of Plaintiff's fundamental rights to be free from

28   discrimination and unreasonable searches and seizures, among others guaranteed by the United

                                              1

1    States Constitution, California Constitution, and California laws. Defendants violated these rights

2    when they conspired and practiced discriminatory under-policing and selective under-

3    enforcement against rape victims, including Plaintiff.

4         2.     This action stems from law enforcement personnel's response to a heinous crime –

5    rape and how they re-victimized Plaintiff after she came forward. This action is about the

6    discriminatory practice and ill will of law enforcement personnel, their betrayal of public trust,

7    and failure to protect residents from victimization by rapists. Our law enforcement's response to

8    rapes sends a catastrophic message to the whole of our society. To rape victims: bringing a

9    complaint is useless. To rapists: you're allowed to rape as many women as you want and there

10   will be no consequence!

11        3.     Plaintiff's constitutional injuries have occurred since the first minute she came into

12   contact with law enforcement personnel who were supposed to support and protect her. Plaintiff

13   was not only a rape victim but also a victim of discrimination, uneven enforcement of law, and

14   law enforcement personnel's misconduct.

15        4.     Without the ability to hold law enforcement accountable for its responses, rape

16   victims, including Plaintiff, will be far too likely to face hostility, disinterest, and concrete harms

17   as a result of their interactions with law enforcement. The people who mishandle rape cases are

18   just as bad as the perpetrators themselves because they are perpetuating rapes.

19        5.     Plaintiff has been injured by Defendants' willful refusal to provide the

20   accommodations, advantages, privileges, and facilities of an unbiased and adequate sexual assault

21   investigation, and effective prosecution. Plaintiff has endured multiple traumas; first, the criminal

22   assault itself; second, a discriminatory, unconstitutional, unfair, and unequal treatment by the

23   people sworn to protect the public - the government officials and actors who have instead

24   discredited, dismissed, and denigrated Plaintiff as a rape victim; and finally, the additional trauma

25   of watching her case and hope for justice languish and ultimately vanish, due to the sabotage,

26   inaction and refusal to act by law enforcement personnel. Plaintiff's attacker will not see a day of

27   consequence for his violent assault against her.

28        6.     As described in more detail below, Defendants' (a) actions, (b) patterns of

2

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

behavior, (c) history of decision-making, and (d) departures from normal procedures in the course of their response to sexual assaults, demonstrate ongoing, intentional discrimination against rape victims, including Plaintiff. Specifically, Defendants have committed constitutional violations by implementing, promoting, or maintaining policies, practices, and/or customs that:

    a.  Refuse to investigate officer misconduct properly, misconduct is widespread without ramification or discipline;

    b.  Refuse to implement and/or ignore proper training and supervision of government employees handling sexual assault cases;

    c.  Allocate more resources to other violent crimes than to sexual assaults;

    d.  Credit suspects' account over victims' version of story;

    e.  Fail to arrest and charge known perpetrators of sexual assault;

    f.  Disproportionately refuse to thoroughly investigate sexual assault cases;

    g.  Disproportionately refuse to prosecute perpetrators of sexual assault;

    h.  Traumatize Plaintiff in the course of her interactions with Defendants by, among other things, refusing to treat her testimony as adequate evidence regarding lack of consent;

    i.  Subject Plaintiff and other rape victims to future assaults by known perpetrators by failing to act on, investigate, and prosecute prior sexual assaults;

    j.  Treat sexual assault cases with less urgency and importance than is afforded to other types of violent crimes;

    k.  Treat victims of sexual assault, including Plaintiff, with less respect and devote less attention to their cases than to cases of other crimes (collectively referred to herein as the "Policies").

    7.    Defendants' unconstitutional and discriminatory conduct subjects Plaintiff and other victims of sexual assault to continued risk at the hands of perpetrators who are never held accountable.

    8.    Defendants' violations did not stop there. Despite Plaintiff's plain and actual

3

1  authority was to download her particular message conversations on her smartphone Defendants

2  transformed it into a complete search and seizure. As a result, in addition to violating Plaintiff's

3  right to be free from unreasonable searches and seizures Defendants violated Plaintiff's privacy.

4

5                                        **PARTIES**

6        9.      Plaintiff, O.L. ("Plaintiff"), at all times herein mentioned, was a resident of the

7  County of Los Angeles, State of California.

8        10.     Defendant, City of El Monte ("the City"), is a public entity and municipal

9  corporation duly organized and existing under and by virtue of the laws of the State of California.

10  El Monte Police Department ("EMPD") is an operating department of the City. The City is

11  responsible for the training, policies, procedures, and actions of EMPD and its employees. The

12  City has direct supervisory authority over EMPD and its officers, and EMPD policies are City

13  policies for purposes of municipal liability.

14        11.     Defendant, County of Los Angeles ("the County"), is an incorporated municipality

15  organized and existing under the laws of the State of California and wholly located within the

16  State of California. Los Angeles County Sheriff's Department ("LASD") and Los Angeles

17  County District Attorney's Office ("LADA") are operating departments of the County. The

18  County is responsible for the training, policies, procedures, and actions of LASD and LADA, and

19  their employees. The County has direct supervisory authority over LASD, LADA, and their

20  personnel, and LASD and LADA policies are County policies for purposes of municipal liability.

21  According the County's annual report for 2015-2016, the latest annual report Plaintiff obtained

22  from the County's website, 17% of their total resources came from federal assistance.

23  (https://lacounty.gov/wp-content/uploads/Complete_Annual_Report.pdf)

24        12.     Defendant EMPD Officers: At all times herein mentioned, Plaintiff is informed

25  and believes, and thereon alleges that individual Defendants Chief of Police David Reynoso

26  ("Reynoso"), Officer Martha Tate, ID 578 ("Tate"), and Lieutenant Michael Buckhannon, ID 571

27  ("Buckhannon"), were residents of the County of Los Angeles and were civilian employees,

28  agents and/or representatives of EMPD.  At all times relevant hereto, said Defendants were acting

4

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1 within the course and scope of their employment as officers, lieutenants, detectives, and/or

2 civilian employees of EMPD, a department and subdivision of Defendant City of El Monte.  At

3 all times relevant herein, said Defendants were acting under color of law, under the color of

4 statutes, ordinances, regulations, policies, customs, practices and usages of the City, EMPD,

5 and/or the State of California. At all times relevant hereto, Plaintiff alleges Reynoso served as the

6 highest official for EMPD and made the City and EMPD policy for that office. As Chief of

7 Police, Reynoso holds the command and policy making position with regards to EMPD. Reynoso

8 has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the

9 unconstitutional actions, policies, customs and practices as described fully below. By failing to

10 discipline Reynoso endorsed or approved the unconstitutional conduct of individual officers.

11 EMPD has an unofficial policy, custom, or practice of failure to address citizen complaint and the

12 City and Reynoso were well aware of that. (https://www.sgvtribune.com/2018/08/15/el-monte-

13 west-covina-police-departments-criticized-for-citizen-complaint-processes/) Reynoso has, wholly

14 or in part, directly and proximately caused and, in the absence of the injunctive relief which

15 Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the injuries and

16 violations of rights set forth fully below.

17     13. <u>Defendant LASD Officers</u>: At all times herein mentioned, Plaintiff is informed and

18 believes, and thereon alleges that individual Defendants Sheriff Alex Villanueva ("Villanueva")

19 is an elected public official. Individual Defendants Detective Liliana Jara ("Jara") and Lieutenant

20 Richard Ruiz ("Ruiz"), were residents of the County of Los Angeles and were civilian employees,

21 agents and/or representatives of LASD.  At all times relevant hereto, said Defendants were acting

22 within the course and scope of their employment as officers, lieutenants, detectives, and/or

23 civilian employees of LASD, a department and subdivision of the County.  At all times relevant

24 herein, said Defendants were acting under color of law, under the color of statutes, ordinances,

25 regulations, policies, customs, practices and usages of the County, its Sheriff's department, and/or

26 the State of California. At all times relevant hereto, Plaintiff alleges Villanueva served as the

27 highest official for LASD and made the County and LASD policy for that office. As Sheriff of

28 the County, Villanueva holds the command and policy making position with regards to LASD.

By failing to discipline Villanueva endorsed or approved the unconstitutional conduct of individual officers. Villanueva has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the unconstitutional actions, policies, customs and practices as described fully below. Villanueva has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below.

14. <u>Defendant LADA Officials</u>: At all times herein mentioned, Plaintiff is informed and believes, and thereon alleges that individual Defendant District Attorney Jackie Lacey ("Lacey") is an elected public official. Individual Defendants Head Deputy Peter Cagney ("Cagney"), Assistant Head Deputy Karen Thorp ("Thorp"), and Deputy June Chung ("Chung"), were residents of the County of Los Angeles and were civilian employees, agents and/or representatives of LADA. At all times relevant hereto, said Defendants were acting within the course and scope of their employment as civilian employees of LADA, a department and subdivision of Defendant Los Angeles County. At all times relevant herein, said Defendants were acting under color of law, under the color of statutes, ordinances, regulations, policies, customs, practices and usages of the County, its department, and/or the State of California. At all times relevant hereto, Plaintiff alleges Lacey served as the highest official for LADA and made the County and LADA policy for that office. By failing to discipline Lacey endorsed or approved the unconstitutional conduct of individual employees. **LADA Officials are not immune to this suit**. "Prosecutorial immunity only protects the defendants from [§] 1983 damage claims; it does not protect them from suits for injunctive relief." Gobel, 867 F.2d at 1203 n.6. To determine whether particular actions warrant absolute immunity, courts apply a "functional approach." Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993). This approach "looks to 'the nature of the function performed, **not the identity of the actor who performed it**[.]'" Id. (quoting Forrester v. White, 484 U.S. 219, 229 (1988)). "Absolute immunity 'is an extreme remedy, and it is justified only where any lesser degree of immunity could impair the judicial process itself.'" Garmon v. Cty. of Los Angeles, 828 F.3d 837, 843 (9th Cir. 2016) (quoting Lacey v. Maricopa Cty., 693 F.3d 896, 912 (9th Cir. 2012) (en banc)). See also Brooks v. Clark Cty., 828 F.3d 910, 915–16 (9th Cir.

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

2016) (discussing absolute immunity). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns, 500 U.S. at 486. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Id. At 486-87. The purpose of absolute immunity is to eliminate susceptibility to legal actions that would inhibit prosecutors from aggressively prosecuting cases. When prosecutors refuse to perform their duties, provide favoritism to suspects, and act in their own interest this Court should reject their absolute immunity. The following actions by LADA Officials are neither prosecutorial in nature nor decisions of judgment but deplorable intentional antithesis of exercise of judgment:

    a. Adopt "no policy" policy. As the largest local prosecutorial office in the nation, no written policies relating to prosecution of rape exists which suggests deliberate indifference to rape victims safety and a general disinterest in prosecuting sexual assaults due to bias (Lacey has publicly been criticized for inaction in the case of four women who report having been raped by actor Danny Masterson. Lacey and the County have been aware that a pattern and custom of unconstitutional violations exists.). The lack of written policy allows LADA Officials to make wholly arbitrary decisions and is the moving force behind Plaintiff's constitutional injuries;

    b. When asked to adopt "offender-focused approach" and "expert witness strategy" that are recommended by National District Attorneys Association ("NDAA") LADA Officials maliciously refused, giving an ostensible reason that the case cannot be proved beyond a reasonable doubt. Bias against rape victims could not be clearer; **Ex. 1** (Prosecuting Alcohol-Facilitated Sexual Assault), **Ex. 2** (Cold Case Alcohol- and Drug-Facilitated Sexual Assault), **Ex. 3** (Understanding the non-stranger rapist), **Ex. 4** (Plaintiff's email to HD Peter Cagney)

    c. Willfully refused to perform their duties pursuant to professional standards;

    d. Intentionally discredited Plaintiff's account of allegation because she is a rape victim;

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

e.   Callously disregard victim and community safety by using absolute immunity as a badge and shield for their discriminatory practice with no showing of a valid state interest;

f.   Deterred Plaintiff from pursuing the truth and justice by falsely telling her that there was not enough evidence and creating ostensible reasons to justify their discriminatory and unconstitutional treatment to Plaintiff because she is a rape victim;

g.   Acted as suspect's advocate, falsely told Plaintiff there was no corroboration, despite corroboration is not required by law for conviction; **Ex. 5** (Model Response to Sexual Violence for Prosecutors)

h.   Made multiple untrue statements to Plaintiff that were far departure from professional standards, jury instruction, and prosecution guidelines which is a strong indicator that discriminatory intent was a motivating factor for LADA Officials' wild spread custom;

i.   Intentionally enforce a "non-law", falsely requiring corroboration and evidence of force to establish rape, a requirement that is not required by law or jury instruction; (Lacey openly said acquaintance cases are particularly difficult to prove, unless the accused admits what happened, makes incriminating statements, or the victim's account can be corroborated with independent evidence, reflecting higher criteria compared to other crimes with no showing of valid state interest but solely aiming at conviction rate for prosecutor's own personal interest.

https://www.nbclosangeles.com/news/local/former-socal-police-officer-will-not-face-rape-charge/2227236/

j.   Maliciously ignore the fact that a victim's testimony alone is legally sufficient evidence for filing charges but falsely told Plaintiff that the law requires more than that and it's the way the law is, reflecting rape cases are less "worthy" of prosecution than other crime cases;

k.   Willfully provide favoritism and leniency towards rapists, including Suarez who

8

1    attacked Plaintiff, and prevent Plaintiff from pursuing truth and justice;

2       l.  Intentionally use their control and influence to shut Plaintiff out of criminal justice

3          system and reduce the number of perpetrators held accountable for sexual assaults;

4      m.  Employ disparate unwritten policy to rape cases compared to other type of crimes;

5          (According to prosecution data obtained by NBC4's I-Team, in LA County, in

6          2018 police presented 815 forcible rape investigations to prosecutors. Charges

7          were filed in 188 reflecting an extremely low prosecution rate of 23%. This

8          compares to a higher rate at every stage for non-rape crimes, reflecting the lowest

9          priority of LADA's efforts.)

10      n.  Act in their own personal interest to avoid losing at trial simply because rape cases

11          are hard to win and they want their personal conviction rates look good (their

12          powerful incentive to discriminate against rape victims);

13      o.  Treat sex crimes less worthy for prosecution than other crimes;

14      p.  Consciously manipulate prosecution for political purposes;

15          (https://variety.com/2020/politics/news/weinstein-rape-charges-los-angeles-

16          1203461860/)

17      q.  Use "insufficient evidence" as a disguise to deprive Plaintiff of her constitutional

18          rights;

19      r.  Employ unconstitutional and discriminatory practice against sexual assault

20          victims, including Plaintiff; and

21      s.  Misuse their power to undermine the quality of justice.

22    15.    Defendant DOES 1 through 10 are not known or identified at this time. On

23  information and belief, Plaintiff alleges that each Doe is in some manner responsible for the

24  wrongs alleged herein, and that each such Defendant advised, encouraged, participated in,

25  ratified, directed, or conspired to do, the wrongful acts alleged herein.  When the true names and

26  capacities of said Defendants become known, Plaintiff will seek relief to amend this complaint to

27  show their true identities in place of their fictitious names as DOES 1 through 10. Defendants,

28  DOES 1 through 10, and each of them, were the agents, employees and servants of the City or the

County.  Defendants DOES 1 through 10 acted in the course and scope of said agency, service and employment at all relevant times.

16.     Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged.

17.     Defendants, and each of them, did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

18.     All Defendants are sued in their official capacities for declaratory and injunctive relief as to all claims. All Defendants are also sued for damages arising from violations of 42 U.S.C. §§ 1983 and 1985, and for violations of state law and the California Constitution.

19.     Defendants EMPD and LASD Officers, LADA Officials, and DOES 1 through 10 are also sued in their individual capacities for their violations of Plaintiff's constitutional and statutory rights.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a) because this action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

21.     The Court may award damages and grant declaratory and injunctive relief for constitutional violations pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and/or Federal Rules of Civil Procedure 57 and 65.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events that give rise to this action occurred within this district and the Defendants reside in this district and state.

## EMPD POLICIES AND PROCEDURES

23.     At all relevant times, all EMPD members were required to be apprised of the First,

10

Fourth, and Fourteenth Amendment of the United States Constitution, and were required, at all times, to follow the United States Constitution, the laws of California and also to comply with EMPD Policies and Procedures ("EMPD P&Ps"). EMPD P&Ps are written orders which apply to all EMPD members such as Defendant EMPD Officers. Each member of EMPD, including Defendant EMPD Officers, is required to be familiar with the EMPD P&Ps and must adhere to its directives. **Ex. 6** (EMPD Policies and Procedures).

24.     EMPD P&Ps 319.2 POLICY states that "The continued employment or appointment of every member of the El Monte Police Department shall be based on conduct that reasonably conforms to the guidelines set forth herein. Failure to meet the guidelines set forth in this policy, whether on- or off-duty, may be cause for disciplinary action.

25.     EMPD P&Ps 319.3.2 SUPERVISOR RESPONSIBILITIES states that "Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for: (a) Failure to be reasonably aware of the performance of their subordinates or to provide appropriate guidance and control. (b) Failure to promptly and fully report any known misconduct of a member to his/her immediate supervisor or to document such misconduct appropriately or as required by policy.

26.     EMPD P&Ps 319.5 pertains to CAUSES FOR DISCIPLINE. 319.5.3 DISCRIMINATION, OPPRESSION OR FAVORITISM states that "Discriminating against, oppressing or providing favoritism to any person because of age, race, color, creed, religion, sex, sexual orientation, gender identity or expression, national origin, ancestry, marital status, physical or mental disability, medical condition or other classification protected by law, or intentionally denying or impeding another in the exercise or enjoyment of any right, privilege, power or immunity, knowing the conduct is unlawful.

27.     EMPD P&Ps 319.5 elaborates CAUSES FOR DISCIPLINE. 319.5.8 PERFORMANCE includes "(a) Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation. (b) The falsification of any work-related records, making misleading entries or statements with the intent

11

to deceive or the willful and unauthorized removal, alteration, destruction and/or mutilation of any department record, public record, book, paper or document. (c) Failure to participate in, or giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business.

28.     EMPD P&Ps 601 details the requirements for sexual assault investigations. EMPD P&Ps 601.5 TRAINING states that "Subject to available resources, periodic training will be provided to:

(a) Members who are first responders. Training should include:

1. Initial response to sexual assaults.

2. Legal issues.

3. Victim advocacy.

4. Victim's response to trauma."

29.     EMPD P&Ps 601.7 VICTIM INTERVIEWS states that "Whenever possible, **a member of SART** should be included in the initial victim interviews. **No opinion** of whether the case is unfounded shall be included in the report. Victims should be apprised of applicable victim's rights provisions, as outlined in the Victim and Witness Assistance Policy.

30.     EMPD P&Ps 601.7.1 VICTIM RIGHTS states that "Whenever there is an alleged sexual assault, the assigned officer shall accomplish the following:

(a) Advise the victim **in writing** of the right to have a victim advocate and a support person of the victim's choosing present at any interview or contact by law enforcement, any other rights of a sexual assault victim pursuant to Penal Code § 680.2 and the right to have a person of the same or opposite gender present in the room during any interview with a law enforcement official unless no such person is reasonably available (Penal Code § 679.04).

## LASD CODE OF ETHICS

31.     At all relevant times, all LASD members were required to be apprised of the First,

12

Fourth, and Fourteenth Amendment of the United States Constitution, and were required, at all times, to follow the United States Constitution, the laws of California and also to comply with LASD Code of Ethics ("LASD COEs"). LASD COEs are written statements which apply to all LASD members such as Defendant LASD Officers. Each member of LASD, including Defendant LASD Officers, is required to be familiar with the LASD COEs and must adhere to its directives. **Ex. 7** (LASD Code of Ethics).

32.     LASD COEs states that "I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities."

## **CRIMINAL PROSECUTION**

33.     As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.

34.     American Bar Association Criminal Justice Standards for the Prosecution Function: Standard 3-1.2 Functions and Duties of the Prosecutor (b) The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. Standard 3-4.4 Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges (c) A prosecutor may file and maintain charges even if juries in the jurisdiction have tended to acquit persons accused of the particular kind of criminal act in question.

(https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/)

35.     In cases which involve a **serious threat** to the community, the prosecutor should

1   not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit

2   persons accused of the particular kind of criminal act in question because prosecutors have an

3   ethical obligation to pursue difficult cases for public safety reasons.

4         36.    According to NDAA, rape cases rarely have physical evidence that conclusively

5   proves that a rape occurred. The evidence need not conclusively prove that a rape occurred;

6   rather, it must give the jury a sufficient **context** in which to evaluate the victim's credibility. **Ex.**

7   **1** (Prosecuting Alcohol-Facilitated Sexual Assault).

8         37.    Los Angeles County District Attorney's Office ("LADA") declares that their

9   office's top priority is the prosecution of violent and dangerous criminals – murders, rapists, gang

10   members, child abusers and robbers among them. (http://da.lacounty.gov/about/office-overview)

11         38.    AEquitas is a national technical assistance provider that specializes in the

12   prosecution of gender-based violence and human trafficking crimes. AEquitas is a nonprofit

13   organization that brings decades of prosecution experience and collaborative approach to offer

14   law enforcement advice and resources across disciplines at no cost. (https://aequitasresource.org/)

15

16                                  **SEXUAL VIOLENCE**

17         39.    Five categories of sexual violence: **Ex. 8** (National Domestic Violence Prosecution

18   Best Practices Guide)

19        -   Rape or penetration of victim;

20        -   Victim made to penetrate someone else;

21        -   Non-physically pressured unwanted penetration;

22        -   Unwanted sexual contact, defined as the "intentional touching of the victim or

23             making the victim touch the perpetrator, either directly or through clothing . . .

24             without the victim's consent";

25        -   Non-contact unwanted sexual experiences, defined as the "unwanted exposure to

26             sexual situations (e.g., pornography); verbal or behavioral sexual harassment;

27             threats of sexual violence to accomplish some other end; and /or unwanted filming,

28             taking, or disseminating photographs of a sexual nature of another person".

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1

2                                 **RELEVANT LEGISLATION**

3          40.     In 2014 Gov. Jerry Brown has signed a bill into law that makes California the first

4  in the nation to have a clear definition of when people agree to sex. "Lack of protest or resistance

5  does not mean consent," the law states, "nor does silence mean consent. Affirmative consent must

6  be ongoing throughout a sexual activity and can be revoked at any time."

7

8                **RAPE KIT BACKLOG IN COUNTY OF LOS ANGELES**

9          41.     In 2009, Human Rights Watch uncovered a backlog of at least 12,669 untested

10  rape kits in Los Angeles County (including Los Angeles Police Department, LASD, and 47

11  independent police departments in Los Angeles County (including EMPD)), the largest known

12  backlog in the United States at that time. (https://www.hrw.org/report/2009/03/31/testing-

13  justice/rape-kit-backlog-los-angeles-city-and-county) However, there was never ever any backlog

14  of DNA testing for murder or other crimes.

15          42.     The discriminatory practice against rape victims is long-standing, wildspread, and

16  well settled. (https://www.huffpost.com/entry/the-rape-kit-backlog-shows-exactly-how-we-

17  regard-women-in-this-country_n_5acfb5e1e4b016a07e9a8c65)

18

19                **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

20          43.     On or about April 1, 2019 Carlos Suarez (aka Charlie Suarez, hereinafter

21  "Suarez") friended Plaintiff via a mobile app "Wechat". After a few days of chatting, on or about

22  April 5, 2019, Suarez invited Plaintiff out for a dinner date. Plaintiff went home after a two-hour

23  dinner with Suarez but later Suarez brought over Japanese whiskey and Spanish wine. Plaintiff

24  and Suarez had been drinking in Suarez's car for about three hours. Plaintiff eventually lost

25  consciousness after consuming a lot of alcohol.

26          44.     On or about April 6, 2019 at around 8:00 am Plaintiff woke up in an unfamiliar

27  place, naked with a sore vagina. Suarez was also naked lying in bed next to Plaintiff. Plaintiff was

28  still drunk and confused about what had happened. Suarez inserted his penis into Plaintiff's

vagina but she didn't know what to say or what to do. Plaintiff was completely lost and everything was way beyond her comprehension. She didn't resist because she's afraid of any confrontation and escalated situation. She remained silent and went along with what the offender wanted because she reasonably believed that Suarez would commit violence against her if the situation was escalated. Plaintiff never gave her consent to sexual contact with Suarez while she was awake not to mention when she was unconscious.

45.     On or about May 3, 2019 Plaintiff lured Suarez to a hotel and stood him up which was the last time Plaintiff saw Suarez. Between April 7, 2019 and May 3, 2019 Plaintiff not only had no sexual contact with Suarez but also declined his sexual advances.

46.     Plaintiff finally gathered her courage to come forward on June 7, 2019. At the time she believed that coming forward would be her first step to heal and it was her obligation to report it to stop it. However, it turned out she was completely wrong and her life has been turned upside down.

47.     On June 7, 2019 plaintiff was interviewed by Tate at EMPD. During the interview no victim services personnel was present and Plaintiff was not informed that she had the right to request a victim advocate. However, EMPD P&Ps 601.7 VICTIM INTERVIEWS states that "Whenever possible, a member of SART should be included in the initial victim interviews."

48.     The first session of the interview was not recorded and during that session Plaintiff told Tate she was afraid to upset Suarez when she woke up in an unfamiliar place in the morning of Apr 6, 2019. When Tate told Plaintiff to retell the story for recording purposes Plaintiff was very frustrated. Plaintiff was re-traumatized by recounting the incident twice. Throughout the interview Plaintiff noticed Tate's fake smile and the way Tate looked at her with skepticism.

49.     Despite the crime was facilitated by alcohol Tate asked Plaintiff "Did he force you?" Nobody needs force to rape an unconscious woman. Nobody needs force to rape a woman who's in shock and fear. Alcohol is a weapon of choice by perpetrators. Regardless of silence is not consent, by asking irrelevant questions Tate focused on physical force instead of the absence of consent. From the very outset Tate had no intention to uncover the truth that there was no word or conduct indicating Plaintiff's freely given agreement to sexual contact. **Ex. 9** (Jury instruction

16

for criminal sex offense).

50.     At the end of the interview, without any investigation, Tate willfully smirked and announced to Plaintiff that it was not a rape. Tate's statement was like a bombshell that caused Plaintiff to raise her voice and yell "he admitted it." Tate didn't care and showed Plaintiff out. Tate's comment suggests that she believed this was just a drunken night rather than a crime. It is not a policy of EMPD to tell victims of burglaries or attempted murder that their allegations are NOT a crime. The power of Tate's announcement was no different than a bullet shot in Plaintiff's head. **Ex. 10** (Plaintiff's email to EMPD).

51.     After the initial interview Tate falsified her incident report by fabricating Plaintiff gave consent and willingly had sexual intercourse with Suarez because Plaintiff wanted to do so. This action reflects Tate's discriminatory intent to dismiss Plaintiff's allegation. **Ex. 11** (Incident report prepared by Officer Martha Tate).

52.     Plaintiff, after waking up naked in an unfamiliar place with a sore vagina, told her simple and plain narrative to Tate: she didn't know what to do and she was afraid to upset the attacker which implies she's afraid of the consequence of confrontation and escalated situation. Tate twisted the story, bypassing the appropriate context and substituting instead the more familiar account of a sexual encounter. Having preempted Plaintiff's story with one of her own, Tate's falsified report made sense given the premises of her announcement. In other words, before any investigation, Tate had drawn her own conclusion: this was not a rape. Tate's willful denial of what Plaintiff had experienced was the result of stereotyped assumption about the truth of a reported sexual assault, that women are likely to report "regretted sex" as rape.

53.     Plaintiff told her narrative to Tate on tape: she didn't say no, she didn't say yes when Suarez had sex with her after she woke up. Having sex was not what she wanted. Tate distorted the story with her discriminatory mind, again replacing Plaintiff's story with one of her own, Tate wrote in her report that Plaintiff gave consent and willingly had sexual intercourse with Suarez because she wanted to do so.

54.     Plaintiff told her narrative to Tate: Suarez told Plaintiff to book a hotel. Plaintiff didn't do so because she didn't want to have sex with Suarez in the first place, but she went out for

dinner with Suarez. Plaintiff went home straight after dinner with Suarez. Tate distorted the story, again replacing Plaintiff's story with one of her own, Tate wrote in her report that Plaintiff was supposed to meet Suarez in a motel but she changed her mind.

55.     Plaintiff showed Tate Suarez's indirect confession stating that "I felt like you were a virgin and I was stretching you out." However, Tate maliciously omitted this most important text message in her report.

56.     Tate's willful refusal to take Plaintiff at her words - that she had been raped - and Tate's malicious conclusion are symptomatic of a widely recognized stereotype: law enforcement's deep-seated distrust of rape victims.

57.     After the second time Plaintiff recounted her story, Tate's question "What brings you here today?" reflects her doubt about Plaintiff's allegation and explains Tate's initial motive to falsify her report. A victim of other types of crime would not be asked the same question.

58.     Tate asked Plaintiff what made her think she was a victim of rape based on Tate's assumption about sexual assault victims are lying. Victims of other type of crimes would not be asked the same question. Such humiliating and degrading question strongly suggests her discriminatory animus towards rape victims.

59.     Tate's incident report is a summary of her version of events from her discriminatory perspective instead of Plaintiff's.

60.     Tate did not inform Plaintiff of victims' rights. At that time, and at all relevant times, Tate was aware of her duties as an EMPD police officer, specifically adherence to EMPD P&Ps 601 Sexual Assault Investigations. Tate has remained on her job without any discipline. Tate's conduct was approved and/or endorsed by Buckhannon and Reynoso.

61.     By failing to discipline, the City and Reynoso endorsed or approved the unconstitutional conduct of individual officers.

62.     On or about June 12, 2019 Plaintiff had a phone conversation with EMPD Detective Art Saenz ("Saenz"). Right off the bat, without asking any meaningful question, Saenz assumed Plaintiff didn't remember giving consent. Plaintiff immediately raised her voice and responded "He confessed."

18

63.     On or about June 13, 2019, days after Plaintiff's encounter with Tate, while struggling immensely with Tate's announcement, Plaintiff ended up in urgent care for severe sleep disorder.

64.     In June 2019 Plaintiff attempted to download her message conversations with Suarez from the mobile app in order to store them in digital form but Plaintiff realized the mobile app did not have such function that would allow users to download specific message history.

65.     Because of jurisdiction Plaintiff's case was forwarded to LASD by EMPD.

66.     On or about July 2, 2019 Plaintiff arrived at LASD's city of Industry station for the appointment with Jara. While Jara showed Plaintiff the way to Jara's office Plaintiff told Jara that she was on medication for depression.

67.     After Plaintiff sat down in Jara's office Jara asked Plaintiff to recount her story but not long after Plaintiff started Jara assumed that Plaintiff didn't remember giving consent. Jara ignored Plaintiff telling her it was not the case. Jara refused to take Plaintiff's answer and grilled Plaintiff "you ever had this situation that your friend told you that you danced last night when you were drunk and you don't remember?" Plaintiff had to raise her voice and respond "NEVER". It came across Jara was so intimidating and bullying. It also demonstrates how Jara coerced Plaintiff to recant her allegation of rape, reflecting her malicious and discriminatory intent.

68.     After Plaintiff refused to recant her allegation, Jara's question - "What do you want here?" - indicates that she believed that Plaintiff was making a false allegation to gain something else. Jara's humiliating and degrading question was nowhere to be found in LASD's standard operating procedures or investigation guide. Her question is simply a good starting point to devalue Plaintiff's credibility. "What do you want here?" is the main theme of Jara's investigation right from the outset. Victims of other type of crimes would not be asked the same question. Jara's question caused Plaintiff to raise her voice in shock and answer "I want JUSTICE."

69.     When Jara was reading Plaintiff's conversations with Suarez she stated "It doesn't look like you were raped." Jara's stereotyped remarks reveal her stereotypical distrust towards rape victims. Such stereotype about how victims should behave violates the Equal Protection Clause, United States v. Virginia, 518 U.S. 515, 517 (1996), and interferes with the ability of

19

1    investigators to find the truth. Then Jara questioned Plaintiff again "Why did you say 'I can make

2    you lose your job'?" Jara never missed a chance to challenge Plaintiff's every word and action.

3        70.    Jara announced the need to download from Plaintiff's cell phone the conversations

4    between Plaintiff and Suarez. As Plaintiff knew the mobile app did not have a function that would

5    allow users to download messages Plaintiff told Jara "I am not sure if you can download the

6    messages." Then Jara assured that their technical personnel would be able to download those

7    messages.

8        71.    As a victim of crime Plaintiff did not grant consent to search her phone to Jara or

9    anyone else. At the time Plaintiff fully trusted her government and she thought she was being

10   protected by law.

11       72.    Plaintiff asked Jara how long it would take to download those messages and Jara

12   replied it would take about two weeks. Jara didn't inform Plaintiff that she would do something

13   else on the cell phone. However, regardless of repeated requests for her phone's return, Plaintiff

14   did not get her phone back until four months later. Plaintiff would not have given her phone to

15   Jara if she had known that an illegal search and seizure would be conducted.

16       73.    Plaintiff insisted that Suarez confessed he was stretching her out. Jara further

17   intimidated Plaintiff "That's not a confession. Did he say he raped you?" Jara expected that there

18   was only one form of confession.

19       74.    Jara also argued that a woman's vagina would not be loosened when they are

20   aroused. Then Plaintiff asked her how a woman would give birth. After Plaintiff got home she

21   had to send Jara a medical article describing how a woman's vagina changes under different

22   circumstances to enrich her knowledge about a woman's body part.

23       75.    Jara questioned Plaintiff's intent to come forward. She concluded that Plaintiff

24   came forward because she found out Suarez was cheating and she was mad. Again, Plaintiff had

25   to raise her voice to deny Jara's accusation.

26       76.    Jara said founding out his cheating could be Suarez's defense. Plaintiff flat out

27   said "that's not a valid defense" but in response she said "yes it is". The entire time Jara was

28   trying to discourage Plaintiff following through her allegation rather than discover the truth.

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

77.     Text messages showed that Suarez put words in Plaintiff's mouth and invited himself over but Jara concluded that Plaintiff invited him over. Jara kept challenging Plaintiff why she did this/that as if she was a criminal. Jara said Plaintiff's text messages after April 6 looked like she was ok with having sex in the motel by ignoring how Plaintiff processed trauma.

78.     Plaintiff showed Jara some articles that finally made her come forward but Jara didn't bother to know what they were about and attacked Plaintiff that she printed them out after the police report was filed despite the fact that nowadays most people read on screen instead of paper, reflecting Jara's dismissive attitude. The entire time Jara put Plaintiff into a defense mode that Plaintiff had to defend herself although she was a crime victim.

79.     Jara's assumptions made Plaintiff reach the point that she had to yell multiple times "I date him does not mean I want to have sex with him. How come I did not have sex with him after April 6?" Jara put Plaintiff in a position that she was extremely frustrated to the level that she couldn't express herself and wanted the "interview" to end as quickly as possible because the entire "interview" was conducted in a very accusatory manner, very threatening.

80.     Jara kept saying this case was going nowhere, this case had a lot of problems. She also said "if all you want is to arrest this guy it is not gonna happen. I will not make an arrest." Jara's announcement reflects her discriminatory intent to invalidate Plaintiff's allegation.

81.     It is not a policy of LASD to constantly tell victims of burglaries or attempted murder that their allegations are problematic and impossible to prove beyond a reasonable doubt.

82.     At the end of the interrogation Jara told Plaintiff "I will get his phone and see if there's more messages." Her statement again reflects her presumption that Plaintiff was lying or hiding something else. Her statement also implies "If you are lying you will get arrested."

83.     Plaintiff suffered a sexual attack while she was unconscious after drinking. Against this backdrop, Jara's demeaning and accusatory tone of questioning was suspect and suggestive of discrimination. Jara's discriminatory attitude explained why she assumed that Plaintiff did not remember giving consent and stated that "It doesn't look like you were raped." Jara's conduct reflects she discredited Plaintiff's statements because Plaintiff consumed alcohol.

84.     No useful information was extracted during Plaintiff's encounter with Jara. No

21

question regarding the crime element was asked. Instead, the only motive of this "interview" was to challenge Plaintiff's every word and reaction. The only intent of this "interview" was to invalidate and dismiss Plaintiff's allegation. Rather than work with the victim and gather evidence according to each element of the crime Jara repeatedly declared that this type of case was problematic which could not be proven beyond a reasonable doubt. The "interview" conducted by Jara was meaningless with respect to proving a crime.

85.     Jara did not inform Plaintiff of victims' rights as set forth in California constitution. At that time, and at all relevant times, Jara had full knowledge of LASD COEs and awareness of proper investigation protocol.

86.     After the "interview" with Jara Plaintiff's depression and anxiety have been exacerbated to a whole new level.

87.     Again and again, Plaintiff has not been treated like the victim in this case. The trauma Plaintiff has experienced at the hands of Defendants prevented her from having any kind of normal life.

88.     On or about July 3, 2019 Plaintiff was really concerned by Jara's attitude and she believed that Jara was not able to appropriately manage her case. Plaintiff reached out Ruiz and requested another detective to work on her case but her attempt was not successful. Jara remained on Plaintiff's case.

89.     In July 2019 Plaintiff filed separate complaints against Jara and Special Victims Bureau with <u>both LASD and Inspector General</u>. Jara has remained on her job without any discipline and now she has been promoted as a sergeant. Plaintiff never received any results of the internal investigation. Jara's conduct was approved and/or endorsed by Ruiz and Villanueva.

90.     By failing to discipline, the County and Villanueva endorsed or approved the unconstitutional conduct of individual officers.

91.     On or about July 22, 2019, while Jara was on vacation, Plaintiff reached out Ruiz to get her phone back. Over the phone while discussing the case Plaintiff was challenged by Ruiz "How did you not know you were violated?" His question left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all.

22

Such victim blaming does not occur with other types of crimes.

92.     On Aug 6, 2019 Jara arranged a follow-up interview with Plaintiff on Aug 8, 2019 at City of Industry Station.

93.     On Aug 8, 2019, upon arrival at City of Industry Station Plaintiff was arrested by Santa Ana Police. Plaintiff had been really concerned because she thought she missed the follow-up interview with Jara.

94.     On Aug 12, 2019 Plaintiff was charged with misdemeanor but she has not been convicted.

95.     Despite pretext phonecall is a commonly used technique to obtain confession from the offender Jara opted not to use it but on or about Aug 14, 2019 she told Plaintiff she had done everything she could. Plaintiff was never notified after law enforcement contact with the suspect reflecting a serious disregard for Plaintiff's safety.

96.     On or about Aug 14, 2019 Plaintiff phoned Ruiz to inquire the investigation but in an intimidating manner Plaintiff was challenged by Ruiz about her gofundme page which was her private business and had nothing to do with the crime in question. It reveals that LASD Officers' true motive was to spend more energy and time on proving Plaintiff was filing a false claim rather than prove there was a crime occurred. It demonstrates how LASD Officers misused state resources to conduct illegal search and seizure.

97.     Although Ruiz did not personally extract Plaintiff's private data but he had personal knowledge of the illegal search and seizure and he was part of it. LASD technical personnel extracted, stored, and submitted Plaintiff's private data to Ruiz and LADA Officials.

98.     In August 2019 Plaintiff's complaint against Jara was turned into a service comment report and being investigated by Ruiz.

99.     At that time, and at all relevant times, Ruiz was aware of LASD COEs and his role as a supervisor.

100.    The language and attitude of Jara and Ruiz suggests that LASD Officers made minimal or maybe no effort to interrogate or investigate the suspect in Plaintiff's case.

101.    On or about Aug 16, 2019 Plaintiff ended up in ER for dysfunctional menstrual

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

bleeding. In Plaintiff's entire life it was her very first time to visit ER.

102.    On or about Aug 23, 2019 LADA declined to file charges against Suarez. Plaintiff finally realized there was no follow-up interview with Jara in the first place. The follow-up interview was a trap set up by Jara for Plaintiff's arrest by Santa Ana Police.

103.    On Aug 23, 2019 Plaintiff called LADA and requested to speak with the prosecutor in her case. It is prosecutor's duty to educate juries that just because a woman has an open criminal case it doesn't mean that she is not a victim of sexual assault. Despite simply filing a motion to limine can keep out irrelevant or prejudicial evidence Chung falsely told Plaintiff that the open case in Orange County against Plaintiff affected her credibility and made the filing charges against Suarez impossible which was a clear deprivation of Plaintiff's rights secured to her under Fourteenth Amendment. At the time Plaintiff was not convicted and was charged with misdemeanor. The choice of misdemeanor over felony is a callous disregard for victim and community safety, reflecting Chung's dismissive attitude towards rape victims. Having an open criminal case does not justify the deprivation of a victim's fundamental rights.

104.    A victim of attempted murder or other crime would not be told his/her open criminal case would affect his/her credibility.

105.    Regardless of corroboration the ostensible reason for non-prosecution given by Chung was that Plaintiff's case was a "he said she said" case. Given the fact that the suspect admitted he tore apart Plaintiff's vagina this is obviously an untrue statement.

106.    The American Bar Association standard related to Prosecution Function says that the duty of the prosecutor is to seek justice, not merely to convict. Giving false statement to a victim is not prosecutorial in nature. Instead, Chung was afraid to lose the case and affect her personal performance. In another words Chung acted in her own interest and personal capacity during the employment as a prosecutor.

107.    Despite alcohol is a weapon of choice another purported reason for non-prosecution given by Chung was "You also voluntarily consumed alcohol, correct?" which suggests a strong purposeful animus towards Plaintiff. A burglary allegation would not be dismissed because the victim forgot to lock the door or close the window.

108.    Plaintiff was concerned by Chung's attitude and requested to speak with her supervisor.

109.    At that time, and at all relevant times, Chung was aware of LADA's mission and her role as a prosecutor.

110.    On Aug 23, 2019, Chung's supervisor, Thorp, called Plaintiff and during the phone call Thorp was reading Tate's falsified report. Thorp's statement - "We can't prove it in court to a jury that **a jury is not likely to convict**." – is a far departure from professional standards. "**If someone thinks they were raped** and then they have consensual sex with someone, then they have a relationship and they only go to the police after the breakup." Thorp's stereotype about how victims should behave constitutes purposeful unlawful discrimination.

111.    When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Thorp falsely told Plaintiff that in order to prove a case "We need **a forensic medical exam**. We need his semen. We need **evidence of force**."

112.    By intentionally ignoring all the circumstantial evidence Thorp made an untrue statement "We need something more than **the victim alone saying that this happened.**" "**But it's the way the law is**."

113.    Despite most sexual assault victims either delay reporting or never report the crime Thorp made a statement "If you're raped you go to the police right away." Thorp's stereotype about how victims should behave constitutes unlawful discrimination.

114.    Thorp kept going "It doesn't sound like you were raped." "If I was raped …" A victim of robbery wouldn't be told "It doesn't sound like you were robbed."

115.    When Plaintiff pointed out Suarez's predatory behavior to ply her with alcohol Thorp's statement - "**It doesn't matter. You drank it.**" – suggests a strong animus towards rape victims because a victim of burglary would not be told "It doesn't matter. You didn't lock your door." Thorp's language also reflects her discriminatory intent to discard Plaintiff's allegation and her eager to shut Plaintiff out of criminal justice system.

116.    At that time, and at all relevant times, Thorp was aware of LADA's mission and

her role as a prosecutor and supervisor. At all times Plaintiff has been wondering what a victim means to LADA Officials.

117.    Plaintiff finally experienced the despair and emotional distress of living with the knowledge that her rapist would never be held accountable for his act, and nothing was stopping him from assaulting others. Plaintiff's rapist was well protected by law enforcement while she was not and he walks free with the confidence that he can rape other women with no repercussions.

118.    On or about Aug 30, 2019, as a direct result of injustice and unlawful discrimination after sexual assault Plaintiff felt hopeless and worthless, therefore she was transported to the hospital and put on suicidal watch for five days.

119.    On or about Sep 15, 2019 Plaintiff moved out to a new home for fear of her safety.

120.    On or about Sep 22, 2020 Plaintiff emailed County CEO Sachi A. Hamai and Cagney regarding the Fourteenth Amendment violation.

121.    On or about Sep 27, 2019, Plaintiff obtained a copy of the incident report prepared by Tate from Special Victims Bureau. Plaintiff was dumbfounded when reading that Tate wrote in her report "She gave consent and willingly had sexual intercourse with him because she wanted to do so." At that moment Plaintiff's world just went black.

122.    Immediately Plaintiff went to EMPD and the watch commander on duty was Buckhannon at the time. Buckhannon agreed to replay the interview type in front of Plaintiff and two victim advocates from Peace over Violence. During Plaintiff's interview with Buckhannon, by repeating Tate's pattern (telling the victim it was not a rape before any investigation), before carefully and completely listening to the entire interview tape, before going into any details or facts, Buckhannon started applying double standard and steadfastly defending Tate, and told Plaintiff it was not fair to Tate to make an allegation against her. Buckhannon also justified a falsified police report by telling Plaintiff that Tate would need just a little bit training.

123.    In the waiting room, looking at the falsified police report, Plaintiff asked her victim advocate Anne "Can you imagine how many victims didn't get the justice they deserved?"

124.    Out of the blue, Buckhannon asked Plaintiff "Were you married?" Plaintiff

answered "No" with confusion. Then Buckhannon declared that he had been married for twenty years and he did not ask for consent each time he had sex with his wife. (which implies "I have been raping my wife for twenty years but she didn't file a complaint so you shouldn't have filed this complaint.") Such remarks strongly suggest an intention to treat sexual assault cases less seriously than other assaults, as well as an animus against rape victims. Buckhannon's pro-defendant attitude is capable of several interpretations: perhaps he believed that women cry rape, that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless because she was dating the attacker, that such assault was less severe and traumatic because she knew the perpetrator, or that state officials should not intrude upon non-stranger sexual assaults. Whatever the reason, Buckhannon's language reflects an outdated misconception concerning sexual assaults that cannot be used as a source of differential treatment. Buckhannon's statement also demonstrates his discriminatory intent to devalue Plaintiff's allegation.

125.    After Plaintiff stepped out of Buckhannon's office she immediately realized that she forgot her document on his desk. Therefore, Plaintiff returned and retrieved her document on Buckhannon's desk. Despite the document belonged to Plaintiff Buckhannon told her it was disrespectful to take something from his desk without asking. However, Buckhannon thinks it is fine for a man to put his penis in Plaintiff's vagina without asking for consent. It demonstrates how Buckhannon devalues Plaintiff's bodily integrity.

126.    At that time, and at all relevant times, Buckhannon was aware of his duties as a EMPD member and his role as a supervisor.

127.    On Sep 27, 2019, in the presence of Plaintiff's victim advocate, EMPD Officer Carlos Tello conducted a supplemental interview in a hostile manner which caused Plaintiff's victim advocate to pause the interview for a couple of times.

128.    Finally Plaintiff realized why Tate smirked and told her it was not a rape. Tate's falsified report and omission of material fact was not a legitimate exercise of discretion. Tate's falsified report and omission of material fact was highly unlikely to have been a product of random mistake but was a clear reflection of her ill will and discriminatory animus towards Plaintiff because of her status as a woman reporting rape. Little did Plaintiff know, at the time

27

Tate was a senior police officer that was too senior to be able to make such "mistake". (https://transparentcalifornia.com/salaries/2018/el-monte/martha-tate/) In fact, Tate and Buckhannon were implementing EMPD's discriminatory custom rather than frustrate EMPD's written policy.

129.    On or about Oct 4, 2019 Plaintiff filed a police misconduct complaint against Tate but Plaintiff received neither any acknowledgement from EMPD that they have received her complaint nor any results of the internal investigation.

130.    Officer misconduct complaints are not used to identify possible problematic trends within EMPD and failure to discipline officers has been permitted and tolerated for years which resulted in continuing violations of citizens' constitutional rights. (https://www.sgvtribune.com/2018/08/15/el-monte-west-covina-police-departments-criticized-for-citizen-complaint-processes/)

131.    In late October 2019 Plaintiff retrieved her phone back from LADA and noticed that her message conversation with her female friend was translated from Plaintiff's mother language (non-English) into English by LASD personnel. Plaintiff was stunned and devastated.

132.    In October and November 2019 Plaintiff repeatedly requested the investigative report prepared by Jara but her requests were denied by Lieutenant Michael Burse with Special Victims Bureau and she was told she would need a subpoena and attorney for the said purposes.

133.    In November 2019 Plaintiff filed a complaint against Officer Tate with LADA's justice system integrity division but her complaint was referred back to EMPD.

134.    On or about Nov 28, 2019 Plaintiff attempted suicide by trying to overdose sleeping aid. The life-long devastating harm caused by sexual assault is profound and exacerbated by Defendants' deprivation of Plaintiff's fundamental rights secured to her by laws.

135.    In December 2019 Plaintiff requested EMPD's training procedures and the training history of Tate and Buckhannon but her request was denied. Plaintiff also requested the arrest rates of rape and other crimes but EMPD declared that they were not able to provide those data. However, Plaintiff was able to obtain the information from FBI that in 2018 there were 35 rapes and 362 violent crimes in El Monte.

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

136.    In December 2019 Plaintiff requested LASD's policies and procedures regarding sexual assault investigation but her request was denied.

137.    The depth of trauma inflicted upon Plaintiff has a significant impact not only on the victim, but on the entire community because of the scope and lasting effect of the harm, and the fact that unpunished perpetrators are encouraged to repeat their crimes.

138.    The depth of Defendants' discriminatory treatment of sexual assault victims is all the more troubling given the recent expansion of societal awareness of and sensitivity to sexual assault. The discriminatory treatment, deprivation of equal protection of the laws, and invasion of privacy by Defendants caused significant emotional injury to Plaintiff separate and apart from the harm she suffered as a sexual assault victim.

139.    Upon information and belief, critical decision-making regarding the distribution of resources and staffing, training, supervising, and disciplining of officers, detectives, and other personnel, treatment of victims who come forward, and other policies and/or practices that led to the discriminatory denial and/or hostile provision of services to Plaintiff were made by Defendants Reynoso, Villanueva, Lacey, and/or among others. Reynoso, Villanueva, Lacey were deliberately indifferent in fostering and knowingly encouraging a climate of condoning misconduct and indifference to proper supervision. The failure to discipline officers and/or deputies allows the continuing violation of civil rights of residents.

140.    Reynoso, Villanueva, Lacey disregarded the "known or obvious consequence" that a particular omission in their training program would cause their employees to violate citizens' constitutional rights.

141.    Failure of EMPD, LASD, and LADA to adhere to written policy, COEs, mission statement, and training, permits and facilitates the unlawful conduct described above. Accountability systems of EMPD, LASD, and LADA, do not sufficiently detect or prevent unlawful conduct, EMPD, LASD, and LADA did not properly consider and resolve complaints from Plaintiff. Early warning system of EMPD, LASD, and LADA does not adequately identify or effectively respond to a need for intervention to prevent future violations of constitutional rights of sexual assault victims.

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

142.     Plaintiff's complaints against law enforcement personnel were not formally investigated. EMPD, LASD, and LADA minimized the seriousness of Plaintiff's complaints by failing to investigate as a serious complaint that could potentially result in discipline.

143.     Plaintiff's complaint was resolved at the unit level by LASD through "service reviews" rather than as formal administrative investigations. By official policy, service reviews may not result in formal discipline unless elevated to an administrative investigation. Only official administrative investigations, which are primarily conducted by LASD's Internal Affairs Bureau (IAB), may result in formal discipline.

144.     Practice of handling complaints of misconduct as service reviews allows deputies to evade investigation and discipline, which fundamentally undermines meaningful accountability. Such willful failure to conduct proper investigation has remained as unofficial policy for decades. LASD was sued by Department of Justice for discriminatory policing and lax discipline in 2015 but still maintain this unconstitutional practice until today. The County and Villanueva were well aware of that but turned a blind eye on it.

145.     LASD's system for conducting service reviews perpetuates patterns of unlawful community interactions and provides disincentives with regards to LASD's policies prohibiting bias. This has the effect of diminishing and devaluing allegations of discrimination made by civilians. When assessed within the totality of the circumstances, LASD's failure to appropriately handle discrimination complaints provides evidence of an equal protection violation, adding to the statistical evidence of bias. Until today, LASD still maintain this custom of intentionally failing to properly investigate deputy misconduct and discipline deputies.

146.     At its core, the current organizational structure of EMPD, LASD, and LADA is not capable of adequately addressing the victimization and lifetime damage inflicted on sexual assault victims or to stop repeat perpetrators, particularly those who sexually assault women they know or who use drugs/alcohol to commit their sexual assaults.

147.     On Jan 7, 2020 Plaintiff received a joint phone call from Cagney, Thorp, and Chung. Despite Plaintiff never gave her consent to Suarez the ostensible reason for non-prosecution given by Cagney was "You had sex with him. You had contact with him." Despite

30

most rape victims either delay reporting or never report the crime, especially the perpetrator is non-stranger, Cagney falsely told Plaintiff the case was not able to prove beyond a reasonable doubt because "You delayed reporting.", reflecting LADA Officials' dismissive attitude. The insufficient evidence although purporting to be reasonable but in fact was a disguise and pretext for intentional discriminatory under-enforcement against rape victims. **Ex. 12** (Educating Juries in Sexual Assault Cases)

148.    At that time, and at all relevant times, Cagney was aware of LADA's mission and his role as a prosecutor and supervisor.

149.    On or about Jan 7, 2020 Plaintiff emailed Lacey regarding the Fourteenth Amendment violation and Lacey took no action.

150.    By failing to act, the County and Lacey endorsed and/or approved unconstitutional acts of individual officials.

151.    On or about Jan 9, 2020 Plaintiff requested LADA's Sexual Assault Policy and Procedure Manual but she was told by Gina Satriano (LADA's Director of Bureau of Branch and Area Operation Region II) that LADA has no such thing as Missoula County Attorney's Officer does even though LADA is the largest local prosecutorial office in the nation. **Ex. 13** (MISSOULA COUNTY ATTORNEY'S OFFICE SEXUAL ASSAULT POLICY & PROCEDURE MANUAL)

152.    In January 2020 Plaintiff requested LADA's training procedures but her request was denied.

153.    Not having any written policy and procedure for prosecution of a heinous crime – sexual assault, suggests that LADA Officials disregard the known or obvious consequence and it is a conscious choice even though they claim that their top priority is the prosecution of rapists.

## **FIRST CAUSE OF ACTION**

### **Equal Protection (42 U.S.C. § 1983)**

### **Against all Defendants**

154.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

the paragraphs above.

155.    The Fourteenth Amendment prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect.

156.    "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Sioux City Bridge Co. v. Dakota Cty., 260 U.S. 441, 445 (1923) (quoting Sunday Lake Iron Co. v. Wakefield Twp., 247 U.S. 350, 352 (1918)). Discriminatory policing occurs when police officers and departments selectively enforce the law - or fail to enforce the law - based on arbitrary factors.

157.    Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment.  Discriminatory intent implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker selected or reaffirmed a particular course of action at least in part because of – not merely in spite of – its adverse effects upon an identifiable group.

158.    Plaintiff is a member of an identifiable group.  As pled above, she is a rape victim who has been treated differently based upon illegitimate stereotypes and archaic notions of sexual assault. She further alleges that Defendants acted with discriminatory intent in discounting, invalidating, and dismissing her allegation.

159.  Telling Plaintiff it was not a rape before any investigation, falsifying incident report, interrogating Plaintiff, unreasonably searching and seizing Plaintiff's private data, and blaming Plaintiff, when analyzed as a whole using a contextualist approach, permit the inference that Plaintiff's individual case was treated differently without a rational basis and showcase Defendants' custom and practice of intentional discriminatory under-policing. Defendants intentionally provide unequal protection to sexual assault victims in the form of failing to respond with equal effort to sexual assault victims the same as Defendants do with victims of other

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

crimes.

160.     There was no reason for the misconducts and ill treatments other than animus toward victims of sexual assault. Such conducts are not at all related to any governmental purpose and they are a far deviation from commonly accepted procedures. It's not a single word, not a single act, but a series of conducts that demonstrate Defendants' pattern of deliberate indifference and unconstitutional practice to discourage the vigorous prosecution of violent crimes against sexual assault victims.

161.     An individual who alleges that a state actor intentionally treated her differently than other similarly-situated individuals and alleges that there was no rational basis for the difference in treatment, states a viable Fourteenth Amendment Equal Protection Claim.

162.     Plaintiff has been deprived of her rights of equal protection under the law – and as of the date of this filing, continues to be deprived of these rights – on account of sexual assault, in violation of the Fourteenth Amendment to the United States Constitution, in that she has been afforded less favorable terms and conditions than victims of other assaults/crimes, and continues to be afforded less favorable terms and conditions. As a consequence, Plaintiff, as a victim of sexual assault, obtained less protective resources of the state compared with victims of other assaults/crimes.

163.     The devaluation of sexual assaults burdens a particular set of victims. The laws against violence were not and will not be uniformly enforced. Because the vast majority of victims of sexual assault are women, discriminatory practice has an unjustified disparate impact on women. Rape is the most under-reported crime. 63% of sexual assaults are not reported to police. **Ex. 14** (Statistics about sexual violence). Discrimination against rape victims puts victims at a unique disadvantage in the criminal justice system, decreasing the rate of reporting rape and increasing the rate of claims withdrawn by victims.  **Ex. 15** (Rape and Sexual Assault in the Legal System)

164.     The acts of Defendants were unnecessary, objectively unreasonable and malicious.

165.     As a proximate and foreseeable result of Defendants' violations of Plaintiff's Fourteenth Amendment rights, Plaintiff has suffered, is suffering, and will continue to suffer

33

injuries, including but not limited to continued trauma, humiliation, emotional distress, anxiety, depression, stigma, and embarrassment.

## SECOND CAUSE OF ACTION

### Unreasonable Search and Seizure (42 U.S.C. § 1983)

### Against the County, LASD Officers, LADA Officials, and Does 1-10

166.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

167.    The Fourth Amendment protection from unreasonable search and seizure has been extended to protect individuals with a "reasonable expectation of privacy." Katz v. United States, 389 U.S. 347 (1967).

168.    The modern reality of smartphones is people carry their entire lives on their cell phones. The smartphone has everything as if it was a mobile home. All information on cell phone is private.

169.    Plaintiff showed Jara nothing else but her particular conversations with Suarez. Plaintiff's actual consent should be limited to her conversations with Suarez. She had reasonable expectation of privacy for everything on her cell phone except for her conversations with Suarez. Jara was well aware that Plaintiff handed over her cell phone solely for Jara to download her conversations with Suarez. Jara didn't inform Plaintiff that she would do something else on Plaintiff's cell phone.

170.    When officers receive consent to search for narcotics and then also search for and seize currency and exchange receipts, insurance policies, loan receipts, and certificates of title to real estate, the officers have misused the limited consent as a license to conduct a general exploratory search. Such unlawful action by government officers or agents raises the issue of the overall voluntariness of the actual consent. United States v. Dichiarinte, 445 F.2d 126 (7th Cir. 1971). A consent search is reasonable only if kept within the bounds of the actual consent. Honig v. United States, 208 F.2d 916, 919 (8th Cir. 1953).

171.    A person giving consent to a search of her cell phone for the sole and express

purpose of downloading particular conversations restricts the officers' search to only those conversations. There was no indication that Jara desired to look for anything else other than Plaintiff's conversations with Suarez.

172.    The 9th Circuit Court of Appeals stated "We think it is clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." If Plaintiff had known her entire life would be searched she wouldn't have handed over her cell phone. She handed over her cell phone based on her trust in her government but later she found out she was betrayed and her cell phone was strip searched even though her private data was irrelevant to the crime in question.

173.    By unlawfully abusing Plaintiff's actual consent, and/or by failing to intercede to prevent such unlawful conduct, Defendants violated Plaintiff's Fourth Amendment right to be secure in her person against unreasonable searches and seizures.

174.    As a proximate and foreseeable result of Defendants' unconstitutional acts or omissions, Plaintiff's private information was subjected to analysis by LASD personnel without a warrant, valid consent, or exigent circumstances, in violation of her Fourth Amendment rights.

175.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's Fourth Amendment rights, although Plaintiff's private data is irrelevant to the crime in question, it has been, and continue to be, in the possession of government agencies including but not necessarily limited to LASD and LADA, resulting in a continuing violation of her Fourth Amendment rights.

176.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's Fourth Amendment rights, Plaintiff has suffered, is suffering, and will continue to suffer injuries, including but not limited to continued invasion of privacy, humiliation, emotional distress, anxiety, depression, stigma, and embarrassment.

177.    The acts of Defendants were unnecessary, objectively unreasonable and malicious.

## THIRD CAUSE OF ACTION

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**Gender-based Civil Conspiracy (42 U.S.C. § 1985)**

**Against all Defendants**

178.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

179.    Starting on June 7, 2019 and continuing on, Defendants conspired among themselves and with others for the purpose of depriving, directly or indirectly, Plaintiff of equal protection under the law with the intent to deny her right to free from discrimination and unreasonable search and seizure.

180.    The conduct described above, when viewed in total, is conscience shocking. Each member of this conspiracy shared the same conspiratorial objective.

181.    Defendants engaged in a conspiracy among themselves and with others based on discriminatory animus for the purpose of depriving, directly or indirectly, Plaintiff's right to equal protection under the law in violation of 42 U.S.C. § 1985(3), with the object of that conspiracy being to conceal the fact that the complaints of crime made by female rape victims are less important to the EMPD, LASD, and LADA than complaints made by similarly-situated male rape victims.

182.    Defendants conspired among themselves and with others to deprive Plaintiff of equal protection of the laws as alleged in this Complaint based on animosity toward Plaintiff as a woman reporting rape.

183.    Defendants engaged in oral, written, and electronic communications, and/or endorsement and support among themselves and with others regarding: a) their agreement to conduct illegal search and seizure; b) actions taken to deter Plaintiff from pursuing the truth and justice; and c) their effort to support each other's unconstitutional actions and discourage vigorous prosecution of sex crimes against women.

184.    EMPD Officers conspired among themselves and with others in order to minimize, specifically, Tate's police misconduct occurred on June 7, 2019 and beyond, which reflects their hostility towards Plaintiff, and the fact that Tate breached her most basic police duties when she fabricated material facts.

185.     LASD Officers conspired among themselves and with others in order to coerce Plaintiff to recant her allegation, specifically, Jara breached her most basic duties when she acted on stereotypes about how a victim of sexual assault should behave, and wantonly left Plaintiff's vulnerable to even greater danger and harm.

186.     Failing to supervise and discipline, defending Tate's wrong doings, tolerating Jara's bad acts, when analyzed as a whole using a contextualist approach, permit the inference that Defendants have a meeting of the minds to violate Plaintiff's constitutional rights.

187.     Between August 2019 and January 2020 LADA Officials made multiple untrue statements that were far departure from professional standards, jury instruction, and prosecution guidelines by employing their discriminatory policy towards female rape victims, in order to prevent Plaintiff from exercising her constitutional rights.

188.     Defendants, in part or whole, directly or indirectly, have used their control and influence to reduce the number of perpetrators held accountable for rapes against women.

189.     As a result of said conspiracy Plaintiff has suffered, is suffering, and will continue to suffer injuries, including but not limited to continued trauma, dissociation, humiliation, emotional distress, anxiety, depression, stigma, and embarrassment.

190.     Defendants' failure to prevent or aid in preventing a conspiracy under 42 U.S.C. § 1985 of which the Defendants had knowledge and the power to prevent is also in violation of 42 U.S.C. § 1986.

191.     The acts of Defendants were unnecessary, objectively unreasonable and malicious.

## **FOURTH CAUSE OF ACTION**

**Municipal Liability for Unconstitutional Policies, Customs, and Practices (42 U.S.C. § 1983)**

**Against all Defendants**

192.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

193.     Many different members of the same department refused to take Plaintiff's allegation seriously and that this behavior indicated a practice so widespread that the City and the

37

1   County must have known about it and condoned it.

2   194.   The actions and omissions by EMPD Officers, LASD Officers, and LADA

3   Officials and the pattern of their statements and activities demonstrate the City and the County's

4   policy to discourage vigorous prosecution of sex crimes. This custom is so wildspread and

5   wellsettled.

6   195.   On and for some time prior to June 7, 2019 (and continuing to the present date)

7   Defendants deprived Plaintiff of the rights secured to her by the Fourth and Fourteenth

8   Amendments to the United States Constitution, in that said Defendants and their supervising and

9   managerial employees, agents, and representatives, acting with gross negligence and with

10  reckless and deliberate indifference to the rights of the public in general, and of Plaintiff, and of

11  persons in her class, situation and comparable position in particular, knowingly maintained,

12  enforced and applied officially recognized policies, practices or customs of:

13  (a) Employing and retaining law enforcement personnel, including MARTHA TATE,

14  MICHAEL BUCKHANNON, LILIANA JARA, RICHARD RUIZ, PETER CAGNEY,

15  KAREN THORP, JUNE CHUNG, and DOES 1-10, who had dangerous propensities for

16  discriminating against rape victims and conducting illegal searches and seizures by failing

17  to follow written EMPD P&Ps, LASD COEs, LADA's mission, and/or well established

18  laws;

19  (b) Inadequately supervising, training, controlling, assigning, and disciplining officers,

20  detectives, and other personnel, who the City and County knew or in the exercise of

21  reasonable care should have known had the aforementioned propensities and character

22  traits;

23  (c) Failing or refusing to competently and impartially investigate allegations of

24  misconducts, failing or refusing to enforce established administrative procedures, to

25  ensure victims and community safety, despite Defendants' knowledge of abuse and

26  misconduct;

27  (d) Having and maintaining an unconstitutional custom of discriminatory under-policing,

28  selective under-enforcement, favoritism toward rapists, and/or hostile provision of

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

services to Plaintiff, which also is demonstrated by inadequate training regarding these subjects, and Defendants have no valid justification for such policies, customs, and practice. The practices of Defendants, were done with a deliberate indifference to individuals' safety and rights; and

(e) Fostering and encouraging an atmosphere of lawlessness, abuse and unconstitutional misconduct, as to encourage their personnel to believe that discriminatory under-policing, selective under-enforcement, and illegal searches and seizures would be tolerated, and to believe that unlawful acts would be overlooked without discipline or other official ramifications.

196.    Defendants have demonstrated their deliberate indifference to widespread law enforcement abuses by failing and refusing to impartially investigate personnel complaints, failing to discipline or prosecute personnel who commit acts of dishonesty and misconduct.

197.    By reason of the aforementioned custom and practices of Defendants, Plaintiff was severely injured and subjected to lifetime pain and suffering.

198.    Defendants, together with various other personnel, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above these Defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these practice with respect to the constitutional rights of Plaintiff, and other individuals similarly situated.

199.    By perpetrating, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendants acted with an intentional, reckless, and callous disregard for Plaintiff's constitutional rights. Defendants, each of their actions were willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

200.    Furthermore, the practice implemented and maintained and still tolerated by Defendants, were affirmatively linked to and were a significantly influential force behind the

1   injuries of Plaintiff. Such unconstitutional custom is and will be a threat to justice and community

2   safety.

3

4                              **FIFTH CAUSE OF ACTION**

5   **Municipal Liability – Failure to Train, Supervise, and/or discipline (42 U.S.C. §1983)**

6                              **Against all Defendants**

7          201.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

8   the paragraphs above.

9          202.    On information and belief, the overwhelming majority of law enforcement

10   personnel who handle sexual assaults remain woefully untrained, and fundamentally biased

11   against sexual assault victims, making assumptions about why and when sexual assault victims

12   behave in certain ways and excusing perpetrator conduct as acceptable and/or "normal" behavior.

13         203.    The City and County are well aware that rape is as difficult to investigate and

14   prosecute as murder due to the nature of the crime, the need for extensive training is so obvious.

15   Without adequate training the likelihood for constitutional violation is so high but the City and

16   County make their conscious choice to turn a blind eye on it. Therefore, a rape victim is also a

17   victim of uneven enforcement of law.

18         204.    While acting under the color of state law and within the course and scope of their

19   employment, EMPD and LASD Officers, LADA Officials, and DOES 1-10's unconstitutional

20   practice, deprived Plaintiff's rights secured to her by the Fourth and Fourteenth Amendments,

21   including her right to be free from discrimination and unreasonable search and seizure.

22         205.    The training **policies** of EMPD, LASD, and LADA were not adequate to train their

23   personnel, including but not limited to EMPD and LASD Officers, LADA Officials, and DOES

24   1-10, with regards to providing protection in a nondiscriminatory manner, understanding crime

25   elements, employing investigative tools, conducting reasonable searches and seizures,

26   prosecuting sexual assaults, selecting unbiased jury, and treating victims equally and fairly. As a

27   direct result, EMPD, LASD and LADA personnel, including EMPD and LASD Officers, LADA

28   Officials, and DOES 1-10, are not able to handle the usual and recurring situations with which

                                        40

they must deal, including treating every crime victim fairly and respectfully. These inadequate training policies existed prior to the date of this incident and continue to this day.

206.    Defendants were deliberately indifferent to the known or obvious consequences of their failure to train, supervise, and/or discipline their personnel, including EMPD and LASD Officers, LADA Officials, and DOES 1-10, adequately with regards to providing protection in a nondiscriminatory manner, understanding crime elements, employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased jury, and treating victims equally and fairly. This inadequate training includes failing to teach personnel to properly handle sexual assault investigation and prosecution.

207.    The internal investigation of Plaintiff's complaints about misconduct to EMPD, LASD, inspector general, and LADA evidenced an egregious lack of supervision. A lack of supervision and training was involved in the discrimination Plaintiff received from law enforcement personnel and the application of illegal search and seizure by LASD.

208.    Focusing on the inadequate investigation of law enforcement personnel's misconduct, the City and the County's performance evidenced a purposeful tolerance of civil rights violations by their employees. This tolerance amounted to deliberate indifference with regard to the supervision and discipline of their employees.

209.    Regardless of whether the internal investigation would find Tate, Jara, Chung, Thorp, and Cagney personally responsible for their misconduct, its undertaking was necessary to convey a policy strongly discouraging such acts. Yet policymaking personnel accomplished exactly the opposite, conveying a strong statement of support for civil rights violations by their tolerance of these violations. Their refusal to root out the culprits responsible for the so evident harm issues a shout of support for such actions without a word spoken. Their silent support and protection showed a lack of supervision and a deliberate indifference to the truth. The disciplinary system existed in name only.

210.    Defendants were aware that failure to implement some sort of training and/or supervision with regards to their discriminatory and unlawful practice would result in continuing to have numerous unreasonable officers involved violation of sexual assault victims'

constitutional rights annually.

211.    The failure of Defendants to provide adequate training and/or supervision with regards to providing protection in a nondiscriminatory manner, understanding crime elements, employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased jury, and treating victims equally and fairly, caused the deprivation of the Plaintiff's rights by EMPD and LASD Officers, LADA Officials, and DOES 1-10.  In other words, Defendants' failure to train, supervise, and/or discipline their employees is so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury.

212.    By failing to achieve adequate training and/or supervision, EMPD and LASD Officers, LADA Officials, and DOES 1-10, acted with an intentional, reckless, and callous disregard for Plaintiff's constitutional rights.  EMPD and LASD Officers, LADA Officials, and DOES 1-10, each of their actions was willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

## SIXTH CAUSE OF ACTION

### Violation of Safe Streets Act – 42 U.S.C. §3789d

### Against the County, LASD Officers, LADA Officials, and Does 1-10

213.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

214.    Discriminatory policing is prohibited under the Omnibus Crime Control and Safe Streets Act of 1968 (Safe Streets Act).

215.    Defendants' handling of sexual assault cases has an unnecessary disparate impact on sexual assault victims, it violates the Safe Streets Act and its implementing regulations, even where the discrimination is not intentional, not to mention Defendants' conducts were intentional.

## SEVENTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, §7 – Equal Protection

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1    **Against all Defendants**

2        216.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

3    the paragraphs above.

4        217.    Defendants violated Plaintiff's civil rights by having a widespread practice and/or

5    custom of discriminatory under-policing and selective under-enforcement, when enforced, caused

6    a constitutional deprivation to Plaintiff, although not authorized by written law or express

7    municipal policy, was so permanent and well settled as to constitute a custom or usage with the

8    force of law.

9        218.    Defendants' custom was intentional and, when enforced, had a discriminatory

10   impact on sexual assault victims. Plaintiff's case was not isolated incident. Plaintiff received

11   disparate treatment relative to victims of other violent crimes. Defendants set out to make

12   reporting and pursuing investigation of rapes as unpleasant and difficult as possible.

13       219.    The constitutional injury inflicted by Defendants was caused by the persons with

14   final policymaking authority at the City, the County, EMPD, LASD, and LADA.

15       220.    Defendants knew about the above-described conducts and facilitated them,

16   approved them, condoned them, and/or turned a blind eye to the conducts and systematic failure.

17       221.    The above-described conducts of Defendants constitute a violation of Article 1, §7

18   of the California Constitution.

19

20                        **EIGHTH CAUSE OF ACTION**

21            **Violation of Cal. Const. Art. I, §13 – Unreasonable Search and Seizure**

22            **Against the County, LASD Officers, LADA Officials, and Does 1-10**

23       222.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

24   the paragraphs above.

25       223.    By a complete search of Plaintiff's smartphone and unlawfully analyzing

26   Plaintiff's smartphone without a warrant, valid consent, or exigent circumstances, and/or by

27   failing to intercede to prevent such unlawful search, Defendants violated Plaintiff's right under

28   Art. I, §13 to be secure in her person against unreasonable searches and seizures.

224.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's rights under Art. I, § 13, Plaintiff's private electronic data has been, and continue to be, in the possession of Defendants, resulting in an ongoing violation of those rights.

### NINTH CAUSE OF ACTION

**Violation of Cal. Const. Art. I, §1 – Right of Privacy**

**Against the County, LASD Officers, LADA Officials, and Does 1-10**

225.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

226.    As a California resident, Plaintiff has a legally protected privacy interest in her electronic information, which is recognized as an inalienable right under the California Constitution, Article I, § 1.

227.    Plaintiff has a reasonable expectation of privacy in her electronic information, as contained in her smartphone. Plaintiff has a reasonable expectation of privacy not to have her electronic data searched and seized unreasonably.

228.    By unlawfully obtaining Plaintiff's private data without a warrant, valid consent, or exigent circumstances, while she was victim of sexual assault, Defendants committed a serious invasion of her privacy interests.

229.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's privacy rights under Art. I, § 1, Plaintiff's private data has been, and continues to be, in the possession of government agencies including but not limited to LASD and LADA.

230.    None of the foregoing serious invasions of privacy was justified.

### TENTH CAUSE OF ACTION

**Violation of Cal. Const. Art. I, § 28 (b) – Victims' Bill of Rights**

**Against all Defendants**

231.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

232.    California's Constitution protects the rights of crime victims. Defendants have violated the rights of Plaintiff to be treated with fairness, respect, and dignity, by among other things:

    a.  Subjecting Plaintiff to re-traumatization, demeaning and humiliating interrogation tactics, including inappropriately questioning her reactions without presence of victim advocate;

    b.  Routinely and inappropriately impugning the credibility of sexual assault victims, including Plaintiff;

    c.  Conducting illegal searches and seizures, with no reasonable cause;

    d.  Telling Plaintiff that the crime perpetrated against her was not actually criminal;

    e.  Treating Plaintiff like suspect, rather than victim;

    f.  Willfully failing to inform Plaintiff of her rights as a crime victim; and

    g.  Maliciously using coercion and ostensible reasons to deter Plaintiff from exercising her constitutional rights.

233.    Defendants' conducts violated Plaintiff's rights that set forth in California Constitution she was entitled (a) to be treated with fairness and respect for her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal justice process. (b) to be informed of the rights enumerated in California Constitution Art. I, §28 (b).

## ELEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### Against all Defendants

234.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

235.    Except for homicide, rape is the most serious violation of a person's body because it deprives the victim of both physical and emotional privacy and autonomy. As a rape victim, Plaintiff was particularly susceptible to emotional distress at that time but Defendants willfully

45

engaged in acts and omissions alleged herein with a discriminatory intent or a reckless disregard for the probability of aggravating the emotional distress that Plaintiff was already suffering. Such ill treatment is not what Plaintiff came forward for. Plaintiff certainly didn't walk into a police station thinking her trauma would be lifted to another level by law enforcement personnel.  Law enforcement personnel's response to sexual assault has made Plaintiff feel like being murdered would be better than being raped.

236.    After Plaintiff gathered her courage to step forward and identify her assailant she has been re-traumatized again and again at the hands of law enforcement personnel.

237.    As a direct and proximate result of the Defendants' outrageous and unlawful conducts as described herein, Plaintiff has suffered and/or continue to suffer loss of trust, dissociation, humiliation, mental anguish, nervous shock, severe emotional distress, and other special and general damages according to proof.

238.    Punitive damages should be assessed against Defendants for the purposes of punishment and for the sake of example.

## TWELFTH CAUSE OF ACTION

### Violation of Unruh Civil Rights Act (Cal. Civil Code §51)

### Against all Defendants

239.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

240.    Cal. Civil Code §51, also known as Unruh Civil Rights Act, states that all persons within the jurisdiction of this state are free and equal, and are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

241.    Defendants' policies, practices, and customs complained of herein violated Plaintiff's rights to be free from discrimination and unreasonable searches and seizures, rights to privacy, and victims' rights as secured by Article I, § 1, § 7, § 13, § 28(b) of the California Constitution and directly and proximately damaged Plaintiff as herein alleged, entitling Plaintiff

46

1   to recover a minimum of $4,000 for each and every offense pursuant to California Civil Code §

2   52(a) and §52.1, in addition to other damages.

3        242.    Pursuant to Cal. Govt. Code §815.2, Defendant the City and the County are hereby

4   liable for the acts, omissions and conduct of their employees EMPD Officers, LASD Officers,

5   LADA Officials, and Does 1-10 whose tortious conduct was a cause in the damages and injuries

6   to Plaintiff.

7

8   **THIRTEENTH CAUSE OF ACTION**

9   **Violation of Tom Bane Act (Cal. Civil Code §52.1)**

10   **Against the County and Jara**

11        243.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

12   the paragraphs above.

13        244.    California Civil Code, Section 52.1 (the Tom Bane Act), prohibits any person from

14   interfering by threats, intimidation, or coercion with another person's exercise or enjoyment of

15   his/her constitutional rights secured by the Constitution or laws of the United States, or of the

16   rights secured by the Constitution or laws of this state.

17        245.    Jara, while working as law enforcement personnel for LASD, and acting within the

18   course and scope of her duties, interfered with or attempted to interfere with the rights of Plaintiff

19   to equal protection of the laws, and to be free from state actions that shock the conscience, by

20   threatening or committing acts involving threats, coercion, or intimidation.

21        246.    Pursuant to Cal. Govt. Code §815.2, Defendant the County are hereby liable for

22   the acts, omissions and conduct of their employees whose tortious conduct was a cause in the

23   damages and injuries to Plaintiff.

24

25   **FOURTEENTH CAUSE OF ACTION**

26   **Negligent Supervising, Disciplining, and Retaining Employees**

27   **Against the City, the County, REYNOSO, VILLANUEVA, LACEY, and DOES 1 - 10**

28        247.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

47

the paragraphs above.

248.   REYNOSO, VILLANUEVA, and LACEY customarily failed to properly supervise their officers and deputies, and address citizen complaints reflecting that they were deliberately indifferent to citizens' constitutional rights. At least three of LASD Officers participated in the illegal search and seizure of Plaintiff's smartphone and private data. Plaintiff's constitutional right to be free from discrimination was denied by four EMPD Officers, two LASD Officers, and three LADA Officials.

249.   The City and the County were on notice that EMPD Officers, LASD Officers and LADA Official's misconduct but took no action to remedy their misconduct or discipline them.

**FIFTEENTH CAUSE OF ACTION**

**Conversion/Claim and Delivery**

**Against the County, LASD Officers, LADA Officials, and DOES 1 - 10**

250.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

251.   Both Plaintiff's smartphone and the private electronic data in her smartphone are her properties.

252.   Plaintiff owns and/or has the right to possess the electronic data unlawfully taken from her smartphone, as well as any information derived from said phone.

253.   By abusing Plaintiff's actual and valid consent, Defendants unlawfully obtained electronic data from Plaintiff's smartphone, and Defendants are unlawfully retaining said data and any information derived from the unlawful analysis of her smartphone.

254.   Plaintiff has the right to immediate possession of the electronic data unlawfully taken from her, as well as any information derived from the unlawful analysis of her smartphone.

255.   California Government Code section 815.2 authorizes the vicarious liability of Defendant the County for injuries proximately caused by the acts of Defendants LASD Officers, LADA Officials, and/or Does 1-10 within the scope of their employment if those acts give rise to a cause of action against Defendants LASD Officers, LADA Officials, and/or Does 1-10.

1

2                              **DECLARATORY RELIEF SOUGHT**

3          256.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

4    the paragraphs above.

5          257.    Plaintiff respectfully prays for a declaratory judgment that Defendants, and each of

6    them, have engaged in a pattern or practice of conduct that violated Plaintiff's rights under the

7    Fourth and Fourteenth Amendment to the United States Constitution, Art. I, §§ 1, 7, 13, 28(b) of

8    the California Constitution, Cal. Civil Code § 52.1, and/or California common law.

9

10                              **INJUNCTIVE RELIEF SOUGHT**

11         258.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

12   the paragraphs above.

13         259.    Plaintiff prays for a permanent injunction compelling Lacey and/or LADA to file

14   criminal charges against Suarez.

15         260.    Plaintiff prays for a permanent injunction disbarring PETER CAGNEY, KAREN

16   THORP, and JUNE CHUNG.

17         261.    Defendants' unlawful searches and seizures have resulted and will result in

18   irreparable injury to Plaintiff. There is no plain, speedy, adequate or complete remedy at law to

19   address the wrongs described herein.

20         262.    Plaintiff seeks injunctive relief to prevent continued harm and to protect herself

21   from Defendants' unlawful seizures.

22         263.    Wherefore, Plaintiff requests a permanent injunction enjoining Defendants, and

23   each of them, and their employees, agents, and persons acting with Defendants, from reading,

24   exploring, storing, retaining, using, copying, transferring, distributing, disclosing, or releasing

25   Plaintiff's electronic data (including but not limited to photos, videos, app data, messages, emails,

26   google search content etc.) that Defendants illegally obtained from her smartphone other than her

27   message conversations with Carlos Suarez (aka Charlie Suarez).

28         264.    Plaintiff requests a permanent injunction compelling Defendants, and each of

49

them, and their employees, agents, and persons acting with Defendants, to destroy and expunge all data they illegally obtained and kept from Plaintiff's smartphone except for her message conversations with Suarez.

265.    Plaintiff also prays that the Court issue a permanent injunction against Defendants ordering them to:

      a.  Properly train and supervise government employees handling sexual assault cases or evidence;

      b.  Stop abusing crime victims' actual consent and conducting illegal searches and seizures;

      c.  Establish written policy and procedure manual for investigation and prosecution of sexual assaults;

      d.  Require and enforce trauma-informed approaches to investigation and prosecution of sexual assault cases;

      e.  Treat sexual assault cases with the same urgency and importance afforded to other types of crimes;

      f.  Provide adequate resources for investigation and processing of sexual assault cases;

      g.  Treat victims of sexual assault with the same respect and attention to their cases as victims of other crimes;

      h.  Increase prosecution rate of sex crimes to 50%; and

      i.  Accurately and publicly report data reflecting the number of sexual assaults reported, investigated, prosecuted, and processed to conclusion within the criminal justice system on a bi-annual basis.

## **PRAYER**

WHEREFORE, Plaintiff prays judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

1.    For general damages according to proof;

2.  For special damages according to proof;

3.  For exemplary damages as provided by law, in an amount to be proved against each individual Defendant;

4.  For interest;

5.  For civil penalties pursuant to Civil Code §52;

6.  For attorney's fees pursuant to 42 U.S.C. § 1988 and Civil Code §§52 and 52.1;

7.  For reasonable costs of this suit;

8.  For treble damages under Civil Code §52.1;

9.  For such other and further relief and/or sanction as the Court may deem just, proper, and appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury for all issues so triable.


Dated: Mar 19, 2020


O.L.

Plaintiff in Pro Se

51

# EXHIBITS TO COMPLAINT

## TABLE OF CONTENTS

| Ex # | Document |
|------|----------|
| 1 | <Prosecuting Alcohol-Facilitated Sexual Assault> by National District Attorneys Association<br>http://atixa.org/wordpress/wp-content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf |
| 2 | <Cold Case Alcohol- and Drug-Facilitated Sexual Assault> by National Sexual Assault Kit Initiative (SAKI)<br>https://www.sakitta.org/toolkit/docs/Cold-Case-Alcohol-and-Drug-Facilitated-Sexual-Assault.pdf |
| 3 | <Understanding the non-stranger rapist> by NDAA<br>http://www.ncdsv.org/images/NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_11_2007.pdf |
| 4 | Plaintiff's email to HD Peter Cagney |
| 5 | <Model Response to Sexual Violence for Prosecutors> by AEquitas<br>https://aequitasresource.org/wp-content/uploads/2018/09/Model-Response-to-Sexual-Violence-for-Prosecutors-RSVP-An-Invitation-to-Lead.pdf |
| 6 | EMPD Policies and Procedures |
| 7 | LASD Code of Ethics |
| 8 | NATIONAL DOMESTIC VIOLENCE PROSECUTION BEST PRACTICES GUIDE<br>https://ndaa.org/wp-content/uploads/NDAA-DV-White-Paper-FINAL-revised-July-17-2017-1.pdf |

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

| | |
|---|---|
| 9 | Jury instruction for criminal sex offense |
| 10 | Plaintiff's email to EMPD |
| 11 | Incident report prepared by Officer Martha Tate |
| 12 | <Educating Juries in Sexual Assault Cases> by AEquitas<br>http://www.ncdsv.org/images/AEquitas_EducatingJuriesInSexualAssaultCasesPart1_7-2010.pdf |
| 13 | MISSOULA COUNTY ATTORNEY'S OFFICE SEXUAL ASSAULT POLICY & PROCEDURE MANUAL<br>https://dojmt.gov/wp-content/uploads/SEXUAL-ASSAULT-POLICY-AND-PROCEDURE-MANUAL.pdf |
| 14 | <Statistics about sexual violence> by National Sexual Violence Resource Center<br>https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf |
| 15 | Rape and Sexual Assault in the Legal System<br>https://www.womenslawproject.org/wp-content/uploads/2016/04/Rape-and-Sexual-Assault-in-the-Legal-System-FINAL.pdf |
| 16 | Gov claim rejection letter from City of El Monte |
| 17 | Gov claim rejection letter from County of Los Angeles |

53

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**CERTIFICATE OF SERVICE**

I, O.L., declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I reside in the County of Los Angeles, State of California. My business address is 11151 Valley Blvd #4886, El Monte, CA 91734, in said county and state.

On <u>Mar 19, 2020</u> I electronically filed the following document(s):

Second Amended Complaint

with the United States District Court, Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: Mar 19, 2020

_____

O.L.

Plaintiff in Pro Se

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF