UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| O.L.,<br><br>                    Plaintiff,<br><br>         v.<br><br>CITY OF EL MONTE, et al.,<br><br>                    Defendant. | No. 2:20-cv-00797-RGK-JDE<br><br>REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

    This Report and Recommendation is submitted to the Honorable R. Gary Klausner, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## PROCEEDINGS

    On January 27, 2020, Plaintiff O.L. ("Plaintiff"),[1] proceeding pro se, filed a Complaint arising out of the handling of her report of sexual assault. On

---

[1] On February 28, 2020, Plaintiff was granted approval to proceed using her initials. See Dkt. 27.

March 19, 2020, Plaintiff filed the operative Second Amended Complaint against the City of El Monte (the "City"), the County of Los Angeles (the "County"), David Reynoso ("Reynoso"), Martha Tate ("Tate"), Michael Buckhannon ("Buckhannon"), Alex Villanueva ("Villanueva"), Liliana Jara ("Jara"), Richard Ruiz ("Ruiz"), Jackie Lacey ("Lacey"), Peter Cagney ("Cagney"), Karen Thorp ("Thorp"), June Chung ("Chung"), and Does 1-10 (collectively, "Defendants"). Dkt. 40 ("SAC"). Plaintiff names the individual defendants in both their official and individual capacities. See SAC ¶¶ 18-19.

On May 19, 2020, the City, Reynoso, Tate, and Buckhannon (collectively, the "City Defendants") filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). Dkt. 50 ("City Motion"). On the same date, the County, Villanueva, Jara, Ruiz, Lacey, Cagney, Thorp, and Chung (collectively, the "County Defendants") also filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). Dkt. 51 ("County Motion"). On May 28, 2020, the City Defendants filed a Joinder, seeking to join the County Motion "for all the reasons stated therein." Dkt. 55. On June 3, 2020, Plaintiff filed her Opposition to the City Motion (Dkt. 56, "Opp. City Mtn.") and the County Motion (Dkt. 57, "Opp. Cty. Mtn."). The City and County Defendants filed their respective Reply briefs on June 11, 2020. Dkt. 60 ("City Reply"), 61 ("County Reply"). A tentative ruling was issued on June 24, 2020. A hearing on the Motions was held on June 25, 2020, at which all parties were provided an opportunity to address the Motions, the tentative ruling, and the propriety of leave to amend.

For the reasons discussed hereafter, the Court recommends that the City Motion be granted and the County Motion be granted in part.

## II.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that Carlos Suarez (also known as Charlie Suarez) ("Suarez") "friended" her on or about April 1, 2019 through the mobile app,

"Wechat." SAC ¶ 43. On or about April 5, 2019, Plaintiff and Suarez went to dinner. Later that evening, Plaintiff and Suarez had drinks in his car. Id. Plaintiff maintains that she eventually lost consciousness "after consuming a lot of alcohol" and woke up the following morning "in an unfamiliar place, naked with a sore vagina," next to Suarez. Id. ¶¶ 43-44. She contends she suffered a "sexual attack while she was unconscious." Id. ¶ 83. She avers that she was "still drunk and confused about what had happened." That morning, Suarez initiated sexual intercourse and Plaintiff "didn't know what to say or what to do." Id. ¶ 44. Plaintiff indicates that she did not resist because she was "afraid of any confrontation and escalat[ing] the situation"; she remained silent, "reasonably believ[ing] that Suarez would commit violence against her if the situation was escalated." She asserts she "never gave her consent to sexual contact with Suarez while she was awake not to mention when she was unconscious." Id. Thereafter, Plaintiff allegedly declined his sexual advances, and the last time she saw Suarez was on or about May 3, 2019. Id. ¶ 45.

Plaintiff states she reported the incident on June 7, 2019 and was interviewed by Tate at the El Monte Police Department ("EMPD"). SAC ¶ 47. Although the initial interview was not recorded, Tate asked Plaintiff to retell her story again for recording purposes. Plaintiff claims that during the interview, no victim services personnel were present and she was not advised of a right to request a victim advocate. Plaintiff avers that throughout the interview, she noticed "Tate's fake smile and the way Tate looked at her with skepticism." Id. ¶¶ 47-48. Plaintiff takes issue with how Tate conducted the interview, including her refusal to take Plaintiff at her word and the form of her questions, which purportedly focused on physical force instead of the absence of consent and reflected doubt about Plaintiff's allegation. Id. ¶¶ 49, 56-57. At the end of the interview, Tate allegedly "willfully smirked" and told Plaintiff that it was not rape, which upset her. Id. ¶ 50. According to Plaintiff,

Tate falsified her incident report by stating that she gave consent and willingly engaged in sexual intercourse with Suarez and omitting pertinent information. Id. ¶¶ 51, 55. Plaintiff alleges that she "struggle[ed] immensely" with Tate's finding and went to urgent care for a "severe" sleep disorder. Id. ¶ 63.

Plaintiff alleges that her case was transferred to the Los Angeles County Sheriff's Department ("LASD") based on jurisdiction. SAC ¶ 65. On or about July 2, 2019, Plaintiff claims she had an appointment with Jara at the City of Industry station. Id. ¶ 66. Jara asked Plaintiff to recount her story, but according to Plaintiff, "not long after [she] started Jara assumed that Plaintiff didn't remember giving consent." Id. ¶ 67. Plaintiff avers that Jara did not inform her of a victim's rights under the California Constitution. Id. ¶ 85. After Plaintiff purportedly refused to recant her allegation, Jara asked her, "What do you want here?" Id. ¶¶ 67-68. Plaintiff believes this was a "humiliating and degrading question," aimed at devaluing her credibility. Plaintiff responded that she "want[ed] JUSTICE." Id. ¶ 68. They also apparently argued about whether a comment made by Suarez amounted to a confession. Id. ¶¶ 73-74. According to Plaintiff, Jara questioned Plaintiff's intent to come forward, claiming that she came forward because she learned Suarez was cheating on her and she was mad. Id. ¶ 75. Plaintiff denies this. Id. Plaintiff claims she came forward after reading some articles, which she tried unsuccessfully to show Jara. Id. ¶ 78. Plaintiff avers that the entire interview was "frustrat[ing]" and conducted in "a very accusatory manner, very threatening." Id. ¶¶ 79, 84. Jara allegedly told Plaintiff repeatedly that the "case was going nowhere," it had a lot of problems, and she was not going to arrest Suarez. Id. ¶ 80.

As part of the interview, Jara allegedly read Plaintiff's conversations with Suarez on her cellular phone, concluding that it did not "look like" she was raped. SAC ¶ 69. Plaintiff avers that Jara indicated that LASD would need to download these conversations. Id. ¶ 70. Plaintiff had previously tried to

download these messages, but was unable to do so. Id. ¶ 64. She claims she told Jara as much, but Jara assured her that technical personnel would be able to download the messages. Id. ¶ 70. Plaintiff allegedly agreed to turn over her phone for this purpose only and did not grant consent to search her cellular phone. Id. ¶¶ 71, 169. Plaintiff maintains that she asked Jara how long it would take to download the messages to which Jara responded that it would take "about two weeks." Id. ¶ 72. Nevertheless, she maintains the Los Angeles County District Attorney ("LADA") did not return her phone until October 2019, despite repeated requests. Id. ¶¶ 72, 131. She claims that when she inquired about the investigation in August 2019, Ruiz confronted her about her gofundmepage, which Plaintiff appears to claim evidences that LASD conducted an illegal search of her cellular phone exceeding the scope of her consent. Id. ¶¶ 96-97. When she retrieved her cellular phone in late October 2019, she also noticed that a message conversation with a female friend had been translated into English. Id. ¶ 131.

At the conclusion of the interview with Jara, Plaintiff claims Jara told her that she would get Suarez's phone to see if there were additional messages, which Plaintiff maintains reflected a presumption that Plaintiff was lying or hiding something. SAC ¶ 82. Plaintiff avers that her depression and anxiety were "exacerbated to a whole new level" as a result of the interview. Id. ¶ 86.

On or about July 3, 2019, Plaintiff allegedly "reached out" to Ruiz, requesting that another detective be assigned to her case, but her attempt was unsuccessful. SAC ¶ 88. During a subsequent call with Ruiz regarding the case, Ruiz allegedly asked Plaintiff, "How did you not know you were violated?" Plaintiff claims this question made her feel like she was being punished for coming forward and should not have reported the incident. Id. ¶ 91. That same month, Plaintiff asserts she filed separate complaints against Jara and the Special Victims Bureau with both LASD and Inspector General. Id. ¶ 89. She

did not receive any information regarding the results of the internal investigation. Id. In August 2019, Plaintiff alleges her complaint against Jara was turned into a service comment report and investigated by Ruiz. Id. ¶ 98.

On August 6, 2019, Plaintiff alleges Jara arranged a follow-up interview for August 8, 2019, but claims this was merely a "trap set up by Jara" to have her arrested. Plaintiff claims that when she arrived for the appointment, she was arrested by Santa Ana police and charged with a misdemeanor. SAC ¶¶ 92-94, 102.

Jara allegedly notified Plaintiff on or about August 14, 2019 that she had done everything she could, and the LADA declined to file charges shortly thereafter. SAC ¶¶ 95, 102. Plaintiff maintains that more could have been done, explaining that a pretext phone call could have been made to obtain a confession, but this was never done. Id. ¶ 95. She believes Jara and Ruiz "made minimal or maybe no effort to interrogate or investigate the suspect in Plaintiff's case," and notes that she was never notified after law enforcement contacted Suarez. Id. ¶¶ 95, 100.

On or about August 16, 2019, Plaintiff claims she went to emergency for "dysfunctional menstrual bleeding," which was the first time she went to emergency. SAC ¶ 101.

Plaintiff asserts that she called LADA on August 23, 2019, requesting to speak with the prosecutor on her case. SAC ¶ 103. Plaintiff apparently spoke with Chung, who told her that the open case against her affected her credibility and made filing charges against Suarez impossible. Id. Plaintiff asserts that, at that time, she had not been convicted of a crime. Id. ¶¶ 94, 103. Chung purportedly told her that the case was not being prosecuted because she voluntarily consumed alcohol and it was a "he said she said" case, a characterization Plaintiff disputes. Id. ¶¶ 105, 107. She allegedly requested to speak with Chung's supervisor and spoke with Thorp later that day. SAC

6

¶¶ 108, 110. Thorp purportedly told Plaintiff, "We can't prove it in court to a jury that a jury is not likely to convict. . . . If someone thinks they were raped and then they have consensual sex with someone, then they have a relationship and they only go to the police after the breakup." Id. ¶ 110. Thorp also allegedly told Plaintiff that they needed a forensic medical exam and evidence of force, and it did not sound like she was raped. Id. ¶¶ 111, 114.

On or about August 30, 2019, she was transported to the hospital on suicide watch for five days, allegedly because she felt hopeless and worthless as a result of the "injustice and unlawful discrimination after sexual assault." SAC ¶ 118. On or about September 15, 2019, she allegedly moved for fear of her safety. Id. ¶ 119. Shortly thereafter, she avers she emailed County CEO Sachi A. Hamai and Cagney regarding "the Fourteenth Amendment violation." Id. ¶ 120.

After she obtained a copy of the incident report prepared by Tate in September 2019, Plaintiff claims she spoke to EMPD watch commander, Buckhannon. Plaintiff claims that Buckhannon agreed to play the interview tape in front of her and two victim advocates from Peace over Violence. Before listening to the entire interview, however, Buckhannon allegedly started defending Tate. SAC ¶¶ 121-122. Buckhannon allegedly told Plaintiff that it was "not fair to Tate to make an allegation against her," claiming that Tate just needed "a little bit [of] training." Id. Buckhannon also allegedly commented that he had been married for twenty years and did not ask for consent each time he had sex with his wife. Id. ¶ 124.

On September 27, 2019, Plaintiff alleges that EMPD Officer Carlos Tello conducted a supplemental interview in the presence of Plaintiff's victim advocate. Plaintiff claims the interview was done in a "hostile manner," causing the victim advocate to pause the interview a couple times. SAC ¶ 127. On or about October 4, 2019, Plaintiff alleges she filed a police misconduct

complaint against Tate, but never received a response. SAC ¶ 129. In November 2019, she allegedly filed a complaint against Tate with the LADA justice system integrity division, but her complaint was referred to EMPD. Id. ¶ 133.

In October and November 2019, Plaintiff maintains she tried unsuccessfully to obtain a copy of Jara's report. SAC ¶ 132. Lieutenant Michael Burse with the Special Victims Bureau allegedly told her that she would need a subpoena and attorney to obtain the report. Id.

Plaintiff alleges that she tried to commit suicide in November 2019 as a result of the sexual assault, which was exacerbated by Defendants' conduct. SAC ¶ 134.

On January 7, 2020, Plaintiff apparently had a joint phone call from Cagney, Thorp, and Chung, in which Cagney purportedly told Plaintiff the reason they did not prosecute was because she "had sex with [Suarez]. [She] had contact with him" and they would not be able to prove the case beyond a reasonable doubt because she delayed reporting the incident. SAC ¶ 147. Around the same day, Plaintiff alleges she sent an email to Lacey regarding "the Fourth Amendment violation," but "Lacey took no action." Id. ¶ 149.

As a result of the foregoing, Plaintiff asserts the following claims:

- First Cause of Action: Equal Protection against all Defendants;
- Second Cause of Action: Unreasonable Search and Seizure Against the County, LASD officers, LADA officials, and Doe Defendants;
- Third Cause of Action: Gender-based Civil Conspiracy (42 U.S.C. § 1985) against all Defendants;
- Fourth Cause of Action: Municipal Liability for Unconstitutional Policies, Customs, and Practices against all Defendants;

- Fifth Cause of Action: Municipal Liability – Failure to Train, Supervise, and/or Discipline against all Defendants;
- Sixth Cause of Action: Violation of Safe Street Act against the County, LASD officers, LADA officials, and Doe Defendants;
- Seventh Cause of Action: Violation of Cal. Constitution Art. I § 7 – Equal Protection against all Defendants;
- Eighth Cause of Action: Violation of Cal. Constitution Art. I § 13 – Unreasonable Search and Seizure against the County, LASD officers, LADA officials, and Doe Defendants;
- Ninth Cause of Action: Violation of Cal. Constitution Art. I § 1 – Right to Privacy against the County, LASD officers, LADA officials, and Doe Defendants;
- Tenth Cause of Action: Violation of Cal. Constitution Art. I § 28(b) – Victims' Bill of Rights against all Defendants;
- Eleventh Cause of Action: Intentional Infliction of Emotional Distress against all Defendants;
- Twelfth Cause of Action: Violation of Unruh Civil Rights Act against all Defendants;
- Thirteenth Cause of Action: Violation of Tom Bane Act against the County and Jara;
- Fourteenth Cause of Action: Negligent Supervising, Disciplining, and Retaining Employees against the City, the County, Reynoso, Villanueva, Lacey, and Doe Defendants; and
- Fifteenth Cause of Action: Conversion/Claim and Delivery against the County, LASD officers, LADA officials, and Doe Defendants.

Plaintiff seeks declaratory and injunctive relief and monetary damages.

# III.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of a statement of claim for relief. A complaint may be dismissed for failure to state a claim for two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990) (as amended). In determining whether a complaint states a claim on which relief may be granted, its allegations of material fact must be taken as true and construed in the light most favorable to the plaintiff. See Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

To survive a Rule 12(b)(6) dismissal, a complaint must allege enough specific facts to provide both "fair notice" of the particular claim being asserted and "the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 & n.3 (2007) (citation omitted); see Fed. R. Civ. P. 8(a). While detailed factual allegations are not required, a complaint with "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" and "'naked assertion[s]' devoid of 'further factual enhancement'" would not suffice. Iqbal, 556 U.S. at 678 (citation omitted). Instead, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted).

Pro se complaints are "to be liberally construed" and are held to a less stringent standard than those drafted by a lawyer. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); see also Jackson v. Carey, 353 F.3d 750, 757

10

(9th Cir. 2003) ("In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." (citation omitted)). Even so, "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." <u>Bruns v. Nat'l Credit Union Admin.</u>, 122 F.3d 1251, 1257 (9th Cir. 1997) (quoting <u>Ivey v. Bd. of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982)).

Upon finding that a complaint should be dismissed for failure to state a claim, a court has discretion to dismiss with or without leave to amend. <u>Lopez v. Smith</u>, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc). Leave to amend should be granted if it appears possible that the defects in the complaint could be corrected, especially if the plaintiff is <u>pro se</u>. <u>Id.</u> at 1130-31; <u>see also</u> <u>Cato v. United States</u>, 70 F.3d 1103, 1106 (9th Cir. 1995) (noting that "[a] pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment"). If, after careful consideration, it is clear that a complaint cannot be cured by amendment, the Court may dismiss without leave to amend. <u>Cato</u>, 70 F.3d at 1105-06; <u>see, e.g.</u>, <u>Chaset v. Fleer/Skybox Int'l, LP</u>, 300 F.3d 1083, 1088 (9th Cir. 2002) (holding that "there is no need to prolong the litigation by permitting further amendment" where an amendment would not cure the "basic flaw" in the pleading); <u>Lipton v. Pathogenesis Corp.</u>, 284 F.3d 1027, 1039 (9th Cir. 2002) (holding that "[b]ecause any amendment would be futile, there was no need to prolong the litigation by permitting further amendment").

## IV.

## DISCUSSION

### A. Federal Civil Rights Claims

To state a civil rights claim under 42 U.S.C. § 1983, a plaintiff must allege that a defendant, while acting under color of state law, caused a

deprivation of the plaintiff's federal rights. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). Causation "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." <u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988). An individual "causes" a constitutional deprivation when he or she (1) "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation"; or (2) "set[s] in motion a series of acts by others which the [defendant] knows or reasonably should know would cause others to inflict the constitutional injury." <u>Lacey v. Maricopa Cty.</u>, 693 F.3d 896, 915 (9th Cir. 2012) (en banc) (citation omitted).

      1.   <u>Plaintiff has Standing</u>

      Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III" and contains three elements: (1) the plaintiff must have suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged conduct; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560-61 (1992); <u>see also</u> <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 342 (2006). While the plaintiff bears the burden of establishing standing, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" <u>Lujan</u>, 504 U.S. at 561 (citation omitted).

      Here, the County Defendants claim the SAC should be dismissed for lack of standing. They argue that Plaintiff has no cognizable constitutional

claim against the County Defendants "based on them having allegedly failed to investigate or prosecute her matter" and "[h]er interest in seeing her alleged assailant arrested and prosecuted does not confer standing in federal court." According to the County Defendants, they have not caused Plaintiff "any concrete injury," the Court cannot "redress her injury," and dismissal of her claims is appropriate. County Motion at 2-3.

As an initial matter, lack of Article III standing is not a ground for dismissal under Fed. R. Civ. P. 12(b)(6). While lack of statutory standing requires dismissal for failure to state a claim, lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011); Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004). The County Defendants' reliance on Vaughn v. Bay Envtl. Mgmt., Inc., 567 F.3d 1021, 1022 (9th Cir. 2009) (as amended) is misplaced as the case involved statutory standing, while they raise Article III standing in their Motion. As such, the Court construes the County Defendants' Article III standing argument under Rule 12(b)(1).

As the County Defendants correctly note, the Supreme Court has recognized that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973); see also United States v. Van Dyck, 866 F.3d 1130, 1133 (9th Cir. 2017) ("As a general rule, individuals lack standing to intervene in criminal prosecutions."). However, there is a distinction between the right to force the prosecution of a case and the right of access to judicial procedures to redress an alleged wrong. As the Tenth Circuit has explained, the right to present a criminal complaint is a form of the right to petition for redress of grievances, which represents one of the most basic of all constitutional rights. See Meyer v. Bd. of Cty. Comm'rs of Harper Cty., 482 F.3d 1232, 1243 n. 5 (10th Cir. 2007) (citing with approval a district court's decision in which it

concluded that "[w]hile Plaintiff did not have a right to force the local prosecutor to <u>pursue</u> her charges, she possessed the right to <u>access</u> judicial procedures for redress of her claimed wrongs and to 'set in motion the governmental machinery'" (citation omitted)); <u>see also</u> <u>Entler v. Gregorie</u>, 872 F.3d 1031, 1043-44 (9th Cir. 2017) (citing <u>Meyer</u>). Similarly, "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." <u>Estate of Macias v. Ihde</u>, 219 F.3d 1018, 1028 (9th Cir. 2000); <u>see also</u> <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."); <u>Elliot-Park v. Manglona</u>, 592 F.3d 1003, 1006-07 (9th Cir. 2010).

The County Defendants contend that <u>Estate of Macias</u> is distinguishable because that case involved "police protection" and "the right to have police services administered in a nondiscriminatory manner" while Plaintiff claims "a substantive right in the prosecution of another." County Reply at 4. While the Court agrees with the County Defendants that Plaintiff lacks standing to challenge the decision not to prosecute Suarez, and as such, may not pursue injunctive relief compelling Lacey and/or LADA to file criminal charges against him (SAC ¶ 259), Plaintiff has standing to pursue her other federal civil rights claims. <u>See, e.g.</u>, <u>Elliot-Park</u>, 592 F.3d at 1007 (rejecting contention that "equal protection clause only protects against selective denial of protective services, and that investigation and arrest aren't protective services unless there is a continuing danger to the victim"). As Plaintiff notes in her Opposition to the County Motion, "this case is not simply about the decision of nonprosec[ution] which was the by-product of Plaintiff's constitutional injuries." Opp. Cty. Mtn. at 14. Plaintiff has asserted claims based on alleged

14

discrimination during the investigation of her case and the unlawful search of her personal property. The County Defendants have cited no authority that Plaintiff lacks standing to pursue these claims, which, at least based on Plaintiff's allegations, implicate her constitutional rights.

Accordingly, while Plaintiff lacks standing to pursue a claim based on the failure to prosecute, she has standing to pursue federal civil rights claims implicating her constitutional rights.

2.    The SAC Fails to State a Federal Civil Rights Claim Based on Municipal Liability

Plaintiff has named the City and/or County in all her federal civil rights claims. However, a local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). The municipal entity may not be held liable for the alleged actions of its employees or agents unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers," or if the alleged constitutional deprivation was "visited pursuant to a governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." Id. at 690-91.

To state a claim against a municipal entity, Plaintiff must demonstrate: (1) she possessed a constitutional right of which she was deprived; (2) the local government entity had a policy; (3) the policy amounted to a deliberate indifference to her constitutional right; and (4) the policy was the moving force behind the constitutional violation. See Dougherty v. City of Covina, 654 F.3d

892, 900 (9th Cir. 2011); Anderson v. Warner, 451 F.3d 1063, 1070 (9th Cir. 2006). To "withstand a motion to dismiss for failure to state a claim, a Monell claim must consist of more than mere 'formulaic recitations of the existence of unlawful policies, conducts, or habits.'" Bedford v. City of Hayward, 2012 WL 4901434, at *12 (N.D. Cal. Oct. 15, 2012) (citation omitted); see also Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Oviatt v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992) ("The existence of a policy, without more, is insufficient to trigger local government liability under section 1983."). "Monell allegations must be [pled] with specificity as required under Twombly and Iqbal." Galindo v. City of San Mateo, 2016 WL 7116927, at *5 (N.D. Cal. Dec. 7, 2016). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996); Navarro v. Block, 72 F.3d 712, 714 (9th Cir. 1996) (as amended).

A failure to train may amount to a policy of deliberate indifference "if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." Dougherty, 654 F.3d at 900. Deliberate indifference may be shown through evidence of a "failure to investigate and discipline employees in the face of widespread constitutional violations." Rodriguez v. Cty. of L.A., 891 F.3d 776, 803 (9th Cir. 2018) (citation omitted).

Only the Fourth and Fifth Causes of Action allege "Municipal Liability" based on policies, customs, and/or inadequate training, claims which also have been asserted against all Defendants, regardless of their respective positions or conduct. In the Fourth Cause of Action, Plaintiff alleges that "[m]any different members of the same department refused to take Plaintiff's

allegation seriously and that this behavior indicated a practice so widespread that the City and the County must have known about it and condoned it," demonstrating a "policy to discourage vigorous prosecution of sex crimes." SAC ¶¶ 193-194. She claims that "Defendants and their supervising and managerial employees, agents, and representatives" "knowingly maintained, enforced and applied officially recognized policies, practices or customs of:" (a) employing and retaining law enforcement personnel "who had dangerous propensities for discriminating against rape victims and conducting illegal searches and seizures"; (b) inadequately supervising, training, controlling, assigning, and disciplining employees that the City and County "knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits"; (c) failing or refusing to competently and impartially investigate allegations of misconduct and failing or refusing to enforce established administrative procedures to ensure victim and community safety; (d) maintaining a custom of discriminatory under-policing, selective under-enforcement, favoritism towards rapists, and/or hostile provision of services to Plaintiff; and (e) fostering and encouraging an atmosphere of lawless, abuse, and unconstitutional misconduct to encourage personnel to believe that discriminatory under-policing, selective under-enforcement, and illegal searches and seizures would be tolerated, and unlawful acts would be overlooked without discipline. Id. ¶ 195.

Plaintiff's conclusory allegations are insufficient to state a claim for municipal liability. As explained, to state a Monell claim, Plaintiff must assert more than the mere "formulaic recitations of the existence of unlawful policies, conducts, or habits." Bedford, 2012 WL 4901434, at *12 (citation omitted). The SAC is devoid of any allegations identifying a specific policy or custom of the City or County, any specific regulations, or any officially adopted or promulgated decisions, the execution of which allegedly led to the infliction of

the injuries about which Plaintiff is complaining. Plaintiff's reliance on pre-Iqbal cases to support her position that bare allegations of a policy are sufficient is unpersuasive. "Since Iqbal, courts have repeatedly rejected conclusory Monell allegations that lack factual content from which one could plausibly infer Monell liability." Wilson ex rel. Bevard v. City of W. Sacramento, 2014 WL 1616450, at *2 (E.D. Cal. Apr. 22, 2014); see also, e.g., Rodriguez v. City of Modesto, 535 F. App'x 643, 646 (9th Cir. 2013) (affirming district court's dismissal of Monell claim based only on conclusory allegations and lacking factual support). Plaintiff's claim, based on the investigation of a single case, is insufficient to establish a policy or custom "founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918. Although Plaintiff also cites to a news article reporting on another case in which the LADA declined to prosecute a different sexual assault case (SAC ¶ 14(i)), proof of random acts or isolated incidents are insufficient to establish custom. Trevino, 99 F.3d at 918. Likewise, Plaintiff's citations to various news articles regarding unrelated criticism of the EMPD and bare statistics regarding the frequency of rape prosecutions, or an eleven-year old report regarding rape kit backlogs (see SAC ¶¶ 12, 14(m), 41) are insufficient to plausibly allege any specific unlawful policy or custom. To the contrary, at least with respect to the City, based on evidence attached to the SAC, EMPD has specific policies prohibiting "[d]iscourteous, disrespectful or discriminatory treatment of any member of the public" and establishing guidelines for the investigation of sexual assaults. See SAC, Exh. 6 § 319.5.9(f), Policy 601. Plaintiff does not explain how any of these specific policies violated her constitutional rights. The vague and conclusory allegations in the SAC fall far short of pleading a viable Monell claim.

In her Fifth Cause of Action, Plaintiff claims that "the overwhelming majority of law enforcement personnel who handle sexual assaults remain woefully untrained, and fundamentally biased against sexual assault victims." SAC ¶ 202. She alleges that the training policies of the EMPD, LASD, and LADA are not adequate to train their personnel regarding how to provide protection in a nondiscriminatory manner, understanding crime elements, employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased juries, and treating victims equally and fairly. Id. ¶ 205. According to Plaintiff, the inadequate training fails to teach personnel to properly handle sexual assault investigations and prosecution and "the City and County's performance evidenced a purposeful tolerance to civil rights violations," amounting to deliberate indifference. Id. ¶¶ 206, 208. Plaintiff's conclusory allegations are insufficient to plausibly show that the City's or County's deficiency in training reflected a deliberate indifference to her constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 391 (1989) (explaining that allegations that "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" are insufficient to state Monell claim based on failure to train).

As such, Plaintiff has not stated a claim against the City or the County.

3.    The Federal Civil Rights Claims Against Individual Defendants

i.    Plaintiff has Not Stated a Federal Civil Rights Claim Against Reynoso, Villanueva, and Lacey

Plaintiff names Chief of Police Reynoso, Sheriff Villanueva, and District Attorney Lacey as defendants, but as the Supreme Court has emphasized, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Iqbal, 556 U.S. at 676. Rather, Plaintiff must allege that these defendants through their own

individual actions or inactions violated the Constitution. Id. at 677 ("each Government official, his or her title notwithstanding, is only liable for his or her own misconduct"). Plaintiff's SAC fails to so allege.

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation omitted). A causal connection can be established "by setting in motion a series of acts by others" or "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." Id. at 1207-08 (citations and alterations omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." Id. at 1208 (citation omitted).

As to Reynoso, Plaintiff alleges that "Reynoso served as the highest official for EMPD and made the City and EMPD policy for that office; he "has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the unconstitutional actions, policies, customs and practices" as alleged in the SAC; by "failing to discipline," Reynoso "endorsed or approved the unconstitutional conduct of individual officers"; and he was "well aware" of a policy, custom, or practice "of failure to address citizen complaint," citing to a 2018 article in the San Gabriel Valley Tribune describing that police departments, including EMPD, were looking for ways to improve the citizen complaint process prompted by a grand jury investigation. SAC ¶¶ 12, 60-61.

Plaintiff's contentions against Reynoso are insufficient to plausibly show his personal participation in the alleged constitutional violations or a

"sufficient causal connection" between his conduct and the alleged constitutional violations. <u>See</u> <u>Starr</u>, 652 F.3d at 1207. Plaintiff has not provided any factual allegations to support a claim that Reynoso directly or indirectly caused the alleged constitutional violations. Plaintiff vaguely alleges that Reynoso was aware of unrelated complaints regarding the filing of citizen complaints, but does not allege any specific instances in which Reynoso was placed on notice of alleged violations of Plaintiff's constitutional rights. At the hearing on the Motions, Plaintiff vaguely claimed that she filed "complaints" and therefore, Reynoso was on notice, though she conceded that she did not have any further facts to support this contention other than those asserted in her Opposition briefs. Even assuming that Reynoso received one of these "complaints," the mere receipt is insufficient to impose liability on this defendant. <u>See</u> <u>Iqbal</u>, 556 U.S. at 677 (rejecting argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution"). Plaintiff's conclusory allegations are insufficient to plausibly show that Reynoso violated Plaintiff's constitutional rights. <u>See</u> <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998) ("A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights."). Although <u>pro se</u> pleadings are liberally construed, vague and conclusory allegations are insufficient to state a Section 1983 claim. <u>See</u> <u>Pena v. Gardner</u>, 976 F.2d 469, 471 (9th Cir. 1992) (per curiam) (as amended); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 677.

Plaintiff's allegations against Villanueva similarly fail to plausibly allege a federal civil rights claim against this defendant. Plaintiff alleges that Villanueva "holds the command and policy making position with regards to the LASD" and by "failing to discipline," Villanueva endorsed or approved the unconstitutional conduct of individual officers. Plaintiff further alleges that "Villanueva has caused, created, authorized, condoned, ratified, approved or

knowingly acquiesced in the unconstitutional actions, policies, customs and practices" as described in the SAC. SAC ¶¶ 13, 89-90. These allegations fail to raise Plaintiff's right to relief beyond the speculative level. Twombly, 550 U.S. at 555. As with Reynoso, although Plaintiff alleges that she filed a complaint with the LASD, Plaintiff has not alleged any specific facts showing that Villanueva was actually aware of this complaint or otherwise alleged that the allegations in the SAC were brought to Villanueva's attention. Again, Plaintiff's conclusory allegations are insufficient to plausibly state a federal civil rights claim against this defendant.

Finally, as to Lacey, Plaintiff alleges that she is the highest official for the LADA and made the County and LADA policy "for that office"; and "[b]y failing to discipline[,] Lacey endorsed or approved the unconstitutional conduct of individual employees." SAC ¶¶ 14, 150. Plaintiff further alleges that on or about January 7, 2020, she emailed Lacey "regarding the Fourteenth Amendment violation and Lacey took no action." Id. ¶ 149. These allegations are insufficient to plausibly state a federal constitutional violation against this defendant. Plaintiff's vague allegation that she sent Lacey an email regarding "the Fourteenth Amendment violation" is insufficient to show that this individual was personally involved in the deprivation of her rights. Plaintiff does not identify any specific information she provided Lacey, such that Lacey would have been on notice of an alleged on-going constitutional violation. Further, as explained below, the district attorney defendants are entitled to prosecutorial immunity and Plaintiff has failed to state a Fourth Amendment claim against these defendants. Thus, she cannot state a claim based on Lacey's failure discipline her subordinates.

At the hearing on the Motions, Plaintiff also referenced an "announcement" Lacey purportedly made regarding how she handles sexual assault cases. It is unclear what Plaintiff was referencing with respect to this

announcement, but Plaintiff did not explain how anything in in this announcement shows Lacey's personal involvement in a constitutional violation or a causal connection between this announcement and any alleged violation of Plaintiff's constitutional rights. Likewise, to the extent Plaintiff is referencing the "Strategic Vulnerability Assessment" attached to her Opposition to the County Motion, Plaintiff does not identify any specific conduct in this 93-page document purportedly showing an "established discriminatory practice in her office." Opp. Cty. Mtn. at 32, Exh. 1.

Accordingly, Plaintiff has failed to state a federal civil rights claim against Reynoso, Villanueva, and Lacey.

      ii.    <u>Remaining Law Enforcement Defendants (Tate, Buckhannon, Jara, and Ruiz)</u>

          a.    <u>First Cause of Action: Equal Protection Clause</u>

In her First Cause of Action, Plaintiff alleges that all Defendants "deprived . . . her rights of equal protection under the law" "in that she has been afforded less favorable terms and conditions than victims of other assaults/crimes, and continues to be afforded less favorable terms and conditions." SAC ¶ 162. She maintains that Defendants "intentionally provide unequal protection to sexual assault victims in the form of failing to respond with equal effort to sexual assault victims the same as Defendants do with victims of other crimes." <u>Id.</u> ¶ 159. In particular, Plaintiff contends that telling her "it was not a rape before any investigation, falsifying incident report, interrogating Plaintiff, unreasonably searching and seizing Plaintiff's private data, and blaming Plaintiff" "permit the inference that Plaintiff's individual case was treated differently without a rational basis and showcase Defendants' custom and practice of intentional discriminatory under-policing." <u>Id.</u>

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal

protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985) (citation omitted). To state an equal protection claim, the plaintiff must allege facts plausibly showing that "the defendants acted with an intent or purpose to discriminate against [her] based upon membership in a protected class." <u>Barren</u>, 152 F.3d at 1194. Where the governmental classification does not involve a suspect or protected class or impinge upon a fundamental right, the classification will not "'run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose.'" <u>Nurre v. Whitehead</u>, 580 F.3d 1087, 1098 (9th Cir. 2009) (quoting <u>Cent. State Univ. v. Am. Ass'n of Univ. Professors</u>, 526 U.S. 124, 127-28 (1999) (per curiam)); <u>see also</u> <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993).

The City Defendants contend that Plaintiff has no constitutional right to have a particular criminal investigation conducted by law enforcement officers, and as such, no legal claim exists against law enforcement officers for their conduct in inadequately investigating or failing to investigate alleged criminal conduct. City Motion at 11. The City Defendants further maintain that even if a constitutional right existed, the City Defendants are entitled to qualified immunity because the officers' actions in recording her statement and preparing a written report did not clearly violate Plaintiff's rights. <u>Id.</u> at 12.

The County Defendants maintain it is "clear from the face of the SAC" that Jara and Ruiz lawfully conducted an investigation of Plaintiff's complaints regarding the alleged sexual assault, but determined there was a lack of probable cause to arrest the alleged assailant. The County Defendants argue, in such circumstances, "it would be clear to a reasonable officer that they were upholding the Constitution rather than participating in unlawful conduct." County Motion at 5. The County Defendants further argue that Plaintiff's

equal protection claim fails because she cannot show that she was a member of a protected class, that she was treated differently, or that the County Defendants' actions were motivated by discriminatory animus. Id. at 6-7.

While the "police have no affirmative obligation to investigate a crime in a particular way or to protect one citizen from another even when one citizen deprives the other of liberty of property," Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041, 1045 (9th Cir. 1994), as explained, "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." Estate of Macias, 219 F.3d at 1028; see also DeShaney, 489 U.S. at 197 n.3; Elliot-Park, 592 F.3d at 1006-07. In Elliot-Park, the Ninth Circuit explained that while an officer's "discretion in deciding whom to arrest is certainly broad," that discretion "cannot be exercised in a racially discriminatory fashion." 592 F.3d at 1006. This right is violated even where some services, as opposed to a complete withdrawal of police services, are provided because "diminished police services" does not satisfy the government's obligation to provide services on a non-discriminatory basis. Id. at 1007. The Ninth Circuit rejected the officers' argument that "investigation and arrest" are not "protective services" unless there is a continuing danger to the victim, reasoning that "[i]f police refuse to investigate or arrest people who commit crimes against a particular ethnic group, it's safe to assume that crimes against that group will rise." Id.

Here, Plaintiff's allegations are not sufficient to state an equal protection claim based on the manner in which her complaint was investigated. While Plaintiff claims she, as a sexual assault victim, was treated differently than other assault/crime victims, she has not alleged any facts demonstrating that she was intentionally treated differently than other assault victims without a

rational relationship to a legitimate state purpose.[2] To the contrary, the allegations of the SAC indicate a rational basis for declining to further pursue her complaint. The allegations of the SAC reflect that Plaintiff's complaint was investigated by both police departments. Her initial complaint with EMPD was transferred for jurisdictional reasons. Upon transfer, Jara conducted an investigation and forwarded the matter to the LADA. According to the SAC, the LADA declined to prosecute for a number of reasons, including credibility concerns, lack of evidence, and the involvement of alcohol. There are no allegations to plausibly suggest that her case was treated any different because she was an alleged victim of a sexual assault. Plaintiff's mere disagreement with how the investigation was conducted or the conclusions reached is insufficient to show that any of the individual defendants violated her equal protection rights.

Accordingly, Plaintiff has failed to state an equal protection claim against Tate, Buckhannon, Jara, and Ruiz.

b.    Second Cause of Action: Fourth Amendment

In her Second Cause of Action, Plaintiff alleges the County Defendants violated the scope of her consent to search of her smartphone, in violation of

_____

[2] Although the Ninth Circuit has recognized that victims of certain crimes may constitute a cognizable class for equal protection purposes, see Navarro, 72 F.3d at 717 (concluding that domestic violence victims were a cognizable class for equal protection purposes and that discrimination against this group is subject to rational basis review), it appears that the Ninth Circuit has not recognized a "class of one" equal protection claim based on police inaction. See, e.g., Mancini v. City of Cloverdale Police Dep't, 2015 WL 4512274, at *5 (N.D. Cal. July 24, 2015) (noting that circuit courts are divided on whether class-of-one claims can be brought in the failure to investigate context and that the Ninth Circuit has not decided the issue); Le Fay v. Le Fay, 2015 WL 106262, at *5-6 (E.D. Cal. Jan. 7, 2015) ("the Ninth Circuit has not directly addressed the question of whether, or under what circumstances, an Equal Protection claim on a class-of-one theory may be alleged in the context of police non-action"). Plaintiff has not cited any authority suggesting otherwise.

her Fourth Amendment rights. She contends she did not consent to search the entire contents of her phone, but rather only to download the communications between herself and Suarez. SAC ¶¶ 71, 169, 171, 173. She contends that "Jara was well aware" that she "handed over her cell phone solely for Jara to download her conversations with Suarez" and Ruiz "had personal knowledge of the illegal search and seizure" and "was part of it." Id. ¶¶ 97, 169. Based on a conversation with Ruiz and a translation done on her cellular phone, she believes the County Defendants exceeded the scope of her consent.

Under the Fourth Amendment to the U.S. Constitution, individuals have the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, law enforcement officials must obtain a warrant before searching the contents of a phone. Carpenter v. United States, 585 U.S. --, 138 S. Ct. 2206, 2214 (2018); Riley v. California, 573 U.S. 373, 401 (2014).

Consent is a recognized exception to the Fourth Amendment protection against unreasonable searches and seizures. United States v. Russell, 664 F.3d 1279, 1281 (9th Cir. 2012). However, "[t]he existence of consent to a search is not lightly to be inferred" and the government always has the burden of proving effective consent. United States v. Reid, 226 F.3d 1020, 1025 (9th Cir. 2000) (citation omitted). The scope of the search by consent is limited by the terms of its authorization. Walter v. United States, 447 U.S. 649, 656 (1980). Under the Fourth Amendment, the standard for measuring the scope of an individual's consent is "that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [person giving consent]?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).

The County Defendants contend Plaintiff's Fourth Amendment claim is conclusory and speculative, with the elements of a Fourth Amendment violation not sufficiently alleged to put Defendants on notice of the contours of

the claim. County Motion at 8. For similar reasons, the County Defendants maintain they are entitled to qualified immunity since Plaintiff has not alleged facts showing a constitutional violation. Id. at 5. Beyond this conclusory assertion, however, the County Defendants do not substantively address the application of qualified immunity to a Fourth Amendment violation.

At this stage of the case and construing the allegations in the SAC in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently stated a Fourth Amendment claim against Jara and Ruiz. As the County Defendants have not sufficiently addressed their qualified immunity argument with respect to the Fourth Amendment claim, the Court concludes that Jara and Ruiz have not shown entitlement to qualified immunity. However, this finding is without prejudice to the County Defendants reasserting qualified immunity at a later stage of the proceedings upon a further showing.

### c.   Third Cause of Action: Civil Conspiracy

In her Third Cause of Action, Plaintiff contends that all Defendants "conspired among themselves and with others for the purpose of depriving, directly or indirectly, Plaintiff of equal protection under the law with the intent to deny her right to [be] free from discrimination and unreasonable search and seizure." SAC ¶ 179. According to Plaintiff, the "object" of the conspiracy was to "conceal the fact that the complaints of crime made by female rape victims are less important" to the EMPD, LASD, and LADA than complaints made by similarly situated male rape victims. Id. ¶ 181.

"Section 1985 prohibits conspiracies to deny an individual [her] civil rights." Cerrato v. S.F. Cmty. Coll. Dist., 26 F.3d 968, 975 n.19 (9th Cir. 1994). In order to state a claim based on a violation of Section 1985(3), the plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy;

(4) "whereby a person is either injured in [her] person or property or deprived of any right or privilege of a citizen of the United States." <u>Fazaga v. FBI</u>, 916 F.3d 1202, 1245 (9th Cir. 2019) (citation omitted). Claims brought under Section 1985 must be supported by allegations of specific facts; "[a] mere allegation of conspiracy without factual specificity is insufficient." <u>Karim-Panahi v. L.A. Police Dep't</u>, 839 F.2d 621,626 (9th Cir. 1988). Further, a plaintiff must first have a cognizable claim under Section 1983 in order to state a claim for conspiracy under Section 1985. <u>Olsen v. Idaho State Bd. of Med.</u>, 363 F.3d 916, 930 (9th Cir. 2004).

Here, Plaintiff alleges no specific facts suggesting an agreement or common objective among Defendants to violate her rights. <u>See</u> <u>Olsen</u>, 363 F.3d at 929 (affirming dismissal of conspiracy claim where plaintiff failed to allege sufficiently that the defendants conspired to violate her civil rights). Plaintiff must allege more than the alleged co-conspirators did or said the same thing. <u>See</u> <u>Myers v. City of Hermosa Beach</u>, 299 F. App'x 744, 747 (9th Cir. 2008). Plaintiff's naked assertion that a conspiracy existed, without more, is insufficient to state a claim. <u>See</u> <u>Twombly</u>, 550 U.S. at 557 ("a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). The SAC fails to set forth essential, specific acts of each defendant that support the existence of the claimed conspiracy. The mere fact that Suarez was not criminally prosecuted does not establish liability, or the existence of a conspiracy.

             iii.    <u>District Attorney Defendants (Cagney, Thorp, and Chung)</u>

The County Defendants contend that these defendants are absolutely immune from Plaintiff's federal civil rights claims. They contend that prosecutors have absolute immunity when acting within the scope of their duties as an advocate for the state and are entitled to sovereign immunity to extent they are being sued in their official capacity. County Motion at 3-4.

Section 1983 claims for monetary damages against prosecutors are barred by absolute prosecutorial immunity where the claimed violations are "intimately associated with the judicial phase of the criminal process." Van de Kamp v. Goldstein, 555 U.S. 335, 341 (2009) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protection of absolute immunity." Kalina v. Fletcher, 522 U.S. 118, 126 (1997) (citation omitted). "The intent of the prosecutor when performing prosecutorial acts plays no role in the immunity inquiry." McCarthy v. Mayo, 827 F.2d 1310, 1315 (9th Cir. 1987) (as amended). Such immunity is "an extreme remedy," justified only where "any lesser degree of immunity could impair the judicial process itself." Patterson v. Van Arsdel, 883 F.3d 826, 830 (9th Cir. 2018) (quoting Lacey, 693 F.3d at 912). An official seeking absolute immunity bears the burden of showing that such immunity is essential for the function in question. Id. When the prosecutor steps outside of the advocate's role, her conduct is protected only "to the extent that any other individual would be protected performing the same function." Id. (citation omitted).

As explained, Plaintiff lacks standing to the extent she challenges the decision not to criminally prosecute Suarez. Further, any claim regarding the decision to prosecute would fall squarely within that protected by prosecutorial immunity. See, e.g., Imbler, 424 U.S. at 430-31 (prosecutorial immunity applies to conduct "intimately associated with the judicial phase of the criminal process," protecting prosecutors when performing traditional activities related to the initiation and presentation of criminal prosecutions); Botello v. Gammick, 413 F.3d 971, 976 (9th Cir. 2005) (prosecutorial immunity applies to the decision not to prosecute a particular case or group of cases); see also Van de Kamp, 555 U.S. at 348-49 (prosecutorial immunity

applied to claims that the supervision, training, and information-system management was constitutionally inadequate). Despite Plaintiff's attempt to re-frame her allegations against these defendants, at essence, Plaintiff's equal protection and civil conspiracy claims are premised on these Defendants' failure to pursue a criminal prosecution against Suarez, and as such, they are entitled to prosecutorial immunity as to these claims. Although, as Plaintiff notes (SAC ¶ 14), prosecutorial immunity only extends to claims for damages, Gobel v. Maricopa Cty., 867 F.2d 1201, 1203 n.6 (9th Cir. 1989), abrogated on other grounds by Merritt v. Cty. of L.A., 875 F.2d 765 (9th Cir. 1989), as discussed above, Plaintiff does not have standing to pursue her claim for injunctive relief seeking the prosecution of Suarez. Plaintiff's claim for declaratory relief merely duplicates her claims for damages. See Kimball v. Flagstar Bank, F.S.B., 881 F. Supp. 2d 1209, 1220 (S.D. Cal. 2012) (dismissing declaratory relief claim "based upon the same allegations supporting [plaintiffs'] other causes of action" and "duplicative of their other claims"). As such, Plaintiff cannot pursue her equal protection and civil conspiracy claims against the district attorney defendants.

The Fourth Amendment claim is a closer call. The Supreme Court has held that "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993). For instance, district courts have recognized that the refusal to return property after criminal charges are dismissed does not constitute conduct that is "intimately associated with the judicial phase of the criminal process," and therefore, may not be covered by the doctrine of prosecutorial immunity. See Inman v. Anderson, 294 F. Supp. 3d 907, 917 (N.D. Cal. 2018); see also Ellawendy v. CSUMB Police Dep't, 2020 WL 1820669, at *5 (N.D. Cal. Apr. 10, 2020). In this case, however,

regardless of whether the district attorney defendants would be entitled to prosecutorial immunity, Plaintiff has not sufficiently stated a claim against these defendants based on a violation of the Fourth Amendment.

Plaintiff alleges that LASD technical personnel extracted, stored, and submitted her private cellular phone data to LADA officials. SAC ¶ 97. The LADA declined to file charges against Suarez on or about August 23, 2019, but retained her cellular phone until October 2019. SAC ¶¶ 102, 131 (alleging that she retrieved her phone from LADA in late October 2019). These allegations are insufficient to state a Fourth Amendment claim against the district attorney defendants.

The Supreme Court has recognized that a Fourth Amendment violation is "fully accomplished" by the illegal search or seizure and the governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution. Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 362 (1998). Plaintiff affirmatively alleges that LASD performed the allegedly unlawful search. Although Plaintiff claims the cellular phone was ultimately in the possession of unidentified district attorney officials,[3] she has not alleged any specific facts to connect any particular district attorney defendant to the alleged violation of the Fourth Amendment, let alone alleged that any individual district attorney defendant was aware of the alleged limited scope of her consent or that any of them were in possession of information derived from an unlawful search. To the contrary, she appears to concede in her Opposition that the unlawful search was limited to the law enforcement defendants. In her Opposition to the County Motion, she argues that "Jara, Ruiz, and other unknown LASD personnel participated in the illegal search and seizure of Plaintiff's private electronic data in her smartphone." Opp. Cty. Mtn. at 9.

_____

[3] The Court notes that Plaintiff claimed in her Motion for a Preliminary Injunction that she retrieved her cellular phone from LASD. Dkt. 43 at 6.

At the hearing on the Motions, Plaintiff argued that she believes Cagney was in possession of information derived from an unlawful search. In support of this contention, Plaintiff cited to an October 11, 2019 email from Cagney attached to the Motion for Preliminary Injunction in which he stated:

> Thank you for your email. We have already contacted LASD to acquire the texts and recorded interview. This review is going to take me weeks to do so I ask for your patience.

Dkt. 43-1. Plaintiff also referenced a telephone call with Cagney on January 20, 2020, in which he allegedly stated he reviewed the "texts" and recorded interview. Plaintiff maintains that "texts" in this context refers to all her text messages, noting the message with her female friend that was translated.

These additional contentions are insufficient to plausibly show that Cagney violated Plaintiff's Fourth Amendment rights. The fact that he may have looked at some text messages does not establish he violated her Fourth Amendment rights, or that he knew any information he reviewed had been obtained without her consent. The Court cannot reasonably infer from the reference to "texts" that this included any materials other than those between Plaintiff and Suarez or infer that Cagney had knowledge of any limits imposed by Plaintiff as to her consent provided to Jara. Likewise, Plaintiff's speculation that these messages may have been shared with the other district attorney defendants does not constitute sufficient factual support to state a Fourth Amendment claim against the remaining district attorney defendants.

The Court concludes Plaintiff has failed to state a Fourth Amendment claim against the district attorney defendants.

**B.    Plaintiff Has Not Stated a Claim Under the Safe Streets Act**

In her Sixth Cause of Action, Plaintiff alleges the County Defendants' handling of sexual assault cases has an unnecessary disparate impact on sexual assault victims, in violation of the Omnibus Crime Control and Safe Streets

Act of 1968. SAC ¶¶ 214-215. The County Defendants maintain that this claim should be dismissed because Plaintiff failed to allege that she exhausted her administrative remedies prior to bringing this claim. County Motion at 12.

Title 34 of United States Code, Section 10228 (formerly 42 U.S.C. § 3789d) prohibits discrimination in any program or activity funded by this Act based on "race, color, religion, national origin, or sex." 34 U.S.C. § 10228(c)). In order to exhaust administrative remedies under 34 U.S.C. § 10228, an "administrative complaint [must be] filed with the Office of Justice Programs or any other administrative enforcement agency." 34 U.S.C. § 10228(c)(4)(A).

Here, the SAC does not aver that Plaintiff exhausted her administrative remedies, precluding the Court from granting relief. See Horde v. Elliot, 2018 WL 987683, at *14 (D. Minn. Jan. 9, 2018), report and recommendation adopted by 2018 WL 985294 (D. Minn. Feb. 20, 2018); Nash v. City of Oakwood, 541 F. Supp. 220, 223 (S.D. Ohio 1982). Although Plaintiff claims in her Opposition to the County Motion that she attempted to file a complaint with the Department of Justice (Opp. Cty. Mtn. at 35; Declaration of Plaintiff filed in support of Opp. Cty. Mtn. ¶¶ 2-3), the Court may not consider such allegations in ruling on a Rule 12(b)(6) motion to dismiss. Schneider v. Cal. Dep't of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."); see also Sagan v. Apple Comput., Inc., 874 F. Supp. 1072, 1076 n.1 (C.D. Cal. 1994) (explaining that the court's "analysis is limited to the four corners of the complaint.").

In any event, Plaintiff has not stated a claim under Section 10228. Plaintiff has not identified any program administered by the Omnibus Crime Control and Safe Streets Act of 1968 connected to the alleged discrimination asserted in the SAC. See Horde, 2018 WL 987683, at *14 (because plaintiff

"has not identified any program funded by the Safe Streets Act connected to the discrimination [she] has alleged, there is no plausible basis for claims under this statute" (citation omitted)); Agent Anonymous v. Gonzalez, 2016 WL 8999471, at *6 (S.D. Cal. Dec. 14, 2016). This claim should be dismissed.

## C.   The Basis for the Court's Findings Applies Equally to Doe Defendants

Although the Doe Defendants have not been identified or served in this action, the basis for the Court's findings as to all Defendants except Jara and Ruiz applies equally to them. "A District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related." Silverton v. Dep't of Treasury, 644 F.2d 1341, 1345 (9th Cir. 1981); accord Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 742 (9th Cir. 2008) ("As a legal matter, we have upheld dismissal with prejudice in favor of a party which had not appeared, on the basis of facts presented by other defendants which had appeared."). The absence of any specific factual allegations to support Plaintiff's claims applies equally to Doe Defendants. Accordingly, the Court recommends that these Defendants be dismissed.

By this Report, Plaintiff is placed on notice that the Court recommends dismissing Does 1-10; if Plaintiff disagrees and believe she can state a claim as to these Defendants, she should make that showing in Objections to the Report and Recommendation.

## D.   Further Leave to Amend Would be Futile

As explained, a pro se litigant must ordinarily be given leave to amend unless it is absolutely clear that deficiencies in a complaint cannot be cured by further amendment. See Cato, 70 F.3d at 1106.

In this instance, Plaintiff has had multiple opportunities to amend her complaint in order to state a federal claim for relief. Despite two opportunities

to amend her complaint, Plaintiff fails to allege a valid federal claim against all but two of the Defendants, as to a single claim. Although the Court may not look beyond the SAC and facts subject to judicial notice in determining the propriety of a Rule 12(b)(6) dismissal, the Court has considered Plaintiff's additional factual allegations in the Oppositions, the Motion for Preliminary Injunction, and the arguments at the hearing in determining whether leave to amend should be granted. Plaintiff was provided an opportunity at the hearing on the Motions to identify any additional facts that would support her federal claims for relief. Plaintiff was unable to identify any additional facts beyond those already identified and considered that would be sufficient to state a federal claim to relief. The Court finds that the deficiencies of the SAC cannot be cured by further amendment.

As such, the Court recommends that the federal claims and all defendants, except for the Fourth Amendment claim against Jara and Ruiz, be dismissed without further leave to amend. See Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001); see also, e.g., Fid. Fin. Corp. v. Fed. Home Loan Bank of S.F., 792 F.2d 1432, 1438 (9th Cir. 1986) ("The district court's discretion to deny leave to amend is particularly broad where the court has already given the plaintiff an opportunity to amend his complaint."); Ismail v. Cty. of Orange, 917 F. Supp. 2d 1060, 1066 (C.D. Cal. 2012) ("[A] district court's discretion over amendments is especially broad where the court has already given a plaintiff one or more opportunities to amend his complaint." (quoting DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 n.3 (9th Cir. 1987))).

E.   **Denial of Supplemental Jurisdiction as to all State Law Claims Except Those Alleged Against Defendants Jara and Ruiz**

In addition to federal claims, Plaintiff asserts nine state law claims based on the conduct discussed above. Based on the Court's initial review of

Plaintiff's state law claims, as well as the briefing on the Motions with respect to these claims, it appears most of Plaintiff's state law claims, with the possible exception of the Eighth Cause of Action (California Constitution – Unreasonable Search and Seizure) and the Ninth Cause of Action (California Constitution – Right to Privacy), are subject to dismissal for failure to state a claim for the reasons set forth above, among other reasons.

However, when a federal court has dismissed all claims over which it has original jurisdiction, it may, at its discretion, decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3); Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639-40 (2009).

As only one federal claim, out of six, against two defendants, out of twelve, survives Defendants' Motions to Dismiss, as a matter of comity, the Court should decline to exercise supplemental jurisdiction over the nine remaining state law claims as asserted against all Defendants except Jara and Ruiz, rending the Motions to Dismiss as to those claims moot.

With respect to the state law claims against Jara and Ruiz, as a matter of judicial efficiency, the Court should decline to rule on the challenges by Jara and Ruiz to Plaintiff's nine remaining state law claims at this time and instead will stay those claims pending further proceedings as to the sole claim the Court finds sufficient in the SAC, the Second Cause of Action alleging a Fourth Amendment violation against Defendants Jara and Ruiz.

## V.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order, to be reflected in a final judgment where appropriate:

1. approving and accepting this Report and Recommendation;

2. granting the City's and County's Motions as follows:

       a.    dismissing the First, Third, Fourth, Fifth, and Sixth Causes of Action without leave to amend and with prejudice as to the City, the County, Reynoso, Tate, Buckhannon, Villanueva, Jara, Ruiz, Lacey, Cagney, Thorp, and Chung; and

       b.    dismissing the Second Cause of Action without leave to amend and with prejudice as to the County, Villanueva, Cagney, Thorp, Chung, and Lacey;

3.    denying the County's Motion as to the Second Cause of Action against Jara and Ruiz in their individual and official capacities;

4.    dismissing all federal claims against Does 1-10 without leave to amend;

5.    declining to exercise supplemental jurisdiction over the state law claims against the City, the County, Reynoso, Tate, Buckhannon, Villanueva, Lacey, Cagney, Thorp, Chung, and Does 1-10 without prejudice to Plaintiff raising them in state court;

6.    staying further proceedings with respect to the state law claims against Jara and Ruiz until further order of the Court; and

7.    modifying the May 22, 2020 Preliminary Injunction and releasing Villanueva, Lacey, Cagney, Thorp, and Chung therefrom.

DATED: June 26, 2020

JOHN D. EARLY
United States Magistrate Judge