FILED
CLERK, U.S. DISTRICT COURT

06/07/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:  M.B.        DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| O.L.,<br><br>                    Plaintiff,<br><br>     v.<br><br>CITY OF EL MONTE, et al<br><br>             Defendants. | No. 2:20-cv-00797-RGK-JDE<br><br>REDACTED DECLARATION OF ERIN R. DUNKERLY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO STAY DEPOSITION<br>(DOCKET ENTRY 106) |

EXHIBIT 2

Erin R. Dunkerly, Esq. (State Bar No. 260220)
Amanda G. Papac, Esq. (State Bar No. 328899)
**COLLINS COLLINS MUIR + STEWART LLP**
1100 El Centro Street
South Pasadena, CA 91030
(626) 243-1100 – FAX (626) 243-1111
Email:  edunkerly@ccmslaw.com
Email:  apapac@ccmslaw.com

Attorneys for Defendants,
LILIANA JARA and RICHARD RUIZ

FILED
CLERK, U.S. DISTRICT COURT

10/22/2020

CENTRAL DISTRICT OF CALIFORNIA
BY:  M.B.  DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| O.L., | CASE NO. 2:20-CV-00797-RGK-JDE |
| Plaintiff, | *[Reassigned to Magistrate Judge John D. Early – Courtroom 6A]* |
| vs. | **DECLARATION OF ERIN R. DUNKERLY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION TO STAY DEPOSITION** |
| CITY OF EL MONTE; COUNY OF LOS ANGELES; DAVID REYNOSO; MARTHA TATE; MICHAEL BUCKHANNON; ALEX VILLANUEVA; LILIANA JARA; RICHARD RUIZ; JACKIE LACEY; PETER CAGNEY; KAREN THORP; JUNE CHUNG; and DOES 1-10, inclusive, | |
| | Complaint Filed:  2/3/2020 |
| Defendants. | Trial Date:  None |

///

///

22240

COLLINS COLLINS
MUIR + STEWART...
1100 El Centro Street
So. Pasadena, CA 91030
Phone: (626) 243-1100
Fax (626) 243-1111

1

**DUNKERLY DECLARATION RE: OPPOSITION TO EX PARTE**

## DECLARATION OF ERIN R. DUNKERLY

I, Erin R. Dunkerly, declare and state as follows:

1.     I am licensed to practice law in California, and am a partner with the law firm of Collins Collins Muir + Stewart, LLP, counsel of record for defendants Liliana Jara and Richard Ruiz. I make this declaration in support of the Opposition to Plaintiff's Ex Parte Application to Stay Plaintiff's Deposition, Request for Protective Order, and Request for Sanctions. This declaration is based upon my personal knowledge, and if called upon as a witness, I could and would testify truthfully under oath as to the facts stated herein.

2.     On September 28, 2020, I prepared and had my office serve notice of plaintiff O.L.'s deposition with a request for production of documents, which is set for November 5, 2020.

3.     On October 12, 2020, I received an email from plaintiff O.L. in which she raised several issues with discovery. Relative to her deposition, O.L. stated "As to the deposition, please narrow and break down the scope and restrict the length in an hour or Plaintiff has to seek a protective order." A true and correct copy of her email and our later colloquy is attached hereto as **Exhibit A.**

4.     On October 14, 2020, plaintiff O.L., my associate Amanda Papac, and I had a telephonic conference for over one hour to discuss Plaintiff's concerns raised in her email.

5.     During the conference, plaintiff O.L. stated that she wanted the duration of her deposition limited to one hour due to her "emotional status" and also limit the scope of questions. Plaintiff did not provide additional information regarding her "emotional status" or how she wanted the scope limited.

6.     I informed plaintiff O.L. that I could not agree to a deposition length of one hour. I told her in general a party's deposition can take up to seven hours. I also told her that a defendant is entitled to take a full deposition of a plaintiff. I told her that we could not agree to stay, shorten, or limit the scope of her deposition without more

22240

2

**DUNKERLY DECLARATION RE: OPPOSITION TO EX PARTE**

COLLINS COLLINS MUIR + STEWART...
1100 El Centro Street
So. Pasadena, CA 91030
Phone: (626) 243-1100
Fax: (626) 243-1111

information relative to good cause. She reiterated unspecified emotional issues preventing a deposition of longer than one hour. Since our conversation at that point had already lasted over an hour, I inquired if she needed to end our call, and we ended the call.

7.      I have taken several hundred depositions throughout my career, including depositions of plaintiffs who have alleged sexual or other sensitive injuries. While I cannot give a precise length for the deposition of plaintiff O.L., I do intend and endeavor to be efficient and respectful. I am open to breaking O.L.'s deposition into shorter periods of multiple days, if warranted. However, in order to defend my clients I must have the ability to question O.L. fully as to her allegations and damages, otherwise my clients will be unduly prejudiced.

8.      Instead of providing additional information regarding good cause to limit or stay the deposition, Plaintiff filed in the instant Ex Parte Application more than three weeks after receiving the written notice of her deposition.

9.      At no time did plaintiff O.L. inform my office of her need to obtain any document from her medical provider regarding her inability to be deposed. The first I learned of this was in her ex parte application. The exhibit to her ex parte application that includes the purported doctor's note appears redacted and partially obscured on my end, such that I cannot evaluate it adequately.

10.      Regarding plaintiff's argument about Defendants' deposition document requests related to her communications with Charlie Suarez—the man she accused of raping her—those requests relate to the scope of the consent she gave to the Los Angeles County Sheriff's Department to search her phone, which is at issue in this case. Attached hereto as **Exhibit B** is a true and correct copy of the Entry and Search Waiver form, which was identified in Defendants' initial disclosures on September 3, 2020.

11.      In her initial disclosures O.L. has refused to provide the names of any of her medical providers. She has a pending motion for a protective order in this case

COLLINS COLLINS
MUIR + STEWART...
1100 El Centro Street
Sn. Pasadena, CA 91030
Phone: (626) 243-1100
Fax (626) 243-1111

22240

3

**DUNKERLY DECLARATION RE: OPPOSITION TO EX PARTE**

seeking blanket protection for unspecified personal information, including her medical information. Overall, defendants are in the dark as to the particular facts concerning her emotional distress and other damages. O.L. has plainly put her emotional and medical state at issue in this case and the document requests seek information relative to her damages that she alleges were *proximately caused* by defendants.

12. To further add to the need for an opportunity to conduct full discovery as to her claims, an issue of concern is plaintiff seeking duplicative damages. Plaintiff O.L. has filed at least three other lawsuits anonymously complaining of similar damages to those alleged in this instant lawsuit:

13. The first lawsuit she filed in the Central District of California against California Governor Gavin Newsom and California Attorney General Xavier Becerra. Starting at page 20, paragraph 121, plaintiff recounts the same incidents alleged in this instant lawsuit. Attached hereto as **Exhibit C** is a true and correct copy of the complaint downloaded from PACER.

14. The second lawsuit plaintiff filed in the Northern District of California against the City of Concord and various other defendants in which she alleges various injuries and at page 14, paragraph 48, plaintiff recounts similar damages alleged in this instant lawsuit. Attached hereto as **Exhibit D** is a true and correct copy of the complaint downloaded from PACER.

15. The third lawsuit plaintiff filed in the Central District of California against the County of Orange and other defendants in which plaintiff recounts similar damages alleged in this instant lawsuit. Attached hereto as **Exhibit E** is a true and correct copy of the complaint downloaded from PACER.

///

///

///

///

///

22240

COLLINS COLLINS MUIR + STEWART... 1100 El Centro Street So. Pasadena, CA 91030 Phone: (626) 243-1100 Fax (626) 243-1111

4

**DUNKERLY DECLARATION RE: OPPOSITION TO EX PARTE**

16.   Plaintiff O.L. may have filed other lawsuits regarding events or damages similar to this lawsuit, but it's difficult to determine given her filing several under an alias and her unwillingness to identify what other lawsuits she has filed in discovery in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 21, 2020, in Pasadena, California.

By: _____

ERIN R. DUNKERLY

COLLINS COLLINS
MUIR + STEWART...
1100 El Centro Street
Sic, Pasadena, CA 91030
Phone: (626) 243-1100
Fax: (626) 243-1111

22240

5

**DUNKERLY DECLARATION RE: OPPOSITION TO EX PARTE**

# EXHIBIT A

| From: | Jane Doe |
|---|---|
| To: | Kristy M. Fullogui |
| Cc: | tgallagher@omlolaw.com; vhsu@omlolaw.com; Erin R. Dunkerly; Amanda G. Papac; Legal Assistant Services; Helen L. Esparza |
| Subject: | 2:20-cv-00797-RGK-JDE - meet and confer |
| Date: | Monday, October 12, 2020 1:50:09 PM |
| Attachments: | Stipulated Protective Order O.L. v City of El Monte, et al.doc |

Dear Ms Papac,

This email is an attempt to meet and confer in regards to the discovery responses made by County Defendants on Oct 9, 2020, discovery sanction, a protective order governing confidential information, a protective order quashing certain discovery requests propounded by Defendants, scope and length of deposition, and Plaintiff's need for a second amended scheduling order.

Set out below is a discussion of Plaintiff's first set discovery requests in question, Defendants' responses thereto, and explanations why the responses are inadequate. I ask that you provide supplemental and additional further responses no later than 5 pm PST Oct 19, 2020.

For each preliminary statement, please describe in details how Plaintiff's requests violate Federal Rules of Civil Procedure Rule 26(b)(1) as to which Plaintiff's request. If you fail to do so Plaintiff asks you to withdraw or Plaintiff will move the court to remove it and seek sanction. As your statement seems like a general objection but general objections are improper and sanctionable. Any objections Defendants had or intended to assert should have been asserted regarding each individual discovery request, or else they were waived. This requirement allows a party to track exactly which objection is being asserted against which discovery item, enabling the party to fully understand the response and to assist in the meet-and-confer process.

For each objection to any part of Plaintiff's discovery on the basis of a claim that the request is burdensome, please provide the following information to allow Plaintiff and the Court to assess the applicability of the objection:

        (a)   Identify the number of documents you need to search;

        (b)  Identify the nature of documents you need to search;

        (c)   Identify the location of the documents;

        (d)  Identify the number of hours required to conduct the search; and

        (e)   Identify the costs required to conduct the search, including the formulation used to calculate the costs.

JARA's response to Plaintiff's RFA (Set One):

The response is not verified.

RFA #3 through 7, 11 and 23

These RFAs are related to the entire interview of Plaintiff and JARA which provides a context for the jury to apply fact driven notions of common sense. The jury is entitled to hear every word that was said during the interview that led up to the complete search and seizure of Plaintiff's phone. Whether the suspect's phone was searched also helps the jury to decide whether the complete search of a victim's phone is reasonable.

JARA's response to Plaintiff's Interrogatory (Set One):

Interrogatory #1

JARA denies RFAs #16 and 21 but does not provide response requested by Interrogatory #1.

Interrogatory #4

The response is incomplete as date of training/course, brief training/course description, and duration of training/course (hours) are missing. Please provide privilege log as privilege is asserted.

RUIZ's response to Plaintiff's Interrogatory (Set One):

Interrogatory #3, 4, and 5

Please provide privilege log as privilege is asserted.

Interrogatory #6

The response is incomplete as date of training/course, brief training/course description, and duration of training/course (hours) are missing.

RFP and Interrogatory to County of Los Angeles (Set One):

Per Dkt. 66 at 38, the court denies the County's Motion as to the Second Cause of Action against Jara and Ruiz in their individual and official capacities and the Court accepts the findings and recommendation of the magistrate judge except the Court does not, at this time, dismiss claims against DOE defendants to the extent such the claims against such DOE defendants relate to claims not dismissed by this Order, see Dkt. 72. The court did not dismiss the individual defendants in their official capacity from this claim, therefore the County of Los Angeles has to respond to Plaintiff's RFP and interrogatory. Plaintiff will seek sanction if she does not receive the County's response by 5 pm PST Oct 19, 2020.

In regards to your discovery requests, absent a protective order governing confidential information Plaintiff objects to any attempt to obtain her confidential information. Attached please find a proposed protective order governing confidential information and please let me know if we could stipulate it.

As to the following specific requests Plaintiff asks you to withdraw or she will move the court for a protective order:

JARA's RFP (Set One):

RFP #4, 10, 12, 13, 20, 21, 22, 23, 24, 27, 28

EMPD, LADA, and Charlie Suarez are not the parties in this claim and their information is irrelevant. These requests also violate third party's privacy.

Any and all Plaintiff's declarations are filed with the court which are equally available to Defendants.

Based on the collateral source rule Plaintiff's health insurance is irrelevant to this claim.

RUIZ's RFP (Set One):

RFP #10

Plaintiff's medical files, notes, bills, and invoices are not established by injury. Plaintiff will object to any attempt to obtain her medical files and notes but agree with Defendants' specific inquiry from Plaintiff's health care providers.

JARA's Interrogatory (Set One):

Interrogatory #19

This request is not REASONABLY calculated to lead to any relevant information but for the sole purpose to harass or annoy Plaintiff.

RUIZ's RFA (Set One):

RFA #1 through 5

It is for the finder of fact to assess whether a document or witness supports a claim and answer your questions. These RFAs are not an attempt to nail down the disputed core facts of the case but to harass or annoy Plaintiff.

JARA's RFA (Set One):

RFA #1 through 4, 7
It is for the finder of fact to assess whether a document or witness supports a claim and answer your questions. These RFAs are not an attempt to nail down the disputed core facts of the case but to harass or annoy Plaintiff.

I obviously prefer resolving these discovery issues without court intervention, and so I ask for Defendants' cooperation in informally resolving these discovery issues. However, absent an informal resolution, I'm left with no choice but to pursue Plaintiff's discovery rights and put these issues before the Court for resolution.
As in Defendants' response to Plaintiff's discovery requests Defendant RUIZ claims that Plaintiff's gofundme page link was sent by Santa Ana Police Department. Due to this new information Plaintiff is entitled to further investigation to identify potential defendants which means the first amended scheduling order does not provide Plaintiff with sufficient time and opportunity to conduct such investigation. Plaintiff desires to stipulate with Defendants a seconded amended scheduling order. As to the deposition, please narrow and break down the scope and restrict the length in an hour or Plaintiff has to seek a protective order.

Please let me know your position and see if we can eliminate any motions. Thank you for your continued courtesy and cooperation.

Regards,
O.L.

# EXHIBIT B

# LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

## ENTRY AND SEARCH WAIVER

FILE No. 019-07341-0563-021

I ▮▮▮▮▮▮ , ▮▮▮▮▮▮▮▮ , having legal custody or
(Last Name)              (First)              Middle)

control or authority or personal ownership of the cell phone(s) described below:

SAMSUNG, S6, WHITE IN COLOR, PASSCODE 9249 1001

do hereby grant full and unconditional authority to the Los Angeles County Sheriff's Department to search the listed items for any and all data. RELATED TO THIS CASE, TEXT MESSAGES, PHOTOGRAPHS, VIDEOS, MESSAGES, EMAILS

and to conduct any related investigation any related criminal or non-criminal law enforcement matter.

I grant this consent freely, knowingly, and intelligently with full knowledge that members of the Department will have free and unrestricted access to the listed items until the current investigation is completed.

7/2/19                    1:55 pm
Signature                                      Date              Time

JARA, L              467533              07/02/19         1:55 HRS.
Witnessing Officer        Badge I.D. Number        Date              Time

SH-R-4105-5-00

# EXHIBIT C

JANE DOE

11151 Valley Blvd #4886,

El Monte, CA 91734

626-208-9665

Plaintiff in Pro Se

FILED
CLERK, U.S. DISTRICT COURT

5/20/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: DO DEPUTY

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, an individual,<br><br>    Plaintiff,<br><br>    v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California; XAVIER BECERRA, in his official capacity as the Attorney General of California,<br><br>    Defendants. | No.   2:20-cv-04525-JAK(PVCx)<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

RECEIVED
CLERK, U.S. DISTRICT COURT

5/18/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: DEPUTY

Plaintiff JANE DOE ("Plaintiff") alleges and complains the following, on information and belief except for information identified as being based on personal knowledge.

### INTRODUCTION

1.   Cal. Penal Code §739 bans private citizens to pursue justice in the criminal courts by initiating a criminal case themselves and leaves them zero alternative remedy in cases where law enforcement personnel have failed crime victims.

2.   California, of course, is free to decide whether or not to prosecute against a

1

suspect. But it cannot shut crime victims out of criminal justice system, especially in a manner that discriminates against them.

3.     Cal. Penal Code §739 discriminates against Plaintiff in her exercise of a fundamental right without adequate justification.

4.     Plaintiff now brings this case to vindicate her constitutional right to equal protection of the law, and to vindicate the rights of all other crime victims in California who no longer feel secure in their community because of law enforcement personnel's egregious indifference toward their safety.

5.     In this action, Plaintiff seeks a declaration invalidating, and order enjoining, enforcement of Cal. Penal Code §739 against crime victims for criminal prosecution initiation. This statute discriminates against crime victims, and obstructs their ability to pursue criminal justice and seek accountability. It therefore violates the Equal Protection Clause of the Constitution.

6.     As described in more detail below, law enforcement personnel's response to a heinous crime – rape is conscience shocking. Law enforcement personnel's response includes their discriminatory practice and ill will, their betrayal of public trust, and failure to protect residents from victimization by rapists. Our law enforcement's response to rapes sends a catastrophic message to the whole of our society. To rape victims: bringing a complaint is useless. To rapists: you're allowed to rape as many women as you want and there will be no consequence!

7.     The enforcement of Cal. Penal Code §739 and law enforcement personnel's failure on their duties subject Plaintiff and other crime victims to continued risk at the hands of perpetrators who are never held accountable.

**PARTIES**

8.     Plaintiff, JANE DOE ("Plaintiff"), is a resident of County of Los Angeles, State of California.

9.     Defendant Gavin Newsom ("Newsom") is the Governor of the State of California (the "State") and is being sued in his official capacity. Newsom has "[t]he supreme executive

2

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

power" of the State and is charged with "see[ing] that the law is faithfully executed." CAL. CONST. Art. V, § 1. As head of the Executive Branch, he has a duty to "supervise the official conduct of all executive and ministerial officers," including the Attorney General. CAL. GOV'T CODE § 12010. In light of these duties, Newsom has responsibility for enforcing Cal. Penal Code §739.

10.     Defendant Xavier Becerra ("Becerra") is made a party to this action in his official capacity as the Attorney General of California. Under California law he is the chief law enforcement officer with supervision over all law enforcement agencies in the state. CAL. CONST. Art. V, § 13.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1331 because whether Cal. Penal Code §739 violates the United States Constitution is a federal question.

12.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's request for relief because that claim is "so related to claims in the action within [this Court's] original jurisdiction that [it] form[s] part of the same case or controversy." 28 U.S.C. § 1367(a).

13.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions that give rise to this action occurred within this district and state.

## CAL. PENAL CODE §739 AND IT'S EFFECT

14.     Cal. Penal Code §739 provides that "When a defendant has been examined and committed, as provided in Section 872, it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed. The information shall be in the name of the people of the State of California and subscribed by the district attorney."

15.     Cal. Penal Code §739 offers no exceptions to its blanket prohibition on private

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prosecution. When the state monopolizes a certain area, certain positive duties should be and are imposed on it. Thus, when the state employs prosecutors to initiate prosecutions, and the prosecutors fail to fulfill their duties, the harmed individuals should be allowed to bring an action.

16. A tort victim can initiate an action against their infringer but a crime victim has no say on prosecution of their assailant.

17. Cal. Penal Code §739 has both the purpose and effect of depriving crime victims of equal protection when law enforcement personnel conspire and practice discriminatory under-policing and selective under-enforcement against crime victims, including Plaintiff. Crime victims are being shut out of criminal justice system by Cal. Penal Code §739.

18. The monopoly on criminal prosecution achieves no compelling state interest and undermines the quality of justice.

**CRIMINAL PROSECUTION AND SYSTEMIC FAILURE IN CALIFORNIA**

19. As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.

20. American Bar Association Criminal Justice Standards for the Prosecution Function: Standard 3-1.2 Functions and Duties of the Prosecutor (b) The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. Standard 3-4.4 Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges (c) A prosecutor may file and maintain charges even if juries in the jurisdiction have tended to acquit persons accused of the particular kind of criminal act in question. (https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on/ )

21. In cases which involve a **serious threat** to the community, the prosecutor should

4

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit persons accused of the particular kind of criminal act in question because prosecutors have an ethical obligation to pursue difficult cases for public safety reasons.

22.    According to National District Attorneys Association ("NDAA"), rape cases rarely have physical evidence that conclusively proves that a rape occurred. The evidence need not conclusively prove that a rape occurred; rather, it must give the jury a sufficient context in which to evaluate the victim's credibility. (http://atixa.org/wordpress/wp-content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf)

23.    Physical evidence can prove that the intercourse happened, but not the absence of consent. When there's no issue about who the assailant is DNA doesn't really contribute anything. Victim's reaction or whether or not victim stays contact with the perpetrator is not a crime element. It's prosecutor's duty to educate the jury the right way to identify whether or not a crime occurred.

24.    In 2018 in California the arrest rate of rape is as low as 16.4% while arrest rate of aggravated assault is 85.5%. (https://data-openjustice.doj.ca.gov/sites/default/files/2019-07/Crime%20In%20CA%202018%2020190701.pdf)

| Law Enforcement Agency | Arrest rate between 2014 and 2018 | |
| --- | --- | --- |
| | Rape | Aggravated Assault |
| Cotati Police Depart ("Cotati PD") | 33% | 58% |
| Concord Police Depart ("Concord PD") | 18% | 83% |
| Los Angeles County Sheriff's Depart ("LASD") | 34% | 62% |

25.    California law enforcement agencies have reported rape at "unfounded" rates in recent years as high as 55% in Concord, 53% in Berkeley, and a statewide clearance rate of 40.8% in 2016 (higher than the national average of 37%). These fundamental investigative problems still remain today.

(https://www.buzzfeednews.com/article/alexcampbell/unfounded#.wa7gk54Zr)

26.    Los Angeles County District Attorney's Office ("LADA") declares that their office's top priority is the prosecution of violent and dangerous criminals – murders, rapists, gang members, child abusers and robbers among them. (http://da.lacounty.gov/about/office-overview)

5

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

27.    Jackie Lacey ("Lacey", Los Angeles County District Attorney) adopts "no policy" policy. As the largest local prosecutorial office in the nation, no written policies relating to prosecution of rape exists which suggests deliberate indifference to rape victims safety and a general disinterest in prosecuting sexual assaults due to bias (Lacey has publicly been criticized for inaction in the case of four women who report having been raped by actor Danny Masterson. Lacey has been aware that a pattern and custom of unconstitutional violations exists). The lack of written policy allows LADA Officials to make wholly arbitrary decisions.

28.    Lacey also enforces a "non-law", falsely requiring corroboration and evidence of force to establish rape, a requirement that is not required by law or jury instruction; (Lacey openly said acquaintance cases are particularly difficult to prove, unless the accused admits what happened, makes incriminating statements, or the victim's account can be corroborated with independent evidence, reflecting higher criteria compared to other crimes with no showing of valid state interest but solely aiming at conviction rate for prosecutor's own personal interest. (https://www.nbclosangeles.com/news/local/former-socal-police-officer-will-not-face-rape-charge/2227236/)

29.    Lacey consciously manipulates prosecution for political purposes. (https://variety.com/2020/politics/news/weinstein-rape-charges-los-angeles-1203461860/)

30.    Lacey employs disparate unwritten policy to rape cases compared to other type of crimes. According to prosecution data obtained by NBC4's I-Team, in LA County, in 2018 police presented 815 forcible rape investigations to prosecutors. Charges were filed in 188 reflecting an extremely low prosecution rate of 23%. This compares to a higher rate at every stage for non-rape crimes, reflecting the lowest priority of LADA's efforts.

31.    Contra Costa County District Attorney ("CCDA") declares that their office's mission is to seek justice and enhance public safety for all their residents by fairly, ethically, aggressively and efficiently prosecuting those who violate the law, and by working to prevent crime. (https://www.contracosta.ca.gov/7284/District-Attorney)

32.    Between 2017 and 2018, CCDA's prosecution rate of rape is as low as 34% although few sex crimes referred for prosecution by police and sheriff.

6

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

33.    District Attorney's Office of Sonoma County ("SDA")'s mission statement indicates that "We shall seek truth and justice in a professional manner, while maintaining the highest ethical standards." (http://da.sonoma-county.org/content.aspx?sid=1023&id=1379)

34.    Between 2017 and 2018 SDA's prosecution rate of rape is 31%, even lower than CCDA.

35.    Neither CCDA nor SDA adopts any written policies regarding prosecution of sexual assault.

36.    AEquitas is a national technical assistance provider that specializes in the prosecution of gender-based violence and human trafficking crimes. AEquitas is a nonprofit organization that brings decades of prosecution experience and collaborative approach to offer law enforcement advice and resources across disciplines at no cost. (https://aequitasresource.org/)

37.    Corroboration is not required by law for conviction. (https://aequitasresource.org/wp-content/uploads/2018/09/Model-Response-to-Sexual-Violence-for-Prosecutors-RSVP-An-Invitation-to-Lead.pdf)

38.    When LADA, CCDA, and SDA were asked to adopt "offender-focused approach" and "expert witness strategy" that are recommended by NDAA they maliciously refused, giving an ostensible reason that the case cannot be proved beyond a reasonable doubt and falsely told Plaintiff that jury would not believe expert witness. Bias against rape victims could not be clearer. <Prosecuting Alcohol-Facilitated Sexual Assault> (http://atixa.org/wordpress/wp-content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf), <Cold Case Alcohol- and Drug-Facilitated Sexual Assault> (https://www.sakitta.org/toolkit/docs/Cold-Case-Alcohol-and-Drug-Facilitated-Sexual-Assault.pdf), <Understanding the non-stranger rapist> (http://www.ncdsv.org/images/NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_1_1_2007.pdf)

39.    The low number of arrests and prosecutions for sexual assault is not a statistical anomaly. The fact that so few people are arrested and held accountable for sexual assault is a direct result of a persistent pattern of indifference toward and disregard for the safety of rape victims by law enforcement personnel.

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40.    The failure to properly investigate and prosecute sexual assault cases has been motivated at least in part by animus toward women reporting rape. Rape cases are deemed unworthy to investigate and prosecute and rapists are provided favoritism and leniency.

41.    Law enforcement personnel's actions or inactions, protocol and procedures, disproportionately affect female sexual assault victims generally and violated Plaintiff's equal protection rights. Law enforcement personnel's intentional acts and their policies and procedures have created the danger of an increased risk of harm to Plaintiff and other victims of sexual assault who are disproportionately women. All these failures come from a "long-standing refusal" to properly investigate and effectively prosecute sexual assault crimes against women.

42.    As described in more detail below, the following actions by prosecutors are neither in state's interest nor legitimate decisions of judgment but deplorable intentional antithesis of exercise of judgment:

   a.  Willfully refuse to perform their duties pursuant to professional standards;

   b.  Intentionally and consistently credit the suspect's version over Plaintiff's account because she is a rape victim, notwithstanding objective evidence;

   c.  Put their own interest ahead of the state which they serve;

   d.  Callously disregard victim and community safety by using absolute immunity as a badge and shield for their discriminatory practice with no showing of a valid state interest;

   e.  Deter Plaintiff from pursuing truth and justice by falsely telling her that there was not enough evidence and creating purported reasons to justify their discriminatory and unconstitutional treatment to Plaintiff because she is a woman reporting rape;

   f.  Made multiple untrue statements to Plaintiff that were far departure from professional standards, jury instruction, and prosecution guidelines which is a strong indicator that discriminatory intent was a motivating factor for prosecutors' wild spread custom;

   g.  Maliciously ignore the fact that a victim's testimony alone is legally sufficient evidence for filing charges but falsely told Plaintiff that there was no

8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

corroboration, reflecting rape cases are less "worthy" of prosecution than other crime cases; and

h. Use "insufficient evidence" as a disguise to deprive Plaintiff of her constitutional rights.

43. Other failures by law enforcement personnel:

Prosecutors declined to bring charges against officers who fatally shot an unarmed man. (https://www.scpr.org/news/2017/02/13/69009/appeals-court-dismisses-suit-over-gardena-police-s/)

Victim family and activists demand criminal charges. (https://abc7.com/kenneth-ross-jr.-gardena-police-shooting-ois-michael-robbins/5872326/)

No charges against officer who fatally shot an apparently intoxicated college student. (https://www.presstelegram.com/2017/09/12/no-charges-against-long-beach-officer-involved-in-2015-shooting-of-woodland-hills-student-feras-morad/)

## PRIVATE PROSECUTION OUTSIDE CALIFORNIA

44. South Carolina: a private citizen may initiate a criminal case by approaching a magistrate.

45. Maryland: a private citizen has the right and the ability to appear before a District Court Commissioner and write out an affidavit that lodges criminal charges against another individual.

46. Georgia: criminal process may be issued based on a request by a private citizen, though only after a "warrant application hearing" at which the potential accused has an opportunity to argue that charges should not be issued.

## SEXUAL AND DOMESTIC VIOLENCE

47. It is a common misconception that most sexual assaults are committed by strangers. In reality, sexual assault can be perpetrated by anybody. A woman is more likely to be sexually assaulted by someone she knows— a friend, partner, date, classmate, neighbor or

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

relative—than by a stranger in a dark alley. <Understand the Nature and Dynamics of Sexual Violence> (https://www.mocadsv.org/FileStream.aspx?FileID=3)

<Dynamics of Sexual Violence> (https://www.youtube.com/watch?v=gSh7CmWGa58)

48.     Five categories of sexual violence (https://ndaa.org/wp-content/uploads/NDAA-DV-White-Paper-FINAL-revised-July-17-2017-1.pdf):

  a.  Rape or penetration of victim;

  b.  Victim made to penetrate someone else;

  c.  Non-physically pressured unwanted penetration;

  d.  Unwanted sexual contact, defined as the "intentional touching of the victim or making the victim touch the perpetrator, either directly or through clothing . . . without the victim's consent";

  e.  Non-contact unwanted sexual experiences, defined as the "unwanted exposure to sexual situations (e.g., pornography); verbal or behavioral sexual harassment; threats of sexual violence to accomplish some other end; and /or unwanted filming, taking, or disseminating photographs of a sexual nature of another person".

49.     The real threat of sexual assault that is posed not by strangers but rather by people we know and trust. <Characteristics of Sexual Assault: What Does It Really Look Like?> (https://www.evawintl.org/Library/DocumentLibraryHandler.ashx?id=42)

50.     A woman initially trusts the person who rapes her and welcomes him into her home or accepts an invitation from him. She is then blamed for his actions and, sadly, often blames herself, especially if her prior understanding of rape was based on more myth than fact. And if the rapist is her husband, or partner, she may not anticipate that anyone, including herself, would define that as rape. <Dynamics of Sexual Assault> (http://www.ncdsv.org/images/Sexual%20Assault%20Dynamics%20for%20DV%20Advocates%20and%20Agency%20Responders%20-%20Tucker%205.28.08.pdf)

51.     Researches show that distorted thoughts is one of the main reasons women stay in abusive relationships. Being controlled and hurt is traumatizing, and this leads to confusion,

10

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

doubts, and even self-blame. For example, women shared: "I believed I deserved it." Others minimized the abuse as a way to cope with it, saying: "[I stayed] because I didn't think that emotional and financial abuse was really abuse. Because words don't leave bruises," and, "Because I didn't know what my boyfriend did to me was rape."
(http://www.ncdsv.org/images/Investigating%20and%20Prosecuting%20Intimate%20Partner%20 Sexual%20Assa....pdf); (https://law.lclark.edu/live/files/17491-countering-common-misperceptions-of-sa-victims)

52.     When prevailing myths go unchallenged rape is supported, justified, and even condoned. Myths tend to be victim blaming; instead of holding the perpetrator responsible for his behaviour, the victim is blamed and held responsible for the assault, especially in cases where the victim knows the perpetrator. Often victims of sexual violence are simply not believed. These circumstances make it much more difficult for victims to seek help and recover from their experience. <Sexual violence: prevalence, dynamics and consequences>

(https://www.who.int/violence_injury_prevention/resources/publications/en/guidelines_ch ap2.pdf)

53.     Intimate partner sexual violence is as dangerous or problematic to the community as other violent crimes. <Intimate Partner Sexual Violence>

(https://player.vimeo.com/video/120390159)

54.     When NFL linebacker Ray Rice knocked his fiancée Janay Palmer unconscious in an elevator in 2014, it didn't initially get much attention. He was accused of domestic violence and suspended for two games. After a few weeks, he was formally charged, but he and Palmer were married the next day. A security video quickly went viral showing Janay Palmer knocked down and roughly dragged out of the elevator by Rice. Victim's staying with their abuser does not erase the crime committed by the abuser.

55.     Both rape and battery are domestic violence and they should be treated the same way. No law requires a victim breaking up with their attacker to establish battery or rape.

**RAPE KIT BACKLOG**

11

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

56.     In 2009, Human Rights Watch uncovered a backlog of at least 12,669 untested rape kits in County of Los Angeles (including Los Angeles Police Department, LASD, and 47 independent police departments in Los Angeles County), the largest known backlog in the United States at that time. (https://www.hrw.org/report/2009/03/31/testing-justice/rape-kit-backlog-los-angeles-city-and-county) In 2015 there were 2400 untested rape kit found in Contra Costa County. However, there was never ever any backlog of DNA testing for murder or other crimes.

57.     The discriminatory practice against rape victims is long-standing, widspread, and well settled. (https://www.huffpost.com/entry/the-rape-kit-backlog-shows-exactly-how-we-regard-women-in-this-country_n_5acfb5e1e4b016a07e9a8c65)

58.     The devaluation of sexual assaults burdens a particular set of victims. The laws against violence were not and will not be uniformly enforced. Because the vast majority of victims of sexual assault are women, discriminatory practice has an unjustified disparate impact on women. Rape is the most under-reported crime. 63% of sexual assaults are not reported to police. <Statistics about sexual violence> https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf)

59.     Discrimination against rape victims puts victims at a unique disadvantage in the criminal justice system, decreasing the rate of reporting rape and increasing the rate of claims withdrawn by victims. <Rape and Sexual Assault in the Legal System> https://www.womenslawproject.org/wp-content/uploads/2016/04/Rape-and-Sexual-Assault-in-the-Legal-System-FINAL.pdf)

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

60.     Plaintiff grew up in a traditional household in a foreign county with long-standing social prohibitions on talking about sexual matters.

### Rapes between 2013 and 2014

61.     In 2013 Edward Weamer ("Weamer") was a police officer at Sonoma University Police Department. In Nov 2013 via an online app "POF" Weamer friended Plaintiff and started

12

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

chatting with her online.

62. Before Plaintiff met Weamer in person she made a clear statement via text messages that she didn't want to rush sex and insisted to stick to her traditional culture. Weamer agreed to respect Plaintiff so Plaintiff decided to meet him in person.

63. Once Plaintiff met Weamer in person, he didn't keep his words and forced himself on top of Plaintiff around ten times between 2013 and 2014.

64. Via Plaintiff's message conversations with Weamer he acknowledged that each time Plaintiff said no and resisted. Plaintiff also accused Weamer that he set her up but she was not able to recognize what Weamer had done to her was a crime due to her confusion about rape. Plaintiff mistakenly thought rape was a crime committed by a stranger. < Understanding and Countering Rape Myths >

(https://www.nationalguard.mil/Portals/31/Documents/J1/SAPR/SARCVATraining/Barriers_to_Credibility.pdf)

65. In Aug 2014 Plaintiff broke up with Weamer and never had contact with him again. Over the years Plaintiff has been broken, and experienced depression, anxiety, and low self-esteem but she didn't know where those came from until Oct 2019.

66. In Oct 2019 Plaintiff met with LADA prosecutor Peter Cagney ("Cagney") and he explained to Plaintiff what rape was. Plaintiff has realized what Weamer had done to her was in fact rape.

67. In 2013 Plaintiff was raped in Cotati. In 2014 Weamer raped Plaintiff in Concord. Plaintiff filed the police reports with Cotati PD and Concord PD respectively on Oct 18, 2019.

*Cotati PD's Failure to Investigate Plaintiff's Sexual Assault Claim*

68. After the initial report was filed on Oct 18, 2019 Cotati PD Officer Bennet Knight ("Knight") informed Plaintiff of victims rights and followed up with Plaintiff the following week. However, approximately three months after Plaintiff first reported the assaults Weamer was still not contacted by Knight for investigation.

69. Since Weamer refused to make a statement to Cotati PD he faced no investigation or scrutiny from law enforcement. After little to no investigation conducted Knight maliciously

13

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

concluded the incidents were consensual and the case was subsequently submitted to SDA.

70.     Plaintiff obtained a copy of the incident report prepared by Knight and asked Sergeant Baudelia Gallo ("Gallo") for an explanation but Gallo endorsed or approved those failures by taking no correction action.

*Concord PD's Failure to Investigate Plaintiff's Sexual Assault Claim*

71.     After the initial interview with Concord PD Officer Shasta Vanetti on Oct 18, 2019, the following month Plaintiff heard nothing from CONCORD PD, no follow-up and literally nothing.

72.     Sometime in November 2019 Plaintiff left voice mail to Detective Renenlle-Rey Valeros ("Valeros") but still heard nothing from CONCORD PD in the following month.

73.     In December 2019 after Plaintiff reached out to Sgt Cody Harrison ("Harrison") she finally got a phone call from Detective Valeros.

74.     Rather than ask relevant questions regarding crime elements the first thing Valeros wanted to confirm was "So are you still living in Southern California?" Perhaps he thought he could treat this case less seriously because the victim lived far away.

75.     Then Plaintiff was asked by Valeros what's her ultimate goal. Such humiliating and degrading question strongly suggests his discriminatory animus towards Plaintiff as a rape victim. Such question demonstrates that Valeros thought Plaintiff came forward for something else other than justice. A victim of other crimes would not be asked about their goal to come forward.

76.     Plaintiff was shocked to find out the suspect was not contacted nearly two months after she reported the crime.

77.     Despite there is no statute of limitations for rape Valeros told Plaintiff this happened five years ago. Even though Weamer admitted through texts that each time Plaintiff said no and resisted Valeros told Plaintiff he could not prove it was Weamer who was texting.

78.     No useful information was extracted during Plaintiff's conversation with Valeros. No question regarding the crime element was asked. The "investigation" conducted by Valeros was meaningless with respect to proving a crime. Instead, Valeros' language reflects how he

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

deterred Plaintiff from pursuing the case.

79.    Despite pretext phonecall is a commonly used technique to obtain confession from the offender Valero opt not to use it, not to mention he would not spend any effort finding out if there would be more women victimized by Weamer.

80.    In December 2019 Plaintiff was really concerned by Valeros' attitude and she reached out to Sgt Harrison again. However, despite there is no statute of limitations for rape and physical evidence is not required by law or jury instruction, Harrison falsely announced to Plaintiff that the case was six years old and there was no physical evidence at all for filing charges. Harrison didn't stop there. He further falsely told Plaintiff that there was no indication of any type of sexual assault and appeared quite consensual which strongly suggests how CONCORD PD Officers deterred Plaintiff from pursuing justice and CONCORD PD Officers' discriminatory intent to discount and dismiss Plaintiff's allegation.

81.    After the horrifying interactions with Valero and Harrison Plaintiff reached out to Lieutenant Tamra Roberts ("Roberts").

82.    Despite victim's testimony is legally enough to file charges Roberts falsely told Plaintiff that her testimony was absolutely not enough and there was no evidence of sexual assault.

83.    When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Roberts falsely told Plaintiff "There needs to be physical evidence, uh, either DNA evidence or a confession from the suspect. Um, and we don't have any of those things. In this case, there's no DNA evidence."

84.    The crime of battery (e.g. a punch) is established based solely on the perpetrator's actions and/or intent. The victim's response to being punched is irrelevant. The victim need not resist nor express unwillingness to being punched to establish a crime, nor is a victim's history of being punched relevant. The relationship between the assailant and the victim does not make the crime less seriously or make the victim suffer less.

85.    While Plaintiff pointed out that Weamer acknowledged each time Plaintiff said no

15

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and resisted but Roberts challenged Plaintiff "But then you got back together with him and continued." It's obvious that Roberts treat rape completely different from other crimes.

86.    There is no law requires victim act in certain way in order to prove she was raped. Roberts' stereotype about how victims should behave constitutes unlawful discrimination. Roberts' language also reflects her discriminatory intent to discredit Plaintiff and discard Plaintiff's allegation. Roberts' announcement left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all. Such victim blaming does not occur with other types of crimes. Moreover, according to Roberts' theory a man is entitled to rape a woman if they are in a relationship, suggesting a strong purposeful animus towards Plaintiff.

87.    Although victim's reaction is not a crime element Roberts twisted Plaintiff's account of story and announced to Plaintiff "You were okay with having sex." by ignoring how a victim would process trauma. Then Roberts falsely told Plaintiff the text messages would only work in the suspect's favor and there was no evidence of sexual assault.

88.    Battery and rape are both domestic violence. The law does not require a victim break up with the assailant to establish battery but Roberts told Plaintiff "This is a different situation. You continue to get together with him." Roberts imposed a non-law to require Plaintiff break up with the suspect to establish rape. Roberts flat out told Plaintiff "Most people, if they got raped, they wouldn't get together with that person again." Such remarks strongly suggest an intention to treat sexual assault cases less seriously than other assaults, as well as an animus against rape victims. Roberts' pro-defendant attitude is capable of several interpretations: perhaps she believed that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless because she stayed contact with the attacker, that such assault was less severe and traumatic because she was dating this suspect, or that state officials should not intrude upon dating violence. Whatever the reason, Roberts' language reflects an outdated misconception concerning rapes that cannot be used as a source of differential treatment. Roberts' statement also demonstrates her discriminatory intent to devalue Plaintiff's allegation.

89.    When Plaintiff pointed out rape should be treated the same way as battery Roberts

16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

responded "I don't think I can understand what you are saying."

90. Regardless Plaintiff say no and resisted each time Roberts twisted it as sexual play. Roberts also declared "A district attorney would have a very hard time convincing a jury of 11 people."

91. The language and attitude of CONCORD PD Officers suggests that they made minimal or maybe no effort to investigate the suspect in Plaintiff's case. None has been done to see if there are more women victimized by the suspect. None has been done in order to support Plaintiff's allegation.

92. Roberts went on and told Plaintiff "The district attorney's office won't prosecute on a case like this." "If we don't have any evidence, then we don't submit the case to the district attorney." "It is here in Contra Costa County, the district attorney's office would never file a case like this. Um, I've been doing this for 18 years. I've worked sexual assault for five years. Um, they will never file a case like this."

93. Since Weamer refused to make a statement to Concord PD he faced no investigation or scrutiny from law enforcement.

94. In December 2019 Plaintiff filed a complaint with Concord Police Chief Guy Swanger ("Swanger") but Plaintiff never received any investigation result. Swanger took no action to correct Valero's failures or to discipline him for his malfeasance.

95. CONCORD PD personnel did not inform Plaintiff of victims' rights as set forth in California constitution. At that time, and at all relevant times, CONCORD PD personnel had full knowledge of CONCORD PD's mission and awareness of proper investigation protocol.

96. By failing to discipline or act, Swanger endorsed or approved the unconstitutional conduct of individual officers.

97. Plaintiff requested CONCORD PD's policy and procedures regarding sexual assault investigation but no such thing existed.

*CCDA's Failure to Prosecute Plaintiff's Sexual Assault Case*

98. In January 2020 CCDA declined to file charges against Weamer. Before the non-prosecution decision was made none of any member of CCDA met with Plaintiff in person, nor

17

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

did they ever speak to her about the alleged assaults.

99. Given the way how law enforcement personnel responded to rapes, Plaintiff asked herself "Can you imagine how many victims didn't get the justice they deserved?"

100. On Jan 7, 2020 during a recorded phone call conversation Colleen Gleason ("Gleason", CCDA prosecutor) told Plaintiff this was a he said she said case by ignoring the objective evidence. Gleason announced that there was NO EVIDENCE to prove it was not consensual by invaliding Plaintiff's testimony. By intentionally ignoring the context Gleason falsely told Plaintiff that the jury would interpret it as rough sex and Plaintiff came forward because she was upset about Weamer chasing other girls. Gleason took every word of Weamer as true even though a normal person, through inference, could easily tell Weamer was lying. By ignoring the fact that Plaintiff texted Weamer he set her up Gleason credited Weamer because Weamer falsely said Plaintiff enjoyed the sex and put his penis in her vagina.

101. At the end of the phone conversation with Gleason Plaintiff requested to speak with her supervisor, Walpole. At that time, and at all relevant times, Gleason was aware of CCDA's mission and her role as a prosecutor.

102. In Jan 2020 Plaintiff notified Diana Becton ("Becton", District Attorney of Contra Costa County) of the constitution violation.

103. On Jan 8, 2020 during a recorded phone call conversation Christopher Walpole ("Walpole", CCDA prosecutor) declared that it was their filing standard to file cases they believed they could win. "We wouldn't file cases if we don't get a guilty verdict." "It's a big hurdle." Walpole also announced that they would need strong corroboration despite it was not required by law.

104. In 2018 in California the conviction rate of violent offenses is 56.8% (https://data-openjustice.doj.ca.gov/sites/default/files/2019-07/Crime%20In%20CA%202018%2020190701.pdf). However, Walpole flat out told Plaintiff "We only file cases we believe we can win. That's our filing standard."

105. When Plaintiff questioned about the use of expert witness Walpole falsely told her many times jury would disagree with the expert. Despite stereotype about how victims should

18

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

behave is unlawful discrimination and it's a prosecutor's job to select unbiased jury Walpole falsely told Plaintiff the jury would say "If I was in her shoes, I wouldn't have had the relationship."

106. By invaliding Plaintiff's testimony Walpole valued Weamer's version because Weamer falsely said Plaintiff put his penis inside her and being upset about Weamer seeing other women was Plaintiff's motive to pursue this case. Walpole also declared this was part of the #Metoo movement.

107. Although Plaintiff's motive is not a crime element Walpole attacked Plaintiff's motive of coming forward was the suspect seeing other women. Motive of victims of other assaults would not be attacked as a target.

108. The entire time Walpole tried his best to derail Plaintiff from pursuing the truth and justice, reflecting Walpole's conscious choice not to overcome common defenses. Rather than uphold the law, educate the jury, and overcome common defenses, Walpole chose to act as the suspect's advocate. At that time, and at all relevant times, Walpole was aware of CCDA's mission and his role as a prosecutor and supervisor.

109. On Jan 25, 2020 Plaintiff filed a complaint with CCDA regarding the constitutional violation and Becton was put on notice.

110. Plaintiff requested CCDA's policy and procedures regarding sexual assault prosecution but no such thing was available.

111. BECTON failed to draft or implement procedures in the District Attorney's Office to ensure proper investigation of rape cases and proper review and handling of sexual assault prosecutions.

*SDA's Failure to Prosecute Plaintiff's Sexual Assault Case*

112. In Feb 2020 SDA declined to file charges against Weamer. Before the non-prosecution decision was made none of any member of SDA met with Plaintiff in person, nor did they ever speak to her about the alleged assaults.

113. On Feb 10, 2020 during a recorded phone call conversation Laura Passaglia ("Passaglia", SDA prosecutor) told Plaintiff this case was fairly old regardless of no statute of

19

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

limitation for rape. Despite corroboration is not require by law Passaglia announced "We don't have any opportunity to do any investigation or find any corroboration".

114.    Passaglia went on and told Plaintiff "It's not enough for me to say conclusively what exactly occurred" and such statement is completely opposite to the prosecution guideline set forth by NDAA. Despite sexual assault cases rarely have witnesses Passaglia declared "There is no opportunity to interview any witnesses and talk to people in real time."

115.    On Feb 15, 2020 Plaintiff emailed Anne Masterson ("Masterson", SDA prosecutor) and encourage her to follow the prosecution guidelines but Plaintiff's email was ignored, reflecting SDA's dismissive attitude.

116.    At that time, and at all relevant times, Passaglia and Masterson were aware of SDA's mission and their role as a prosecutor.

117.    In Feb 2020 Plaintiff filed complaint with Jill Ravitch ("Ravitch", District Attorney of Sonoma County) but no action was taken.

118.    By failing to discipline or act, Sonoma County and Ravitch endorsed or approved the unconstitutional conduct of individual employees.

119.    Plaintiff requested SDA's prosecution policy for sexual assault but no such thing exists as Missoula County Attorney's Office does. <MISSOULA COUNTY ATTORNEY'S OFFICE SEXUAL ASSAULT POLICY & PROCEDURE MANUAL> (https://dojmt.gov/wp-content/uploads/SEXUAL-ASSAULT-POLICY-AND-PROCEDURE-MANUAL.pdf )

120.    RAVITCH failed to draft or implement procedures in the District Attorney's Office to ensure proper investigation of rape cases and proper review and handling of sexual assault prosecutions.

*Rape in 2019*

121.    On or about April 1, 2019 Carlos Suarez (aka Charlie Suarez, hereinafter "Suarez") friended Plaintiff via a mobile app "Wechat". After a few days of chatting, on or about April 5, 2019, Suarez invited Plaintiff out for a dinner date. Plaintiff went home after a two-hour dinner with Suarez but later Suarez brought over Japanese whiskey and Spanish wine. Plaintiff and Suarez had been drinking in Suarez's car for about three hours. Plaintiff eventually lost

20

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

consciousness after consuming a lot of alcohol.

122.    On or about April 6, 2019 at around 8:00 am Plaintiff woke up in an unfamiliar place, naked with a sore vagina. Suarez was also naked lying in bed next to Plaintiff. Plaintiff was still drunk and confused about what had happened. Suarez inserted his penis into Plaintiff's vagina but she didn't know what to say or what to do. Plaintiff was completely lost and everything was way beyond her comprehension. She didn't resist because she's afraid of any confrontation and escalated situation. She remained silent and went along with what the offender wanted because she reasonably believed that Suarez would commit violence against her if the situation was escalated. Plaintiff never gave her consent to sexual contact with Suarez while she was awake not to mention when she was unconscious.

123.    On or about May 3, 2019 Plaintiff lured Suarez to a hotel and stood him up which was the last time Plaintiff saw Suarez. Between April 7, 2019 and May 3, 2019 Plaintiff not only had no sexual contact with Suarez but also declined his sexual advances.

### *EMPD and LASD's Failure to Investigate Plaintiff's Sexual Assault Claim*

124.    Plaintiff finally gathered her courage to come forward on June 7, 2019. At the time she believed that coming forward would be her first step to heal and it was her obligation to report it to stop it. However, it turned out she was completely wrong and her life has been turned upside down.

125.    On June 7, 2019 plaintiff was interviewed by Martha Tate ("Tate", police officer) at El Monte Police Department ("EMPD"). During the interview no victim services personnel was present and Plaintiff was not informed that she had the right to request a victim advocate. However, EMPD's policy states that "Whenever possible, a member of SART should be included in the initial victim interviews."

126.    The first session of the interview was not recorded and during that session Plaintiff told Tate she was afraid to upset Suarez when she woke up in an unfamiliar place in the morning of Apr 6, 2019. When Tate told Plaintiff to retell the story for recording purposes Plaintiff was very frustrated. Plaintiff was re-traumatized by recounting the incident twice. Throughout the interview Plaintiff noticed Tate's fake smile and the way Tate looked at her with skepticism.

21

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

127. Despite the crime was facilitated by alcohol Tate asked Plaintiff "Did he force you?" Nobody needs force to rape an unconscious woman. Nobody needs force to rape a woman who's in shock and fear. Alcohol is a weapon of choice by perpetrators. Regardless of silence is not consent, by asking irrelevant questions Tate focused on physical force instead of the absence of consent. From the very outset Tate had no intention to uncover the truth that there was no word or conduct indicating Plaintiff's freely given agreement to sexual contact.

128. At the end of the interview, without any investigation, Tate willfully smirked and announced to Plaintiff that it was not a rape. Tate's statement was like a bombshell that caused Plaintiff to raise her voice and yell "he admitted it." Tate didn't care and showed Plaintiff out. Tate's comment suggests that she believed this was just a drunken night rather than a crime. It is not a policy of EMPD to tell victims of burglaries or attempted murder that their allegations are NOT a crime. The power of Tate's announcement was no different than a bullet shot in Plaintiff's head.

129. After the initial interview Tate falsified her incident report by fabricating Plaintiff gave consent and willingly had sexual intercourse with Suarez because Plaintiff wanted to do so. This action reflects Tate's discriminatory intent to dismiss Plaintiff's allegation.

130. Plaintiff, after waking up naked in an unfamiliar place with a sore vagina, told her simple and plain narrative to Tate: she didn't know what to do and she was afraid to upset the attacker which implies she's afraid of the consequence of confrontation and escalated situation. Tate twisted the story, bypassing the appropriate context and substituting instead the more familiar account of a sexual encounter. Having preempted Plaintiff's story with one of her own, Tate's falsified report made sense given the premises of her announcement. In other words, before any investigation, Tate had drawn her own conclusion: this was not a rape. Tate's willful denial of what Plaintiff had experienced was the result of stereotyped assumption about the truth of a reported sexual assault, that women are likely to report "regretted sex" as rape.

131. Plaintiff told her narrative to Tate on tape: she didn't say no, she didn't say yes when Suarez had sex with her after she woke up. Having sex was not what she wanted. Tate distorted the story with her discriminatory mind, again replacing Plaintiff's story with one of her

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

own, Tate wrote in her report that Plaintiff gave consent and willingly had sexual intercourse with Suarez because she wanted to do so.

132.   Plaintiff told her narrative to Tate: Suarez told Plaintiff to book a hotel. Plaintiff didn't do so because she didn't want to have sex with Suarez in the first place, but she went out for dinner with Suarez. Plaintiff went home straight after dinner with Suarez. Tate distorted the story, again replacing Plaintiff's story with one of her own, Tate wrote in her report that Plaintiff was supposed to meet Suarez in a motel but she changed her mind.

133.   Plaintiff showed Tate Suarez's indirect confession stating that "I felt like you were a virgin and I was stretching you out." However, Tate maliciously omitted this most important text message in her report.

134.   Tate's willful refusal to take Plaintiff at her words - that she had been raped - and Tate's malicious conclusion are symptomatic of a widely recognized stereotype: law enforcement's deep-seated distrust of rape victims.

135.   After the second time Plaintiff recounted her story, Tate's question "What brings you here today?" reflects her doubt about Plaintiff's allegation and explains Tate's initial motive to falsify her report. A victim of other types of crime would not be asked the same question.

136.   Tate asked Plaintiff what made her think she was a victim of rape based on Tate's assumption about sexual assault victims are lying. Victims of other type of crimes would not be asked the same question. Such humiliating and degrading question strongly suggests her discriminatory animus towards rape victims.

137.   Tate's incident report is a summary of her version of events from her discriminatory perspective instead of Plaintiff's.

138.   Tate did not inform Plaintiff of victims' rights. At that time, and at all relevant times, Tate was aware of her duties as an EMPD police officer, specifically adherence to EMPD's policy regarding Sexual Assault Investigations.

139.   Although Plaintiff filed internal complaint against Tate she has remained on her job without any discipline. Tate's conduct was approved and/or endorsed by EMPD.

140.   On or about June 12, 2019 Plaintiff had a phone conversation with EMPD

23

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Detective Art Saenz ("Saenz"). Right off the bat, without asking any meaningful question, Saenz assumed Plaintiff didn't remember giving consent. Plaintiff immediately raised her voice and responded "He confessed."

141.   On or about June 13, 2019, days after Plaintiff's encounter with Tate, while struggling immensely with Tate's announcement, Plaintiff ended up in urgent care for severe sleep disorder.

142.   Because of jurisdiction Plaintiff's case was forwarded to LASD by EMPD.

143.   On or about July 2, 2019 Plaintiff arrived at LASD's city of Industry station for the appointment with Liliana Jara ("Jara", LASD detective). While Jara showed Plaintiff the way to Jara's office Plaintiff told Jara that she was on medication for depression.

144.   After Plaintiff sat down in Jara's office Jara asked Plaintiff to recount her story but not long after Plaintiff started Jara assumed that Plaintiff didn't remember giving consent. Jara ignored Plaintiff telling her it was not the case. Jara refused to take Plaintiff's answer and grilled Plaintiff "you ever had this situation that your friend told you that you danced last night when you were drunk and you don't remember?" Plaintiff had to raise her voice and respond "NEVER". It came across Jara was so intimidating and bullying. It also demonstrates how Jara coerced Plaintiff to recant her allegation of rape, reflecting her malicious and discriminatory intent.

145.   After Plaintiff refused to recant her allegation, Jara's question - "What do you want here?" - indicates that she believed that Plaintiff was making a false allegation to gain something else. Jara's humiliating and degrading question was nowhere to be found in LASD's standard operating procedures or investigation guide. Her question is simply a good starting point to devalue Plaintiff's credibility. "What do you want here?" is the main theme of Jara's investigation right from the outset. Victims of other type of crimes would not be asked the same question. Jara's question caused Plaintiff to raise her voice in shock and answer "I want JUSTICE."

146.   When Jara was reading Plaintiff's conversations with Suarez she stated "It doesn't look like you were raped." Jara's stereotyped remarks reveal her stereotypical distrust towards rape victims. Such stereotype about how victims should behave violates the Equal Protection Clause, United States v. Virginia, 518 U.S. 515, 517 (1996), and interferes with the ability of

24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

investigators to find the truth. Then Jara questioned Plaintiff again "Why did you say 'I can make you lose your job'?" Jara never missed a chance to challenge Plaintiff's every word and action.

147.   Plaintiff insisted that Suarez confessed he was stretching her out. Jara further intimidated Plaintiff "That's not a confession. Did he say he raped you?" Jara expected that there was only one form of confession.

148.   Jara also argued that a woman's vagina would not be loosened when they are aroused. Then Plaintiff asked her how a woman would give birth. After Plaintiff got home she had to send Jara a medical article describing how a woman's vagina changes under different circumstances to enrich her knowledge about a woman's body part.

149.   Jara questioned Plaintiff's intent to come forward. She concluded that Plaintiff came forward because she found out Suarez was cheating and she was mad. Again, Plaintiff had to raise her voice to deny Jara's accusation.

150.   Jara said founding out his cheating could be Suarez's defense. Plaintiff flat out said "that's not a valid defense" but in response she said "yes it is". The entire time Jara was trying to discourage Plaintiff following through her allegation rather than discover the truth.

151.   Text messages showed that Suarez put words in Plaintiff's mouth and invited himself over but Jara concluded that Plaintiff invited him over. Jara kept challenging Plaintiff why she did this/that as if she was a criminal. Jara said Plaintiff's text messages after April 6 looked like she was ok with having sex in the motel by ignoring how Plaintiff processed trauma.

152.   Plaintiff showed Jara some articles that finally made her come forward but Jara didn't bother to know what they were about and attacked Plaintiff that she printed them out after the police report was filed despite the fact that nowadays most people read on screen instead of paper, reflecting Jara's dismissive attitude. The entire time Jara put Plaintiff into a defense mode that Plaintiff had to defend herself although she was a crime victim.

153.   Jara's assumptions made Plaintiff reach the point that she had to yell multiple times "I date him does not mean I want to have sex with him. How come I did not have sex with him after April 6?" Jara put Plaintiff in a position that she was extremely frustrated to the level that she couldn't express herself and wanted the "interview" to end as quickly as possible because

25

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the entire "interview" was conducted in a very accusatory manner, very threatening.

154.   Jara kept saying this case was going nowhere, this case had a lot of problems. She also said "if all you want is to arrest this guy it is not gonna happen. I will not make an arrest." Jara's announcement reflects her discriminatory intent to invalidate Plaintiff's allegation.

155.   It is not a policy of LASD to constantly tell victims of burglaries or attempted murder that their allegations are problematic and impossible to prove beyond a reasonable doubt.

156.   At the end of the interrogation Jara told Plaintiff "I will get his phone and see if there's more messages." Her statement again reflects her presumption that Plaintiff was lying or hiding something else. Her statement also implies "If you are lying you will get arrested."

157.   Plaintiff suffered a sexual attack while she was unconscious after drinking. Against this backdrop, Jara's demeaning and accusatory tone of questioning was suspect and suggestive of discrimination. Jara's discriminatory attitude explained why she assumed that Plaintiff did not remember giving consent and stated that "It doesn't look like you were raped." Jara's conduct reflects she discredited Plaintiff's statements because Plaintiff consumed alcohol.

158.   No useful information was extracted during Plaintiff's encounter with Jara. No question regarding the crime element was asked. Instead, the only motive of this "interview" was to challenge Plaintiff's every word and reaction. The only intent of this "interview" was to invalidate and dismiss Plaintiff's allegation. Rather than work with the victim and gather evidence according to each element of the crime Jara repeatedly declared that this type of case was problematic which could not be proven beyond a reasonable doubt. The "interview" conducted by Jara was meaningless with respect to proving a crime.

159.   Jara did not inform Plaintiff of victims' rights as set forth in California constitution.

160.   After the "interview" with Jara Plaintiff's depression and anxiety have been exacerbated to a whole new level.

161.   Again and again, Plaintiff has not been treated like the victim in this case. The trauma Plaintiff has experienced at the hands of law enforcement personnel prevented her from having any kind of normal life.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

162. On or about July 3, 2019 Plaintiff was really concerned by Jara's attitude and she believed that Jara was not able to appropriately manage her case. Plaintiff reached out Richard Ruiz ("Ruiz", LASD lieutenant) and requested another detective to work on her case but her attempt was not successful. Jara remained on Plaintiff's case.

163. In July 2019 Plaintiff filed separate complaints against Jara and Special Victims Bureau with both LASD and Inspector General. Jara has remained on her job without any discipline and now she has been promoted as a sergeant. Plaintiff never received any results of the internal investigation. Jara's conduct was approved and/or endorsed by LASD.

164. In July 2020 Plaintiff also reported her experience to Newsom but her voice fell on deaf ears.

165. On or about July 22, 2019, while Jara was on vacation, Plaintiff reached out Ruiz to get her phone back. Over the phone while discussing the case Plaintiff was challenged by Ruiz "How did you not know you were violated?" His question left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all. Such victim blaming does not occur with other types of crimes.

166. On Aug 6, 2019 Jara arranged a follow-up interview with Plaintiff on Aug 8, 2019 at City of Industry Station.

167. On Aug 8, 2019, upon arrival at City of Industry Station Plaintiff was arrested by Santa Ana Police. Plaintiff had been really concerned because she thought she missed the follow-up interview with Jara.

168. On Aug 12, 2019 Plaintiff was charged with misdemeanor but she has not been convicted.

169. Despite pretext phonecall is a commonly used technique to obtain confession from the offender Jara opted not to use it but on or about Aug 14, 2019 she told Plaintiff she had done everything she could. Plaintiff was never notified after law enforcement contact with the suspect reflecting a serious disregard for Plaintiff's safety.

170. On or about Aug 14, 2019 Plaintiff phoned Ruiz to inquire the investigation but in an intimidating manner Plaintiff was challenged by Ruiz about her gofundme page which was her

27

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

private business and had nothing to do with the crime in question. It reveals that LASD Officers' true motive was to spend more energy and time on proving Plaintiff was filing a false claim rather than prove there was a crime occurred. It demonstrates how LASD Officers misused state resources to conduct illegal search and seizure.

171.   In August 2019 Plaintiff's complaint against Jara was turned into a service comment report and being investigated by Ruiz.

172.   The language and attitude of Jara and Ruiz suggests that LASD Officers made minimal or maybe no effort to interrogate or investigate the suspect in Plaintiff's case.

173.   On or about Aug 16, 2019 Plaintiff ended up in ER for dysfunctional menstrual bleeding. In Plaintiff's entire life it was her very first time to visit ER.

174.   On or about Aug 23, 2019 LADA declined to file charges against Suarez. Plaintiff finally realized there was no follow-up interview with Jara in the first place. The follow-up interview was a trap set up by Jara for Plaintiff's arrest by Santa Ana Police.

175.   On Aug 23, 2019 Plaintiff called LADA and requested to speak with the prosecutor in her case. It is prosecutor's duty to educate juries that just because a woman has an open criminal case it doesn't mean that she is not a victim of sexual assault. Despite simply filing a motion to limine can keep out irrelevant or prejudicial evidence June Chung ("Chung", LADA prosecutor) falsely told Plaintiff that the open case in Orange County against Plaintiff affected her credibility and made the filing charges against Suarez impossible which was a clear deprivation of Plaintiff's rights secured to her under Fourteenth Amendment. At the time Plaintiff was not convicted and was charged with misdemeanor. The choice of misdemeanor over felony is a callous disregard for victim and community safety, reflecting Chung's dismissive attitude towards rape victims. Having an open criminal case does not justify the deprivation of a victim's fundamental rights. A victim of attempted murder or other crime would not be told his/her open criminal case would affect his/her credibility.

176.   Regardless of corroboration the ostensible reason for non-prosecution given by Chung was that Plaintiff's case was a "he said she said" case. Given the fact that the suspect admitted he tore apart Plaintiff's vagina this is obviously an untrue statement.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

177.    Despite alcohol is a weapon of choice another purported reason for non-prosecution given by Chung was "You also voluntarily consumed alcohol, correct?" which suggests a strong purposeful animus towards Plaintiff. A burglary allegation would not be dismissed because the victim forgot to lock the door or close the window.

178.    Plaintiff was concerned by Chung's attitude and requested to speak with her supervisor.

179.    On Aug 23, 2019, Chung's supervisor, Karen Thorp ("Thorp"), called Plaintiff and during the phone call Thorp was reading Tate's falsified report. Thorp's statement - "We can't prove it in court to a jury that **a jury is not likely to convict.**" – is a far departure from professional standards. "**If someone thinks they were raped** and then they have consensual sex with someone, then they have a relationship and they only go to the police after the breakup." Thorp's stereotype about how victims should behave constitutes purposeful unlawful discrimination.

180.    When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Thorp falsely told Plaintiff that in order to prove a case "We **need a forensic medical exam. We need his semen. We need evidence of force.**"

181.    By intentionally ignoring all the circumstantial evidence Thorp made an untrue statement "We need something more than **the victim alone saying that this happened.**" "**But it's the way the law is.**"

182.    Despite most sexual assault victims either delay reporting or never report the crime Thorp made a statement "If you're raped you go to the police right away." Thorp's stereotype about how victims should behave constitutes unlawful discrimination.

183.    Thorp kept going "It doesn't sound like you were raped." "If I was raped ..." A victim of robbery wouldn't be told "It doesn't sound like you were robbed."

184.    When Plaintiff pointed out Suarez's predatory behavior to ply her with alcohol Thorp's statement - "**It doesn't matter. You drank it.**" – suggests a strong animus towards rape victims because a victim of burglary would not be told "It doesn't matter. You didn't lock your

29

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

door." Thorp's language also reflects her discriminatory intent to discard Plaintiff's allegation and her eager to shut Plaintiff out of criminal justice system.

185.    At that time, and at all relevant times, Thorp was aware of LADA's mission and her role as a prosecutor and supervisor. At all times Plaintiff has been wondering what a victim means to LADA Officials.

186.    Plaintiff finally experienced the despair and emotional distress of living with the knowledge that her rapist would never be held accountable for his act, and nothing was stopping him from assaulting others. Plaintiff's rapist was well protected by law enforcement while she was not and he walks free with the confidence that he can rape other women with no repercussions.

187.    On or about Aug 30, 2019, as a direct result of injustice and unlawful discrimination after sexual assault Plaintiff felt hopeless and worthless, therefore she was transported to the hospital and put on suicidal watch for five days.

188.    On or about Sep 15, 2019 Plaintiff moved out to a new home for fear of her safety.

189.    On or about Sep 27, 2019, Plaintiff obtained a copy of the incident report prepared by Tate from Special Victims Bureau. Plaintiff was dumbfounded when reading that Tate wrote in her report "She gave consent and willingly had sexual intercourse with him because she wanted to do so." At that moment Plaintiff's world just went black.

190.    Immediately Plaintiff went to EMPD and the watch commander on duty was Michael Buckhannon ("Buckhannon") at the time. Buckhannon agreed to replay the interview type in front of Plaintiff and two victim advocates from Peace over Violence. During Plaintiff's interview with Buckhannon, by repeating Tate's pattern (telling the victim it was not a rape before any investigation), before carefully and completely listening to the entire interview tape, before going into any details or facts, Buckhannon started applying double standard and steadfastly defending Tate, and told Plaintiff it was not fair to Tate to make an allegation against her. Buckhannon also justified a falsified police report by telling Plaintiff that Tate would need just a little bit training.

191.    In the waiting room, looking at the falsified police report, Plaintiff asked her

30

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

victim advocate Anne "Can you imagine how many victims didn't get the justice they deserved?"

192. Out of the blue, Buckhannon asked Plaintiff "Were you married?" Plaintiff answered "No" with confusion. Then Buckhannon declared that he had been married for twenty years and he did not ask for consent each time he had sex with his wife. (which implies "I have been raping my wife for twenty years but she didn't file a complaint so you shouldn't have filed this complaint.") Such remarks strongly suggest an intention to treat sexual assault cases less seriously than other assaults, as well as an animus against rape victims. Buckhannon's pro-defendant attitude is capable of several interpretations: perhaps he believed that women cry rape, that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless because she was dating the attacker, that such assault was less severe and traumatic because she knew the perpetrator, or that state officials should not intrude upon non-stranger sexual assaults. Whatever the reason, Buckhannon's language reflects an outdated misconception concerning sexual assaults that cannot be used as a source of differential treatment. Buckhannon's statement also demonstrates his discriminatory intent to devalue Plaintiff's allegation.

193. After Plaintiff stepped out of Buckhannon's office she immediately realized that she forgot her document on his desk. Therefore, Plaintiff returned and retrieved her document on Buckhannon's desk. Despite the document belonged to Plaintiff Buckhannon told her it was disrespectful to take something from his desk without asking. However, Buckhannon thinks it is fine for a man to put his penis in Plaintiff's vagina without asking for consent. It demonstrates how Buckhannon devalues Plaintiff's bodily integrity.

194. At that time, and at all relevant times, Buckhannon was aware of his duties as a EMPD member and his role as a supervisor.

195. On Sep 27, 2019, in the presence of Plaintiff's victim advocate, EMPD Officer Carlos Tello conducted a supplemental interview in a hostile manner which caused Plaintiff's victim advocate to pause the interview for a couple of times.

196. Finally Plaintiff realized why Tate smirked and told her it was not a rape. Tate's falsified report and omission of material fact was not a legitimate exercise of discretion. Tate's falsified report and omission of material fact was highly unlikely to have been a product of

31

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

random mistake but was a clear reflection of her ill will and discriminatory animus towards Plaintiff because of her status as a woman reporting rape. Little did Plaintiff know, at the time Tate was a senior police officer that was too senior to be able to make such "mistake". (https://transparentcalifornia.com/salaries/2018/el-monte/martha-tate/) In fact, Tate and Buckhannon were implementing EMPD's discriminatory custom rather than frustrate EMPD's written policy.

197. On or about Oct 4, 2019 Plaintiff filed a police misconduct complaint against Tate but Plaintiff received neither any acknowledgement from EMPD that they have received her complaint nor any results of the internal investigation.

198. Officer misconduct complaints are not used to identify possible problematic trends within EMPD and failure to discipline officers has been permitted and tolerated for years which resulted in continuing violations of citizens' constitutional rights. (https://www.sgvtribune.com/2018/08/15/el-monte-west-covina-police-departments-criticized-for-citizen-complaint-processes/)

199. In October 2019 Plaintiff and her victim advocate met with Cagney and Chung. Cagney assured Plaintiff that he would personally look into the case.

200. In October and November 2019 Plaintiff repeatedly requested the investigative report prepared by Jara but her requests were denied by Lieutenant Michael Burse with Special Victims Bureau and she was told she would need a subpoena and attorney for the said purposes.

201. In November 2019 Plaintiff filed a complaint against Officer Tate with LADA's justice system integrity division but her complaint was referred back to EMPD.

202. On or about Nov 28, 2019 Plaintiff attempted suicide by trying to overdose sleeping aid. The life-long devastating harm caused by sexual assault is profound and exacerbated by law enforcement personnel's deprivation of Plaintiff's fundamental rights secured to her by laws.

203. In December 2019 Plaintiff requested LASD's policies and procedures regarding sexual assault investigation but her request was denied.

204. After Plaintiff's repeated inquiries and Cagney's delaying tactic, on Jan 7, 2020

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff received a joint phone call from Cagney, Thorp, and Chung. Despite Plaintiff never gave her consent to Suarez the ostensible reason for non-prosecution given by Cagney was "You had sex with him. You had contact with him." Despite most rape victims either delay reporting or never report the crime, especially the perpetrator is non-stranger, Cagney falsely told Plaintiff the case was not able to prove beyond a reasonable doubt because "You delayed reporting.", reflecting LADA Officials' dismissive attitude. The insufficient evidence although purporting to be reasonable but in fact was a disguise and pretext for intentional discriminatory under-enforcement against rape victims.

## Selective under-enforcement

205. The American Bar Association standard related to Prosecution Function says that the duty of the prosecutor is to seek justice, not merely to convict. However, prosecutors tend to avoid losing at trial simply because rape cases are hard to win and they pick easy cases to make their personal conviction rates look good for their resumes (their powerful incentive to discriminate against rape victims).

206. Plaintiff finally experienced the despair and emotional distress of living with the knowledge that her rapists would never be held accountable for their acts, and nothing was stopping them from assaulting others. Plaintiff's rapists were well protected by law enforcement while she was not and they walk free with the confidence that they can rape other women with no repercussions. A rapist's words prevail and conquer in every aspect but none of Plaintiff's words ever counts.

207. The depth of law enforcement personnel's discriminatory treatment of sexual assault victims is all the more troubling given the recent expansion of societal awareness of and sensitivity to sexual assault.

208. The current organizational structure of the said law enforcement agencies is not capable of adequately addressing the victimization and lifetime damage inflicted on sexual assault victims or to stop repeat perpetrators, particularly those who sexually assault women they know or who use drugs/alcohol to commit their sexual assaults.

33
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

<Educating Juries in Sexual Assault Cases>

http://www.ncdsv.org/images/AEquitas_EducatingJuriesInSexualAssaultCasesPart1_7-2010.pdf)

## FIRST CAUSE OF ACTION

### Equal Protection Clause of Fourteenth Amendment to U.S. Constitution

209. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

210. The Fourteenth Amendment prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect.

211. Cal. Penal Code §739 discriminates against crime victims by depriving their rights to criminal justice for protection and accountability.

212. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to her constitutional rights unless this Court grants her injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 7 – Equal Protection

213. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

214. Cal. Penal Code §739 monopolizes criminal prosecution and constitutes a violation of Article 1, § 7 of the California Constitution.

## THIRD CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 28 (a)

215. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

216. As California Constitution Art. I, § 28 defines, a "victim" is a person who suffers direct or threatened physical, psychological, or financial harm as a result of the commission or

34

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

attempted commission of a crime or delinquent act. The term "victim" also includes the person's spouse, parents, children, siblings, or guardian, and includes a lawful representative of a crime victim who is deceased, a minor, or physically or psychologically incapacitated.

217. California Constitution Art. I, § 28 (a) (2) provides that "Victims of crime are entitled to have the criminal justice system view criminal acts as serious threats to the safety and welfare of the people of California. The enactment of comprehensive provisions and laws ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system fully protecting those rights and ensuring that crime victims are treated with respect and dignity, is a matter of high public importance. California's victims of crime are largely dependent upon the proper functioning of government, upon the criminal justice system and upon the expeditious enforcement of the rights of victims of crime described herein, in order to protect the public safety and to secure justice when the public safety has been compromised by criminal activity."

218. California Constitution Art. I, § 28 (a) (4) provides that "The rights of victims also include broader shared collective rights that are held in common with all of the People of the State of California and that are enforceable through the enactment of laws and through good-faith efforts and actions of California's elected, appointed, and publicly employed officials. These rights encompass the expectation shared with all of the people of California that persons who commit felonious acts causing injury to innocent victims will be appropriately and thoroughly investigated, appropriately detained in custody, brought before the courts of California even if arrested outside the State, tried by the courts in a timely manner, sentenced, and sufficiently punished so that the public safety is protected and encouraged as a goal of highest importance."

219. California Constitution Art. I, § 28 (a) (8) provides that "To accomplish the goals it is necessary that the laws of California relating to the criminal justice process be amended in order to protect the legitimate rights of victims of crime."

220. Cal. Penal Code §739, without recognition of the profound failure of the present criminal justice system, does not promote the purpose of constitution.

**FOURTH CAUSE OF ACTION**

35

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Violation of Cal. Const. Art. I, § 28 (b) – Victims' Bill of Rights

221.  Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

222.  California Constitution Art. I, § 28 (b) (1) provides that a victim shall be entitled "to be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process."

223.  The monopoly on criminal prosecution, without regard to crime victims' fundamental rights, has violated the rights of Plaintiff to be treated with fairness and respect of her dignity.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

1.  Declaring that Cal. Penal Code §739 violates Equal Protection Clause of Fourteenth Amendments to the U.S. Constitution and Cal. Const. Art. I, §§ 7 and 28 (a) & (b);

2.  Preliminarily and permanently compelling Defendants to appoint seasoned and competent prosecutors with sexual assault prosecution expertise to file criminal charges against Edward Weamer and Carlos Suarez;

3.  Preliminarily and permanently enjoining Defendants, as well as their successors, agents, and employees, from enforcing Cal. Penal Code §739 against private citizens to initiate criminal prosecution;

4.  Awarding attorney's fees and costs as permitted by law; and

5.  Granting such other and further relief or sanction as this Court may deem just, proper, and appropriate.

Dated: May 14, 2020

JANE DOE, Plaintiff in Pro Se

36

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



# EXHIBIT D

JANE DOE

11151 Valley Blvd #4886,

El Monte, CA 91734

626-208-9665

Plaintiff in Pro Se

FILED

APR - 9 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JD

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## CV20       2432

JANE DOE,

Plaintiff,

v.

CITY OF CONCORD; COUNTY OF
CONTRA COSTA; COUNTY OF
SONOMA; GUY SWANGER; TAMRA
ROBERTS; CODY HARRISON;
RENELLE-REY VALEROS; DIANA
BECTON; CHRISTOPHER WALPOLE;
COLLEEN GLEASON; JILL RAVITCH;
ANNE MASTERSON; LAURA
PASSAGLIA; and DOES 1 - 10, inclusive,

Defendants.

No.

**COMPLAINT FOR DAMAGES AND
DECLARATORY AND INJUNCTIVE
RELIEF**

**JURY TRIAL IS HEREBY DEMANDED**

Plaintiff JANE DOE ("Plaintiff") alleges and complains the following, on information and belief except for information identified as being based on personal knowledge, which allegations are likely to have evidentiary support after a reasonable opportunity for further discovery.

## INTRODUCTION

1.      This is a civil rights complaint for damages and declaratory and injunctive relief arising from Defendants' violations of Plaintiff's fundamental rights to be free from discrimination, among others guaranteed by the United States Constitution, California

1

Constitution, and California laws. Defendants violated these rights when they conspired and practiced discriminatory under-policing and selective under-enforcement against rape victims, including Plaintiff.

2. This action stems from law enforcement personnel's response to a heinous crime - rape. This action is about the discriminatory practice and ill will of law enforcement personnel, their betrayal of public trust, and failure to protect residents from victimization by rapists. Our law enforcement's response to rapes sends a catastrophic message to the whole of our society. To rape victims: bringing a complaint is useless. To rapists: you're allowed to rape as many women as you want and there will be no consequence!

3. Plaintiff's constitutional injuries have occurred since the first minute she came into contact with law enforcement personnel who were supposed to support and protect her. Plaintiff was not only a rape victim but also a victim of discrimination, uneven enforcement of law, and law enforcement personnel's misconduct.

4. Without the ability to hold law enforcement accountable for its responses, rape victims, including Plaintiff, will be far too likely to face hostility, disinterest, and concrete harms as a result of their interactions with law enforcement. The people who mishandle rape cases are just as bad as the perpetrators themselves because they are perpetuating rapes.

5. Plaintiff has been injured by Defendants' willful refusal to provide the accommodations, advantages, privileges, and facilities of an unbiased and adequate sexual assault investigation, and effective prosecution. Plaintiff has endured multiple traumas; first, the criminal assault itself; second, a discriminatory, unconstitutional, unfair, and unequal treatment by the people sworn to protect the public - the government officials and actors who have instead discredited, dismissed, and denigrated Plaintiff as a rape victim; and finally, the additional trauma of watching her case and hope for justice languish and ultimately vanish, due to the sabotage, inaction and refusal to act by law enforcement personnel. Plaintiff's attacker will not see a day of consequence for his violent assault against her and it was a byproduct of the law enforcement in a discriminatory manner.

6. As described in more detail below, Defendants' (a) actions, (b) patterns of

2

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

behavior, (c) history of decision-making, and (d) departures from normal procedures in the course of their response to sexual assaults, demonstrate ongoing, intentional discrimination against rape victims, including Plaintiff. Specifically, Defendants have committed constitutional violations by implementing, promoting, or maintaining policies, practices, and/or customs that:

    a. Refuse to implement and/or ignore proper training and supervision of government employees handling sexual assault cases;

    b. Allocate more resources to other violent crimes than to sexual assaults;

    c. Refuse to treat rape victims' testimony as evidence;

    d. Credit suspects' account over victims' version of story;

    e. Fail to arrest and charge known perpetrators of sexual assault, which resulted in extremely low arrest and prosecution rate compared to other crimes;

    f. Disproportionately refuse to thoroughly investigate sexual assault cases;

    g. Disproportionately refuse to prosecute perpetrators of sexual assault;

    h. Traumatize Plaintiff in the course of her interactions with Defendants by, among other things, refusing to treat her testimony as adequate evidence regarding lack of consent;

    i. Subject Plaintiff and other rape victims to future assaults by known perpetrators by failing to act on, investigate, and prosecute prior sexual assaults;

    j. Treat sexual assault cases with less urgency and importance than is afforded to other types of violent crimes;

    k. Treat victims of sexual assault, including Plaintiff, with less respect and devote less attention to their cases than to cases of other crimes (collectively referred to herein as the "Policies").

7. Defendants' unconstitutional and discriminatory conduct subjects Plaintiff and other victims of sexual assault to continued risk at the hands of perpetrators who are never held accountable.

3

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## PARTIES

8.    Plaintiff, JANE DOE ("Plaintiff"), is a resident of County of Los Angeles, State of California. At all relevant and material times, Plaintiff was a visitor in the County of Sonoma and Contra Costa, State of California.

9.    Defendant, City of Concord ("the City"), is a public entity and municipal corporation duly organized and existing under and by virtue of the laws of the State of California. Concord Police Department ("CONCORD PD") is an operating department of the City. The City is responsible for the training, policies, procedures, and actions of CONCORD PD and its employees. The City has direct supervisory authority over CONCORD PD and its officers, and CONCORD PD policies are City policies for purposes of municipal liability.

10.    Defendant, County of Contra Costa ("Contra Costa County"), is an incorporated municipality organized and existing under the laws of the State of California and wholly located within the State of California. Contra Costa County District Attorney's Office ("CCDA") is an operating department of Contra Costa County. Contra Costa County is responsible for the training, policies, procedures, and actions of CCDA and their employees. Contra Costa County has direct supervisory authority over CCDA and their personnel, and CCDA policies are County policies for purposes of municipal liability.

11.    Defendant, County of Sonoma ("Sonoma County"), is an incorporated municipality organized and existing under the laws of the State of California and wholly located within the State of California. Sonoma County District Attorney's Office ("SDA") is an operating department of Sonoma County. Sonoma County is responsible for the training, policies, procedures, and actions of SDA and their employees. Sonoma County has direct supervisory authority over SDA and their personnel, and SDA policies are County policies for purposes of municipal liability.

12.    Defendant CONCORD PD Officers/personnel: At all times herein mentioned, Plaintiff is informed and believes, and thereon alleges that individual Defendants Chief of Police Guy Swanger ("Swanger"), Detective Renelle-Rey Valeros, ID 505 ("Valeros"), Sergeant Cody Harrison, ID 335 ("Harrison") and Lieutenant Tamra Roberts, ID 422 ("Roberts"), were residents

4

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

of Contra Costa County and were civilian employees, agents and/or representatives of CONCORD PD. At all times relevant hereto, said Defendants were acting within the course and scope of their employment as officers, lieutenants, detectives, and/or civilian employees of CONCORD PD, a department and subdivision of Defendant City of Concord. At all times relevant herein, said Defendants were acting under color of law, under the color of statutes, ordinances, regulations, policies, customs, practices and usages of the City, CONCORD PD, and/or the State of California. At all times relevant hereto, Plaintiff alleges Swanger served as the highest official for CONCORD PD and made the City and CONCORD PD policy for that office. As Chief of Police, Swanger holds the command and policy making position with regards to CONCORD PD.

13. Defendant CCDA Officials: At all times herein mentioned, Plaintiff is informed and believes, and thereon alleges that individual Defendant District Attorney Diana Becton ("Becton") is an elected public official. Individual Defendants Assistant District Attorney Christopher Walpole ("Walpole"), and Deputy District Attorney Colleen Gleason ("Gleason"), were residents of Contra Costa County and were civilian employees, agents and/or representatives of CCDA. At all times relevant hereto, said Defendants were acting within the course and scope of their employment as civilian employees of CCDA, a department and subdivision of Defendant Contra Costa County. At all times relevant herein, said Defendants were acting under color of law, under the color of statutes, ordinances, regulations, policies, customs, practices and usages of Contra Costa County, CCDA, and/or the State of California. At all times relevant hereto, Plaintiff alleges Becton served as the highest official for CCDA and made the County and CCDA policy for that office.

14. Defendant SDA Officials: At all times herein mentioned, Plaintiff is informed and believes, and thereon alleges that individual Defendant District Attorney Jill Ravitch ("Ravitch") is an elected public official. Individual Defendants Chief Deputy District Attorney Anne Masterson ("Masterson"), and Deputy District Attorney Laura Passaglia ("Passaglia"), were residents of Sonoma County and were civilian employees, agents and/or representatives of SDA. At all times relevant hereto, said Defendants were acting within the course and scope of their

5

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

employment as civilian employees of SDA, a department and subdivision of Defendant Sonoma County. At all times relevant herein, said Defendants were acting under color of law, under the color of statutes, ordinances, regulations, policies, customs, practices and usages of Sonoma County, SDA, and/or the State of California. At all times relevant hereto, Plaintiff alleges Ravitch served as the highest official for SDA and made the County and SDA policy for that office.

15. **CCDA and SDA Officials are not immune to this suit.** "Prosecutorial immunity only protects the defendants from [§] 1983 damage claims; it does not protect them from suits for injunctive relief." Gobel, 867 F.2d at 1203 n.6. To determine whether particular actions warrant absolute immunity, courts apply a "functional approach." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). This approach "looks to 'the nature of the function performed, **not the identity of the actor who performed it**[.]'" Id. (quoting Forrester v. White, 484 U.S. 219, 229 (1988)). "Absolute immunity 'is an extreme remedy, and it is justified only where any lesser degree of immunity could impair the judicial process itself.'" *Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 843 (9th Cir. 2016) (quoting *Lacey v. Maricopa Cty.*, 693 F.3d 896, 912 (9th Cir. 2012) (en banc)). See also *Brooks v. Clark Cty.*, 828 F.3d 910, 915–16 (9th Cir. 2016) (discussing absolute immunity). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns, 500 U.S. at 486. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Id. At 486-87. The purpose of absolute immunity is to eliminate susceptibility to legal actions that would inhibit prosecutors from aggressively prosecuting cases. When prosecutors fail to perform their duties, provide favoritism to suspects, and act in their own interest this Court should reject their absolute immunity. The following actions by CCDA and SDA Officials are neither prosecutorial in nature nor decisions of judgment but deplorable intentional antithesis of exercise of judgment:

    a. Adopt "no policy" policy for prosecution of rape which suggests deliberate indifference to rape victims safety and a general disinterest in prosecuting sexual assaults due to bias. The lack of written policy allows CCDA and SDA Officials to make wholly arbitrary decisions and is the moving force behind Plaintiff's

6

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

constitutional injuries;

b. When asked to adopt "offender-focused approach" and "expert witness strategy" that are recommended by National District Attorneys Association ("NDAA") CCDA and SDA Officials maliciously refused, giving an ostensible reason that the case cannot be proved beyond a reasonable doubt and falsely told Plaintiff that jury would not believe expert witness. Bias against rape victims could not be clearer; <Prosecuting Alcohol-Facilitated Sexual Assault> (http://atixa.org/wordpress/wp-content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf), <Cold Case Alcohol- and Drug-Facilitated Sexual Assault> (https://www.sakitta.org/toolkit/docs/Cold-Case-Alcohol-and-Drug-Facilitated-Sexual-Assault.pdf), <Understanding the non-stranger rapist> (http://www.ncdsv.org/images/NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_11_2007.pdf)

c. Willfully refuse to perform their duties pursuant to professional standards;

d. Intentionally and consistently credit the suspect's version over Plaintiff's account because she is a rape victim, notwithstanding objective evidence;

e. Callously disregard victim and community safety by using absolute immunity as a badge and shield for their discriminatory practice with no showing of a valid state interest;

f. Deter Plaintiff from pursuing truth and justice by falsely telling her that there was not enough evidence and creating purported reasons to justify their discriminatory and unconstitutional treatment to Plaintiff because she is a woman reporting rape;

g. Falsely told Plaintiff there was no corroboration, despite corroboration is not required by law for conviction; (https://aequitasresource.org/wp-content/uploads/2018/09/Model-Response-to-Sexual-Violence-for-Prosecutors-RSVP-An-Invitation-to-Lead.pdf)

h. Made multiple untrue statements to Plaintiff that were far departure from

7

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

professional standards, jury instruction, and prosecution guidelines which is a strong indicator that discriminatory intent was a motivating factor for CCDA and SDA Officials' wild spread custom;

i. Act in their own personal interest to avoid losing at trial simply because rape cases are hard to win and they want their personal conviction rates look good (their powerful incentive to discriminate against rape victims);

j. Intentionally enforce a "non-law", maliciously requiring strong corroboration and physical evidence to establish rape, a requirement that is not required by law or jury instruction, reflecting higher criteria compared to other crimes with no showing of legitimate state interest but solely aiming at conviction rate for prosecutor's own personal interest;

k. Maliciously ignore the fact that a victim's testimony alone is legally sufficient evidence for filing charges but falsely told Plaintiff that there was no corroboration, reflecting rape cases are less "worthy" of prosecution than other crime cases;

l. Willfully provide favoritism and leniency towards rapists, including Weamer who attacked Plaintiff;

m. Intentionally use their control and influence to shut Plaintiff out of criminal justice system and reduce the number of perpetrators held accountable for sexual assaults;

n. Employ disparate unwritten policy to rape cases compared to other type of crimes; (In 2017 and 2018, CCDA's prosecution rate of rape is as low as 34% although few sex crimes referred for prosecution by police and sheriff. This compares to a higher rate at every stage for non-rape crimes, reflecting the lowest priority of CCDA's efforts. SDA has not been able to provide prosecution rate so far.)

o. Use "insufficient evidence" as a disguise to deprive Plaintiff of her constitutional rights;

p. Employ unconstitutional and discriminatory practice against sexual assault victims, including Plaintiff; and

8

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

q. Misuse their power to undermine the quality of justice.

16. Defendant DOES 1 through 10 are not known or identified at this time. On information and belief, Plaintiff alleges that each Doe is in some manner responsible for the wrongs alleged herein, and that each such Defendant advised, encouraged, participated in, ratified, directed, or conspired to do, the wrongful acts alleged herein. When the true names and capacities of said Defendants become known, Plaintiff will seek relief to amend this complaint to show their true identities in place of their fictitious names as DOES 1 through 10. Defendants, DOES 1 through 10, and each of them, were the agents, employees and servants of the City, Contra Costa or Sonoma County. Defendants DOES 1 through 10 acted in the course and scope of said agency, service and employment at all relevant times.

17. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged.

18. Defendants, and each of them, did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

19. All Defendants are sued in their official capacities for declaratory and injunctive relief as to all claims. All Defendants are also sued for damages arising from violations of 42 U.S.C. §§ 1983 and 1985, and for violations of state law and the California Constitution.

20. Defendants CONCORD PD Officers, CCDA and SDA Officials, and DOES 1 through 10 are also sued in their individual capacities for their violations of Plaintiff's constitutional and statutory rights.

**JURISDICTION AND VENUE**

21. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a) because this action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

22. The Court may award damages and grant declaratory and injunctive relief for

9

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

constitutional violations pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and/or Federal Rules of Civil Procedure 57 and 65.

23. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events that give rise to this action occurred within this district and the Defendants reside in this district and state.

## CONCORD PD POLICIES AND PROCEDURES

24. At all relevant times, all CONCORD PD members were required to be apprised of the Fourteenth Amendment of the United States Constitution, and were required, at all times, to follow the United States Constitution, the laws of California and also to comply with CONCORD PD's Mission. CONCORD PD's Mission applies to all CONCORD PD members such as Defendant CONCORD PD Officers. Each member of CONCORD PD, including Defendant CONCORD PD Officers, is required to be familiar with CONCORD PD mission and must adhere to its directives.

25. CONCORD PD's Mission states "The members of the Concord Police Department are dedicated to providing the highest quality police services in order to enhance community safety, protect life and property, and reduce crime and the fear of crime. To do this, we pledge to develop a partnership with the community, lead a community commitment to resolve problems, and improve the safety and quality of life in our City." (https://www.cityofconcord.org/841/Department-Policy)

26. Although providing the highest quality police services is CONCORD PD's mission no written policies relating to investigation of rape exists which suggests deliberate indifference to rape victims safety and a general disinterest in investigating sexual assaults due to bias and dismissive attitude.

## CRIMINAL PROSECUTION

27. As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at

10

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.

28. American Bar Association Criminal Justice Standards for the Prosecution Function: Standard 3-1.2 Functions and Duties of the Prosecutor (b) The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. Standard 3-4.4 Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges (c) A prosecutor may file and maintain charges even if juries in the jurisdiction have tended to acquit persons accused of the particular kind of criminal act in question. (https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on/ )

29. In cases which involve a **serious threat** to the community, the prosecutor should not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit persons accused of the particular kind of criminal act in question because prosecutors have an ethical obligation to pursue difficult cases for public safety reasons.

30. According to NDAA, rape cases rarely have physical evidence that conclusively proves that a rape occurred. The evidence need not **conclusively** prove that a rape occurred; rather, it must give the jury a sufficient **context** in which to evaluate the victim's credibility. (http://atixa.org/wordpress/wp-content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf)

31. Physical evidence can prove that the intercourse happened, but not the absence of consent. When there's no issue about who the assailant is DNA doesn't really contribute anything. Victim's reaction or whether or not victim stays contact with the perpetrator is not a crime element. It's prosecutor's duty to educate the jury the right way to identify whether or not a crime occurred.

32. CCDA declares that their office's mission is to seek justice and enhance public safety for all their residents by fairly, ethically, aggressively and efficiently prosecuting those

11

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

who violate the law, and by working to prevent crime. (https://www.contracosta.ca.gov/7284/District-Attorney)

33. SDA's mission statement indicates that "We shall seek truth and justice in a professional manner, while maintaining the highest ethical standards." (http://da.sonoma-county.org/content.aspx?sid=1023&id=1379)

34. AEquitas is a national technical assistance provider that specializes in the prosecution of gender-based violence and human trafficking crimes. AEquitas is a nonprofit organization that brings decades of prosecution experience and collaborative approach to offer law enforcement advice and resources across disciplines at no cost. (https://aequitasresource.org/)

35. Corroboration is not required by law for conviction. (https://aequitasresource.org/wp-content/uploads/2018/09/Model-Response-to-Sexual-Violence-for-Prosecutors-RSVP-An-Invitation-to-Lead.pdf)

36. In 2018 in California the arrest rate of rape is as low as 16.4% while arrest rate of aggravated assault is 85.5%. (https://data-openjustice.doj.ca.gov/sites/default/files/2019-07/Crime%20In%20CA%202018%2020190701.pdf)

**SEXUAL AND DOMESTIC VIOLENCE**

37. Five categories of sexual violence (https://ndaa.org/wp-content/uploads/NDAA-DV-White-Paper-FINAL-revised-July-17-2017-1.pdf):

    a. Rape or penetration of victim;

    b. Victim made to penetrate someone else;

    c. Non-physically pressured unwanted penetration;

    d. Unwanted sexual contact, defined as the "intentional touching of the victim or making the victim touch the perpetrator, either directly or through clothing . . . without the victim's consent";

    e. Non-contact unwanted sexual experiences, defined as the "unwanted exposure to sexual situations (e.g., pornography); verbal or behavioral sexual harassment; threats of sexual violence to accomplish some other end; and /or

12

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

unwanted filming, taking, or disseminating photographs of a sexual nature of another person".

38. Researches show that distorted thoughts is one of the main reasons women stay in abusive relationships. Being controlled and hurt is traumatizing, and this leads to confusion, doubts, and even self-blame. For example, women shared: "I believed I deserved it." Others minimized the abuse as a way to cope with it, saying: "[I stayed] because I didn't think that emotional and financial abuse was really abuse. Because words don't leave bruises," and, "Because I didn't know what my boyfriend did to me was rape." (http://www.ncdsv.org/images/Investigating%20and%20Prosecuting%20Intimate%20Partner%20 Sexual%20Assa,...pdf); (https://law.lclark.edu/live/files/17491-countering-common-misperceptions-of-sa-victims)

39. When NFL linebacker Ray Rice knocked his fiancée Janay Palmer unconscious in an elevator in 2014, it didn't initially get much attention. He was accused of domestic violence and suspended for two games. After a few weeks, he was formally charged, but he and Palmer were married the next day. A security video quickly went viral showing Janay Palmer knocked down and roughly dragged out of the elevator by Rice. Victim's staying with their abuser does not erase the crime committed by the abuser.

40. Both rape and battery are domestic violence and they should be treated the same way. No law requires a victim breaking up with their attacker to establish battery or rape.

**RAPE KIT BACKLOG**

41. In 2015 there were 2400 untested rape kit found in Contra Costa County. However, there was never ever any backlog of DNA testing for murder or other crimes.

42. The discriminatory practice against rape victims is long-standing, wildspread, and well settled. (https://www.huffpost.com/entry/the-rape-kit-backlog-shows-exactly-how-we-regard-women-in-this-country_n_5acfb5e1e4b016a07e9a8c65 )

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

13

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

43. In 2013 Edward Weamer ("Weamer") was a police officer at Sonoma University Police Department. In Nov 2013 via an online app "POF" Weamer friended Plaintiff and started chatting with her online.

44. Before Plaintiff met Weamer in person she made a clear statement via text messages that she didn't want to rush sex and insisted to stick to her traditional culture. Weamer agreed to respect Plaintiff so Plaintiff decided to meet him in person.

45. Once Plaintiff met Weamer in person, he didn't keep his words and forced himself on top of Plaintiff around ten times between 2013 and 2014.

46. Via Plaintiff's message conversations with Weamer he acknowledged that each time Plaintiff said no and resisted. Plaintiff also accused Weamer that he set her up but she was not able to recognize what Weamer had done to her was a crime due to her confusion about rape. Plaintiff mistakenly thought rape was a crime committed by a stranger. < Understanding and Countering Rape Myths >
(https://www.nationalguard.mil/Portals/31/Documents/J1/SAPR/SARCVATraining/Barriers_to_ Credibility.pdf)

47. In Aug 2014 Plaintiff broke up with Weamer and never had contact with him again. Over the years Plaintiff has been broken, and experienced depression, anxiety, and low self-esteem but she didn't know where those came from until Oct 2019.

48. In Oct 2019 Plaintiff met with LA County prosecutor Peter Cagney and he explained to Plaintiff what rape was. Plaintiff has realized what Weamer had done to her was in fact rape.

49. Plaintiff finally gathered her courage to come forward on Oct 18, 2019. At the time she believed that coming forward would be her first step to heal and it was her moral obligation to report it to stop it. However, it turned out she was completely wrong and her life has been turned upside down.

50. In 2013 Plaintiff was raped in Cotati. In 2014 Weamer raped Plaintiff in Concord. Plaintiff filed the police reports with Cotati Police Department ("Cotati PD") and Concord PD respectively on Oct 18, 2019.

14

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

51.     After the initial report was filed on Oct 18, 2019 Cotati PD informed Plaintiff of victims rights and followed up with Plaintiff the following week. The case was subsequently submitted to SDA.

52.     After the initial interview with Concord PD Officer Shasta Vanetti on Oct 18, 2019, the following month Plaintiff heard nothing from CONCORD PD, no follow-up and literally nothing.

53.     In November 2019 Plaintiff left voice mail to Detective Valeros but still heard nothing from CONCORD PD in the following month.

54.     In December 2019 after Plaintiff reached out to Sgt Harrison she finally got a phone call from Detective Valeros.

55.     Rather than ask relevant questions regarding crime elements the first thing Valeros wanted to confirm was "So are you still living in Southern California?" Perhaps he thought he could treat this case less seriously because the victim lived far away.

56.     Then Plaintiff was asked by Valeros what's her ultimate goal. Such humiliating and degrading question strongly suggests his discriminatory animus towards Plaintiff as a rape victim. Such question demonstrates that Valeros thought Plaintiff came forward for something else other than justice. A victim of other crimes would not be asked about their goal to come forward.

57.     Plaintiff was shocked to find out the suspect was not contacted nearly two months after she reported the crime.

58.     Despite there is no statute of limitations for rape Valeros told Plaintiff this happened five years ago. Even though Weamer admitted through texts that each time Plaintiff said no and resisted Valeros told Plaintiff he could not prove it was Weamer who was texting.

59.     No useful information was extracted during Plaintiff's conversation with Valeros. No question regarding the crime element was asked. The "investigation" conducted by Valeros was meaningless with respect to proving a crime. Instead, Valeros' language reflects how he deterred Plaintiff from pursuing the case.

60.     Despite pretext phonecall is a commonly used technique to obtain confession from

15

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

the offender Valero opt not to use it, not to mention he would not spend any effort finding out if there would be more women victimized by Weamer.

61.     In December 2019 Plaintiff was really concerned by Valeros' attitude and she reached out to Sgt Harrison again. However, despite there is no statute of limitations for rape and physical evidence is not required by law or jury instruction, Harrison falsely announced to Plaintiff that the case was six years old and there was no physical evidence at all for filing charges. Harrison didn't stop there. He further falsely told Plaintiff that there was no indication of any type of sexual assault and appeared quite consensual which strongly suggests how CONCORD PD Officers deterred Plaintiff from pursuing justice and CONCORD PD Officers' discriminatory intent to discount and dismiss Plaintiff's allegation.

62.     After the horrifying interactions with Valero and Harrison Plaintiff reached out to Lieutenant Roberts.

63.     Despite victim's testimony is legally enough to file charges Roberts falsely told Plaintiff that her testimony was absolutely not enough and there was no evidence of sexual assault.

64.     When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Roberts falsely told Plaintiff "There needs to be physical evidence, uh, either DNA evidence or a confession from the suspect. Um, and we don't have any of those things. In this case, there's no DNA evidence."

65.     The crime of battery (e.g. a punch) is established based solely on the perpetrator's actions and/or intent. The victim's response to being punched is irrelevant. The victim need not resist nor express unwillingness to being punched to establish a crime, nor is a victim's history of being punched relevant. The relationship between the assailant and the victim does not make the crime less seriously or make the victim suffer less.

66.     While Plaintiff pointed out that Weamer acknowledged each time Plaintiff said no and resisted but Roberts challenged Plaintiff "But then you got back together with him and continued." It's obvious that Roberts treat rape completely different from other crimes.

16

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

67. There is no law requires victim act in certain way in order to prove she was raped. Roberts' stereotype about how victims should behave constitutes unlawful discrimination. Roberts' language also reflects her discriminatory intent to discredit Plaintiff and discard Plaintiff's allegation. Roberts' announcement left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all. Such victim blaming does not occur with other types of crimes. Moreover, according to Roberts' theory a man is entitled to rape a woman if they are in a relationship, suggesting a strong purposeful animus towards Plaintiff.

68. Although victim's reaction is not a crime element Roberts twisted Plaintiff's account of story and announced to Plaintiff "You were okay with having sex." by ignoring how a victim would process trauma. Then Roberts falsely told Plaintiff the text messages would only work in the suspect's favor and there was no evidence of sexual assault.

69. Battery and rape are both domestic violence. The law does not require a victim break up with the assailant to establish battery but Roberts told Plaintiff "This is a different situation. You continue to get together with him." Roberts imposed a non-law to require Plaintiff break up with the suspect to establish rape. Roberts flat out told Plaintiff "Most people, if they got raped, they wouldn't get together with that person again." Such remarks strongly suggest an intention to treat sexual assault cases less seriously than other assaults, as well as an animus against rape victims. Roberts' pro-defendant attitude is capable of several interpretations: perhaps he believed that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless because she stayed contact with the attacker, that such assault was less severe and traumatic because she was dating this suspect, or that state officials should not intrude upon dating violence. Whatever the reason, Roberts' language reflects an outdated misconception concerning rapes that cannot be used as a source of differential treatment. Roberts' statement also demonstrates her discriminatory intent to devalue Plaintiff's allegation.

70. When Plaintiff pointed out rape should be treated the same way as battery Roberts responded "I don't think I can understand what you are saying."

71. Regardless Plaintiff say no and resisted each time Roberts twisted it as sexual play.

17

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Roberts also declared "A district attorney would have a very hard time convincing a jury of 11 people."

72. The language and attitude of CONCORD PD Officers suggests that they made minimal or maybe no effort to investigate the suspect in Plaintiff's case. None has been done to see if there are more women victimized by the suspect. None has been done in order to support Plaintiff's allegation.

73. Roberts went on and told Plaintiff "The district attorney's office won't prosecute on a case like this." "If we don't have any evidence, then we don't submit the case to the district attorney." "It is here in Contra Costa County, the district attorney's office would never file a case like this. Um, I've been doing this for 18 years. I've worked sexual assault for five years. Um, they will never file a case like this."

74. In December 2019 Plaintiff filed a complaint with Swanger but Plaintiff never received any investigation result.

75. CONCORD PD personnel did not inform Plaintiff of victims' rights as set forth in California constitution. At that time, and at all relevant times, CONCORD PD personnel had full knowledge of CONCORD PD's mission and awareness of proper investigation protocol.

76. At that time, and at all relevant times, CONCORD PD Officers were aware of CONCORD PD's mission and their role as law enforcement personnel.

77. By failing to discipline or act, Swanger endorsed or approved the unconstitutional conduct of individual officers.

78. Plaintiff requested CONCORD PD's policy and procedures regarding sexual assault investigation but no such thing existed.

79. In January 2020 CCDA declined to file charges against Weamer.

80. Given the way how law enforcement personnel responded to rapes, Plaintiff asked herself "Can you imagine how many victims didn't get the justice they deserved?"

81. On Jan 7, 2020 during a recorded phone call conversation Gleason told Plaintiff this was a he said she said case by ignoring the objective evidence. Gleason announced that there was NO EVIDENCE to prove it was not consensual by invaliding Plaintiff's testimony. By

18

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

intentionally ignoring the context Gleason falsely told Plaintiff that the jury would interpret it as rough sex and Plaintiff came forward because she was upset about Weamer chasing other girls. Gleason took every word of Weamer as true even though a normal person, through inference, could easily tell Weamer was lying. By ignoring the fact that Plaintiff texted Weamer he set her up Gleason credited Weamer because Weamer falsely said Plaintiff enjoyed the sex and put his penis in her vagina.

82.     At the end of the phone conversation with Gleason Plaintiff requested to speak with her supervisor, Walpole.

83.     At that time, and at all relevant times, Gleason was aware of CCDA's mission and her role as a prosecutor.

84.     In Jan 2020 Plaintiff notified Becton of the constitution violation.

85.     On Jan 8, 2020 during a recorded phone call conversation Walpole declared that it was their filing standard to file cases they believed they could win. "We wouldn't file cases if we don't get a guilty verdict." "It's a big hurdle." Walpole also announced that they would need strong corroboration despite it was not required by law.

86.     In 2018 in California the conviction rate of violent offenses is 56.8% (https://data-openjustice.doj.ca.gov/sites/default/files/2019-07/Crime%20In%20CA%202018%2020190701.pdf). However, Walpole flat out told Plaintiff "We only file cases we believe we can win. That's our filing standard."

87.     When Plaintiff questioned about the use of expert witness Walpole falsely told her many times jury would disagree with the expert. Despite stereotype about how victims should behave is unlawful discrimination and it's a prosecutor's job to select unbiased jury Walpole falsely told Plaintiff the jury would say "If I was in her shoes, I wouldn't have had the relationship."

88.     By invaliding Plaintiff's testimony Walpole valued Weamer's version because Weamer falsely said Plaintiff put his penis inside her and being upset about Weamer seeing other women was Plaintiff's motive to pursue this case. Walpole also declared this was part of the #Metoo movement.

19

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

89. Although Plaintiff's motive is not a crime element Walpole attacked Plaintiff's motive of coming forward was the suspect was seeing other women. Motive of victims of other assaults would not be attacked as a target.

90. The entire time Walpole tried his best to derail Plaintiff from pursuing the truth and justice, reflecting Walpole's conscious choice not to overcome common defenses. Rather than uphold the law, educate the jury, and overcome common defenses, Walpole chose to act as the suspect's advocate.

91. At that time, and at all relevant times, Walpole was aware of CCDA's mission and his role as a prosecutor and supervisor.

92. On Jan 25, 2020 Plaintiff filed a complaint with CCDA regarding the constitutional violation.

93. By failing to discipline or act, Contra Costa County and Becton endorsed or approved the unconstitutional conduct of individual employees.

94. Plaintiff requested CCDA's policy and procedures regarding sexual assault prosecution but no such thing was available.

95. On Feb 10, 2020 during a recorded phone call conversation Passaglia told Plaintiff this case was fairly old regardless of no statute of limitation for rape. Despite corroboration is not require by law Passaglia announced "We don't have any opportunity to do any investigation or find any corroboration".

96. Passaglia went on and told Plaintiff "It's not enough for me to say conclusively what exactly occurred" and such statement is completely opposite to the prosecution guideline set forth by NDAA. Despite sexual assault cases rarely have witnesses Passaglia declared "There is no opportunity to interview any witnesses and talk to people in real time."

97. On Feb 15, 2020 Plaintiff emailed Masterson and encourage her to follow the prosecution guidelines but Plaintiff's email was ignored, reflecting SDA's dismissive attitude.

98. At that time, and at all relevant times, Passaglia and Masterson were aware of SDA's mission and their role as a prosecutor.

99. In Feb 2020 Plaintiff filed complaint with Ravitch but no action was taken.

20

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

100. By failing to discipline or act, Sonoma County and Ravitch endorsed or approved the unconstitutional conduct of individual employees.

101. Plaintiff requested SDA's prosecution policy for sexual assault but no such thing exists as Missoula County Attorney's Office does. <MISSOULA COUNTY ATTORNEY'S OFFICE SEXUAL ASSAULT POLICY & PROCEDURE MANUAL> (https://dojmt.gov/wp-content/uploads/SEXUAL-ASSAULT-POLICY-AND-PROCEDURE-MANUAL.pdf )

102. The American Bar Association standard related to Prosecution Function says that the duty of the prosecutor is to seek justice, not merely to convict. Giving false statement to a victim is not prosecutorial in nature. Instead, CCDA and SDA Officials were afraid to lose the case and affect their personal performance. In another words CCDA and SDA Officials acted in their own interest and personal capacity during the employment as prosecutor.

103. The life-long devastating harm caused by sexual assault is profound and exacerbated by Defendants' deprivation of Plaintiff's fundamental rights secured to her by laws. The depth of trauma inflicted upon Plaintiff has a significant impact not only on the victim, but on the entire community because of the scope and lasting effect of the harm, and the fact that unpunished perpetrators are encouraged to repeat their crimes.

104. Plaintiff finally experienced the despair and emotional distress of living with the knowledge that her rapist would never be held accountable for his act, and nothing was stopping him from assaulting others. Plaintiff's rapist was well protected by law enforcement while she was not and he walks free with the confidence that he can rape other women with no repercussions. A rapist's words prevail and conquer in every aspect but none of Plaintiff's words ever counts.

105. The depth of Defendants' discriminatory treatment of sexual assault victims is all the more troubling given the recent expansion of societal awareness of and sensitivity to sexual assault. The discriminatory treatment and deprivation of equal protection of the laws by Defendants caused significant emotional injury to Plaintiff separate and apart from the harm she suffered as a rape victim.

106. Upon information and belief, critical decision-making regarding the distribution of

21

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

resources and staffing, training of officers, detectives, and other personnel, treatment of victims who come forward, and other policies and/or practices that led to the discriminatory denial and/or hostile provision of services to Plaintiff were made by Defendants Swanger, Becton, Ravitch, and/or among others.

107. Failure of CONCORD PD, CCDA and SDA to adhere to mission statement and training, permits and facilitates the unlawful conduct described above. Accountability systems of CONCORD PD, CCDA and SDA, do not sufficiently detect or prevent unlawful conduct, CONCORD PD, CCDA and SDA did not properly consider and resolve complaints from Plaintiff. Early warning system of CONCORD PD, CCDA and SDA does not adequately identify or effectively respond to a need for intervention to prevent future violations of constitutional rights of sexual assault victims.

108. Plaintiff's complaints were not formally investigated. CONCORD PD, CCDA and SDA minimized the seriousness of Plaintiff's complaints by failing to investigate as a serious complaint that could potentially result in discipline.

109. At its core, the current organizational structure of CONCORD PD, CCDA, and SDA is not capable of adequately addressing the victimization and lifetime damage inflicted on sexual assault victims or to stop repeat perpetrators, particularly those who sexually assault women they know or who use drugs/alcohol to commit their sexual assaults.
<Educating Juries in Sexual Assault Cases>
http://www.ncdsv.org/images/AEquitas_EducatingJuriesInSexualAssaultCasesPart1_7-2010.pdf)

110. Not having any written policy and procedure for investigation and prosecution of a heinous crime – sexual assault, suggests that Concord PD, CCDA, and SDA disregard the known or obvious consequence and it is a conscious choice.

## FIRST CAUSE OF ACTION

### Equal Protection (42 U.S.C. § 1983)

### Against all Defendants

111. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

22

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

the paragraphs above.

112. The Fourteenth Amendment prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect.

113. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Sioux City Bridge Co. v. Dakota Cty., 260 U.S. 441, 445 (1923) (quoting Sunday Lake Iron Co. v. Wakefield Twp., 247 U.S. 350, 352 (1918)). Discriminatory policing occurs when police officers and departments selectively enforce the law - or fail to enforce the law - based on arbitrary factors.

114. Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. Discriminatory intent implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected or reaffirmed a particular course of action at least in part because of – not merely in spite of – its adverse effects upon an identifiable group.

115. Plaintiff is a member of an identifiable group. As pled above, she is a rape victim who has been treated differently based upon illegitimate stereotypes and archaic notions of sexual assault. She further alleges that Defendants acted with discriminatory intent in discounting, invalidating, and dismissing her allegation.

116. Defendants' omissions and actions described above, when analyzed as a whole using a contextualist approach, permit the inference that Plaintiff's individual case was treated differently without a rational basis and showcase Defendants' custom and practice of intentional discriminatory under-policing and selective under-enforcement. Defendants intentionally provide unequal protection to sexual assault victims in the form of failing to respond with equal effort to sexual assault victims the same as Defendants do with victims of other crimes.

117. There was no reason for the misconducts and ill treatments other than animus

23

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

toward victims of sexual assault. Such conducts are not at all related to any governmental purpose and they are a far deviation from commonly accepted procedures. It's not a single word, not a single act, but a series of conducts that demonstrate Defendants' pattern of deliberate indifference and unconstitutional practice to discourage the vigorous prosecution of violent crimes against sexual assault victims.

118. An individual who alleges that a state actor intentionally treated her differently than other similarly-situated individuals and alleges that there was no rational basis for the difference in treatment, states a viable Fourteenth Amendment Equal Protection Claim.

119. Plaintiff has been deprived of her rights of equal protection under the law – and as of the date of this filing, continues to be deprived of these rights – on account of sexual assault, in violation of the Fourteenth Amendment to the United States Constitution, in that she has been afforded less favorable terms and conditions than victims of other assaults/crimes, and continues to be afforded less favorable terms and conditions. As a consequence, Plaintiff, as a victim of sexual assault, obtained less protective resources of the state compared with victims of other assaults/crimes.

120. The devaluation of sexual assaults burdens a particular set of victims. The laws against violence were not and will not be uniformly enforced. Because the vast majority of victims of sexual assault are women, discriminatory practice has an unjustified disparate impact on women. Rape is the most under-reported crime. 63% of sexual assaults are not reported to police. <Statistics about sexual violence> https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf )

121. Discrimination against rape victims puts victims at a unique disadvantage in the criminal justice system, decreasing the rate of reporting rape and increasing the rate of claims withdrawn by victims. <Rape and Sexual Assault in the Legal System> https://www.womenslawproject.org/wp-content/uploads/2016/04/Rape-and-Sexual-Assault-in-the-Legal-System-FINAL.pdf )

122. The acts of Defendants were unnecessary, objectively unreasonable and malicious.

24

123. As a proximate and foreseeable result of Defendants' violations of Plaintiff's Fourteenth Amendment rights, Plaintiff has suffered, is suffering, and will continue to suffer injuries, including but not limited to continued trauma, dissociation, humiliation, emotional distress, anxiety, depression, stigma, and embarrassment.

## SECOND CAUSE OF ACTION

### Gender-based Civil Conspiracy (42 U.S.C. § 1985)

### Against all Defendants

124. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

125. Starting on Oct 18, 2019 Defendants, in whole or part, conspired among themselves and with others for the purpose of depriving, directly or indirectly, Plaintiff of equal protection under the law with the intent to deny her right to be treated fairly and equally.

126. The conduct described above, when viewed in total, is conscience shocking. Each member of this conspiracy shared the same conspiratorial objective.

127. Defendants engaged in a conspiracy among themselves and with others based on discriminatory animus for the purpose of depriving, directly or indirectly, Plaintiff's right to equal protection under the law in violation of 42 U.S.C. § 1985(3), with the object of that conspiracy being to conceal the fact that the complaints of crime made by female victims, including Plaintiff, are less important to CONCORD PD, CCDA, and SDA than complaints made by similarly-situated male rape victims.

128. Defendants engaged in oral, written, and electronic communications, and/or endorsement and support among themselves and with others regarding: a) their agreement to treat Plaintiff differently; b) actions taken to deter Plaintiff from pursuing the truth and justice; and c) their effort to support each other's unconstitutional actions and discourage vigorous prosecution of sex crimes against women.

129. Defendants conspired among themselves and with others to deprive Plaintiff of equal protection of the laws as alleged in this Complaint based on animosity toward Plaintiff as a

25

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

woman reporting rape.

130. Defendants' series of omissions and actions described above, when analyzed as a whole using a contextualist approach, permit the inference that Defendants have a meeting of the minds to violate Plaintiff's constitutional rights.

131. Between January and February 2020 CCDA and SDA Officials made multiple untrue statements that were far departure from professional standards, jury instruction, and prosecution guidelines by employing their discriminatory policy towards female rape victims, in order to prevent Plaintiff from exercising her constitutional rights.

132. Defendants, in part or whole, directly or indirectly, have used their control and influence to reduce the number of perpetrators held accountable for rapes.

133. As a result of said conspiracy Plaintiff has suffered, is suffering, and will continue to suffer injuries, including but not limited to continued trauma, humiliation, emotional distress, anxiety, depression, stigma, and embarrassment.

134. Defendants" failure to prevent or aid in preventing a conspiracy under 42 U.S.C. § 1985 of which the Defendants had knowledge and the power to prevent is also in violation of 42 U.S.C. § 1986.

135. The acts of Defendants were unnecessary, objectively unreasonable and malicious.

## THIRD CAUSE OF ACTION

**Municipal Liability for Unconstitutional Policies, Customs, and Practices (42 U.S.C. § 1983)**

**Against all Defendants**

136. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

137. On and for some time prior to Oct 18, 2019 (and continuing to the present date) Defendants deprived Plaintiff of the rights secured to her by the Fourteenth Amendments to the United States Constitution, in that said Defendants and their supervising and managerial employees, agents, and representatives, acting with gross negligence and with reckless and deliberate indifference to the rights of the public in general, and of Plaintiff, and of persons in her

26

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

class, situation and comparable position in particular, knowingly maintained, enforced and applied officially recognized policies, practices or customs of:

(a) Employing and retaining law enforcement personnel, including , Concord PD Officers, CCDA and SDA Officials, and DOES 1-10, who had dangerous propensities for discriminating against rape victims by failing to follow mission of CONCORD PD, CCDA and SDA, and/or well established laws;

(b) Inadequately supervising, training, controlling, assigning, and disciplining officers, detectives, and other personnel, who the City, Contra Costa and Sonoma County knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(c) Failing or refusing to competently and impartially investigate allegations of misconducts, failing or refusing to enforce established administrative procedures, to ensure victims and community safety, despite Defendants' knowledge of abuse and misconduct;

(d) Having and maintaining an unconstitutional custom of discriminatory under-policing, selective under-enforcement, favoritism toward rapists, and/or hostile provision of services to Plaintiff, which also is demonstrated by inadequate training regarding these subjects, and Defendants have no valid justification for such policies, customs, and practice. The practices of Defendants, were done with a deliberate indifference to individuals' safety and rights; and

(e) Fostering and encouraging an atmosphere of lawlessness, abuse and unconstitutional misconduct, as to encourage their personnel to believe that discriminatory under-policing, selective under-enforcement, and illegal searches and seizures would be tolerated, and to believe that unlawful acts would be overlooked without discipline or other official ramifications.

138.    Defendants have demonstrated their deliberate indifference to widespread law enforcement abuses by failing and refusing to impartially investigate personnel complaints, failing to discipline or prosecute personnel who commit acts of dishonesty and misconduct.

27

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

139. By reason of the aforementioned custom and practices of Defendants, Plaintiff was severely injured and subjected to lifetime pain and suffering.

140. Defendants, together with various other personnel, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above these Defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these practice with respect to the constitutional rights of Plaintiff, and other individuals similarly situated.

141. By perpetrating, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendants acted with an intentional, reckless, and callous disregard for Plaintiff's constitutional rights. Defendants, each of their actions were willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

142. Furthermore, the practice implemented and maintained and still tolerated by Defendants, were affirmatively linked to and were a significantly influential force behind the injuries of Plaintiff. Such unconstitutional custom is and will be a threat to justice and community safety.

## FOURTH CAUSE OF ACTION

**Municipal Liability – Failure to Train, Supervise, and/or discipline (42 U.S.C. § 1983)**

**Against all Defendants**

143. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

144. On information and belief, the overwhelming majority of law enforcement personnel who handle sexual assaults remain woefully untrained, and fundamentally biased against sexual assault victims, making assumptions about why and when sexual assault victims behave in certain ways and excusing perpetrator conduct as acceptable and/or "normal" behavior.

28

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

145. While acting under the color of state law and within the course and scope of their employment, Concord PD Officers, CCDA and SDA Officials, and DOES 1-10's unconstitutional practice, deprived Plaintiff's rights secured to her by the Fourteenth Amendment, including her right to be free from discrimination.

146. The training **policies** of CONCORD PD and CCDA were not adequate to train their personnel, including but not limited to, Concord PD Officers, CCDA and SDA Officials, and DOES 1-10, with regards to understanding crime elements, employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased jury, and treating victims equally and fairly. As a direct result, CONCORD PD and CCDA personnel, including, Concord PD Officers, CCDA and SDA Officials, and DOES 1-10, are not able to handle the usual and recurring situations with which they must deal, including treating every crime victim fairly and respectfully. These inadequate training policies existed prior to the date of this incident and continue to this day.

147. Defendants were deliberately indifferent to the known or obvious consequences of their failure to train and/or supervise their personnel, including, Concord PD Officers, CCDA and SDA Officials, and DOES 1-10, adequately with regards to understanding crime elements, employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased jury, and treating victims equally and fairly. This inadequate training includes failing to teach personnel to properly handle sexual assault investigation and prosecution.

148. Defendants were aware that failure to implement some sort of training and/or supervision with regards to their discriminatory and unlawful practice would result in continuing to have numerous unreasonable officers involved violation of sexual assault victims' constitutional rights annually.

149. The failure of Defendants to provide adequate training and/or supervision with regards to understanding crime elements, employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased jury, and treating victims equally and fairly, caused the deprivation of the Plaintiff's rights by, Concord PD Officers,

29

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

CCDA and SDA Officials, and DOES 1-10. In other words, Defendants' failure to train and/or supervise is so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury.

150. By failing to achieve adequate training and/or supervision, Concord PD Officers, CCDA and SDA Officials, and DOES 1-10, acted with an intentional, reckless, and callous disregard for Plaintiff's constitutional rights. Concord PD Officers, CCDA and SDA Officials, and DOES 1-10, each of their actions was willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

## FIFTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 7 – Equal Protection

### Against all Defendants

151. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

152. Defendants violated Plaintiff's civil rights by having a widespread practice and/or custom of discriminatory under-policing and selective under-enforcement, when enforced, caused a constitutional deprivation to Plaintiff, although not authorized by written law or express municipal policy, was so permanent and well settled as to constitute a custom or usage with the force of law.

153. Defendants' custom was intentional and, when enforced, had a discriminatory impact on sexual assault victims. Plaintiff's case was not isolated incident. Plaintiff received disparate treatment relative to victims of other violent crimes. Defendants set out to make reporting and pursuing investigation of rapes as unpleasant and difficult as possible.

154. The constitutional injury inflicted by Defendants was caused by the persons with final policymaking authority at the City, Contra Costa and Sonoma County, CONCORD PD, CCDA, and SDA.

155. Defendants knew about the above-described conducts and facilitated them, approved them, condoned them, and/or turned a blind eye to the conducts and systematic failure.

30

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

156. The above-described conducts of Defendants constitute a violation of Article 1, § 7 of the California Constitution.

## SIXTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 28 (b) – Victims' Bill of Rights

### Against all Defendants

157. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

158. California's Constitution protects the rights of crime victims. Defendants have violated the rights of Plaintiff to be treated with fairness, respect, and dignity, by among other things:

    a. Subjecting Plaintiff to re-traumatization, demeaning and humiliating interrogation tactics, including inappropriately questioning her reactions without presence of victim advocate;

    b. Routinely and inappropriately impugning the credibility of sexual assault victims, including Plaintiff;

    c. Conducting illegal searches and seizures, with no reasonable cause;

    d. Telling Plaintiff that the crime perpetrated against her was not actually criminal;

    e. Treating Plaintiff like suspect, rather than victim;

    f. Willfully failing to inform Plaintiff of her rights as a crime victim; and

    g. Maliciously using coercion and purported reasons to deter Plaintiff from exercising her constitutional rights.

159. Defendants' conducts violated Plaintiff's rights that set forth in California Constitution she was entitled (a) to be treated with fairness and respect for her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal justice process. (b) to be informed of the rights enumerated in California Constitution Art. I, § 28 (b).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## SEVENTH CAUSE OF ACTION

### Negligent Supervising, Disciplining, and Retaining Employees

### Against all Defendants

160. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

161. Defendants customarily failed to properly supervise their officers and deputies, and address citizen complaints reflecting that they were deliberately indifferent to citizens' constitutional rights.

## EIGHTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### Against all Defendants

162. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

163. Except for homicide, rape is the most serious violation of a person's body because it deprives the victim of both physical and emotional privacy and autonomy. As a rape victim, Plaintiff was particularly susceptible to emotional distress at that time but Defendants willfully engaged in acts and omissions alleged herein with a discriminatory intent or a reckless disregard for the probability of aggravating the emotional distress that Plaintiff was already suffering. Such ill treatment is not what Plaintiff came forward for. Plaintiff certainly didn't walk into a police station thinking her trauma would be lifted to another level by law enforcement personnel. Law enforcement personnel's response to sexual assault has made Plaintiff feel like being murdered would be better than being raped.

164. After Plaintiff gathered her courage to step forward and identify her assailant she has been re-traumatized again and again at the hands of law enforcement personnel. The trauma Plaintiff has experienced at the hands of Defendants prevented her from having any kind of normal life.

165. As a direct and proximate result of the Defendants' outrageous and unlawful

32

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

conducts as described herein, Plaintiff has suffered and/or continue to suffer loss of trust, comfort, protection, and support, humiliation, mental anguish, nervous shock, severe emotional distress, and other special and general damages in amounts according to proof.

166. Punitive damages should be assessed against Defendants for the purpose of punishment and for the sake of example.

## NINTH CAUSE OF ACTION

### Violation of Unruh Civil Rights Act (Cal. Civil Code § 51)

### Against all Defendants

167. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

168. Cal. Civil Code § 51, also known as Unruh Civil Rights Act, states that all persons within the jurisdiction of this state are free and equal, and are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

169. Defendants' policies, practices, and customs complained of herein violated Plaintiff's rights to be free from discrimination and unreasonable searches and seizures, rights to privacy, and victims' rights as secured by Article I, § 1, § 7, § 13, § 28(b) of the California Constitution and directly and proximately damaged Plaintiff as herein alleged, entitling Plaintiff to recover a minimum of $4,000 for each and every offense pursuant to California Civil Code § 52(a) and § 52.1, in addition to other damages.

## DECLARATORY RELIEF SOUGHT

170. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

171. Plaintiff respectfully prays for a declaratory judgment that Defendants, and each of them, have engaged in a pattern or practice of conduct that violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution, Art. I, §§ 1, 7, 13, 28(b) of the

33

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

California Constitution, Cal. Civil Code § 52.1, and/or California common law.

## INJUNCTIVE RELIEF SOUGHT

172. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

173. Plaintiff prays for a permanent injunction compelling Becton, Ravitch, and/or CCDA, SDA to file criminal charges against Weamer.

174. Plaintiff prays for a permanent injunction disbarring CHRISTOPHER WALPOLE, COLLEEN GLEASON, ANNE MASTERSON, and LAURA PASSAGLIA.

175. Plaintiff also prays that the Court issue a permanent injunction against Defendants ordering them to:

    a. Properly train and supervise government employees handling sexual assault cases or evidence;

    b. Establish written policy and procedure manual for investigation and prosecution of sexual assaults;

    c. Require and enforce trauma-informed approaches to investigation and prosecution of sexual assault cases;

    d. Increase prosecution rate of sexual assault to 50%;

    e. Treat sexual assault cases with the same urgency and importance afforded to other types of crimes;

    f. Provide adequate resources for investigation and processing of sexual assault cases;

    g. Treat victims of sexual assault with the same respect and attention to their cases as victims of other crimes; and

    h. Accurately and publicly report data reflecting the number of sexual assaults reported, investigated, prosecuted, and processed to conclusion within the criminal justice system on a bi-annual basis.

34

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**PRAYER**

WHEREFORE, Plaintiff prays judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

1. For general damages according to proof;

2. For special damages according to proof;

3. For exemplary damages as provided by law, in an amount to be proved against each individual Defendant;

4. For interest;

5. For civil penalties pursuant to Civil Code § 52;

6. For attorney's fees pursuant to 42 U.S.C. § 1988 and Civil Code §§ 52 and 52.1;

7. For reasonable costs of this suit;

8. For treble damages under Civil Code § 52.1;

9. For such other and further relief as the Court may deem just, proper, and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury for all issues so triable.


Dated: Mar 31, 2020

JANE DOE

Plaintiff in Pro Se

35

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## EXHIBITS TO COMPLAINT

## TABLE OF CONTENTS

| Exhibit # | Document | Pages |
|:---:|:---|:---:|
| 1 | Gov claim rejection letter from City of Concord | 38 |
| 2 | Gov claim rejection letter from County of Contra Costa | 40 |
| 3 | Gov claim rejection letter from County of Sonoma | 42 |

36

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

EXHIBIT 1



City of Concord
1950 Parkside Drive, MS 08
Concord, California 94519-2578
cxx 1925 671-3424

Office of the City Attorney
Telephone: (925) 671-3160

Susanne Meyer-Brown
City Attorney

Margaret Kotzebue
Senior Assistant City Attorney

Joshua K. Clendenin
Senior Assistant City Attorney

Laura Bayer
Special Counsel

February 3, 2020

11151 Valley Boulevard, Suite 4886
El Monte, CA 91734

    Re:    *Notice of Rejection of Claim against the City of Concord*

Dear Ms

Pursuant to the authority vested in me by the City Council, you are hereby notified that the amended claim received January 16, 2020, which refers to an incident that took place on or about October 18, 2019, in an unknown amount, is hereby rejected in its entirety.

## WARNING

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. See Government Code Section 945.6. This warning does not extend the statute of limitations involving any federal cause of action.

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Very truly yours,

JOSHUA K. CLENDENIN
Senior Assistant City Attorney

JKC:lrm

EXHIBIT 2

County Administrator
Risk Management Division

2530 Arnold Drive, Suite 140
Martinez, California 94553

# Contra
# Costa
# County



Liability Claims    (925) 335-1440
Fax Number    (925) 335-1421

March 5, 2020

P.O. Box 4886
El Monte, CA 91734

Re:    Claimant:
        Insured:    Contra Costa County
        Date of Loss: 1/7/20
        Claim #:    86109

Dear

The above captioned matter was referred to my office for investigation and handling on behalf of the Contra Costa County Board of Supervisors and the District Attorney's Office. Please note that this letter is not intended to waive any statutory requirements as set forth in the California Government Code Sections 910-913, nor does our investigation of this matter constitute any admission of negligence of liability.

This letter is to provide you with a response to your claim that was received by the Clerk of the Board on 1/24/20. Your claim filing states that Deputy District Attorneys failed to perform their duties to prosecute a suspect accused of rape, and that your civil rights were violated by deterring you from pursuing justice.

Based on the information provided by the DA's office, several factors went into their decision to not pursue charges in this case. Those factors include that the sex appeared consensual, that there was no corroborating evidence that the rape occurred, and delayed reporting.

As you may know, District Attorneys have to weigh the probability of a conviction before they make the decision to move forward with prosecuting a case. In this case, the decision was made to decline prosecution as the probability of a conviction was extremely low.

Accordingly, the District Attorney's office acted within the scope of their appointed duties as criminal prosecutors. As such, there is no negligence on the part of the County and we must respectfully deny your claim. If you have any additional information you wish to discuss, please feel free to call me.

Scanned with Car

EXHIBIT 3



**HUMAN RESOURCES DEPARTMENT**

Opportunity. Diversity. Service.

COUNTY OF SONOMA

Employment • Classification • Employee Relations • EEO • Training • Risk Management

March 24, 2020

11151 Valley Blvd #4886
El Monte, CA 91734

Subject:      **NOTICE OF REJECTION OF CLAIM**
Claim of:
Date of Incident:      02/10/2020
Claim Number:      2020006

Dea

The claim you presented to the Sonoma County Board of Supervisors on February 11, 2020 has been referred to the Risk Manager pursuant to Board of Supervisors Resolution No. 66798 and California Government Code Section 935.4.

NOTICE IS HEREBY GIVEN that said claim was rejected on March 24, 2020.

**WARNING**

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. See California Government Code Section 945.6

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

This notice applies only to causes of action arising under California law for which a claim is mandated by the California Government Tort Claims Act, California Government Code Sections 900 et seq. Other causes of action, including those arising under federal law, may have shorter time limitations for filing.

If you would like to discuss your claim further, please call Reesha Ruel in Risk Management at (707) 565-3563.

Sincerely,

*Janell Crane*

Janell Crane
Risk Manager

575 Administration Drive, Suite 116B • Santa Rosa, CA 95403 • Telephone (707) 565-6059 • Fax (707) 565-3770 • www.sonoma-county.org



COUNTY OF
SONOMA

Scanned with Car

FILED

APR -9 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CV20     2432**

Jane Doe

Case No. C

Plaintiff(s)

CONSENT OR DECLINATION
TO MAGISTRATE JUDGE
JURISDICTION

v.

City of Concord; et al

Defendant(s)

**INSTRUCTIONS**: Please indicate below by checking **one** of the two boxes whether you (if you are the party) or the party you represent (if you are an attorney in the case) choose(s) to consent or decline magistrate judge jurisdiction in this matter. Sign this form below your selection.

☐ **Consent to Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily **consent** to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

**OR**

☑ **Decline Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I **decline** to have a United States magistrate judge conduct all further proceedings in this case and I hereby request that this case be reassigned to a United States district judge.

DATE: 3/31/2020     NAME: Jane Doe _____

COUNSEL FOR
(OR "PRO SE"): _____

_____
*Signature*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANE DOE,

    Plaintiff,

v.

CITY OF CONCORD,

    Defendant.

Case No. 20-cv-02432-JD

**ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND ADR DEADLINES**

United States District Court
Northern District of California

IT IS HEREBY ORDERED that this action is assigned to the Honorable James Donato. When serving the complaint or notice of removal, the plaintiff or removing defendant must serve on all other parties a copy of this order and all other documents specified in Civil Local Rule 4-2. Counsel must comply with the case schedule listed below unless the Court otherwise orders.

IT IS FURTHER ORDERED that this action is assigned to the Alternative Dispute Resolution (ADR) Multi-Option Program governed by ADR Local Rule 3. Counsel and clients shall familiarize themselves with that rule and with the material entitled "Dispute Resolution Procedures in the Northern District of California" on the Court ADR Internet site at http://www.cand.uscourts.gov/adr. A limited number of printed copies are available from the Clerk's Office for parties in cases not subject to the court's Electronic Case Filing program (ECF).

**CASE SCHEDULE – ADR MULTI-OPTION PROGRAM**

| Date | Event | Governing Rule |
|---|---|---|
| 4/9/2020 | Complaint Filed | |
| 6/18/2020 | *Last day to:<br>• meet and confer re: initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR L.R.3-5 |
| | • file ADR Certification signed by Parties and Counsel (form available at http://www.cand.uscourts.gov) | Civil L.R. 16-8(b) & ADR L.R. 3-5(b) |
| 7/2/2020 | **Last day to file Rule 26(f) Report, complete initial disclosures or state objection in Rule 26(f) Report and file Case Management Statement per Standing Order re Contents of Joint Case Management Statement<br><br>(also available at http://www.cand.uscourts.gov) | FRCivP 26(a) (1) Civil L.R. 16-9 |
| 7/9/2020 | INITIAL CASE MANAGEMENT CONFERENCE (CMC) at 10:00 AM in:<br><br>Courtroom 11, 19th Floor<br>Phillip Burton Federal Building<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Civil L.R. 16-10 |

* If the Initial Case Management Conference is continued, unless otherwise ordered this deadline is continued to 21 days in advance of the Initial Case Management Conference.

** If the Initial Case Management Conference is continued, unless otherwise ordered this deadline is continued to 7 days in advance of the Initial Case Management Conference.

United States District Court
Northern District of California

# STANDING ORDER FOR ALL JUDGES
## OF THE NORTHERN DISTRICT OF CALIFORNIA

### CONTENTS OF JOINT CASE MANAGEMENT STATEMENT

All judges of the Northern District of California require identical information in Joint Case Management Statements filed pursuant to Civil Local Rule 16-9. The parties must include the following information in their statement which, except in unusually complex cases, should not exceed ten pages:

1.  Jurisdiction and Service: The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding personal jurisdiction or venue, whether any parties remain to be served, and, if any parties remain to be served, a proposed deadline for service.

2.  Facts: A brief chronology of the facts and a statement of the principal factual issues in dispute.

3.  Legal Issues: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions.

4.  Motions: All prior and pending motions, their current status, and any anticipated motions.

5.  Amendment of Pleadings: The extent to which parties, claims, or defenses are expected to be added or dismissed and a proposed deadline for amending the pleadings.

6.  Evidence Preservation: A brief report certifying that the parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and confirming that the parties have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action. *See ESI Guidelines 2.01 and 2.02, and Checklist for ESI Meet and Confer.*

7.  Disclosures: Whether there has been full and timely compliance with the initial disclosure requirements of Fed. R. Civ. P. 26, and a description of the disclosures made.

8.  Discovery: Discovery taken to date, if any, the scope of anticipated discovery, any proposed limitations or modifications of the discovery rules, a brief report on whether the parties have considered entering into a stipulated e-discovery order, a proposed discovery plan pursuant to Fed. R. Civ. P. 26(f), and any identified discovery disputes.

9.  Class Actions: If a class action, a proposal for how and when the class will be certified, and whether all attorneys of record for the parties have reviewed the Procedural Guidance for Class Action Settlements.

10. Related Cases: Any related cases or proceedings pending before another judge of this court, or before another court or administrative body.

11. Relief: All relief sought through complaint or counterclaim, including the amount of any damages sought and a description of the bases on which damages are calculated. In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.

*Effective November 1, 2018*

12. <u>Settlement and ADR</u>: Prospects for settlement, ADR efforts to date, and a specific ADR plan for the case, including compliance with ADR L.R. 3-5 and a description of key discovery or motions necessary to position the parties to negotiate a resolution.

13. <u>Consent to Magistrate Judge For All Purposes</u>: Whether **all** parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment. ___ Yes ___ No

14. <u>Other References</u>: Whether the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

15. <u>Narrowing of Issues</u>: Issues that can be narrowed by agreement or by motion, suggestions to expedite the presentation of evidence at trial (e.g., through summaries or stipulated facts), and any request to bifurcate issues, claims, or defenses.

16. <u>Expedited Trial Procedure</u>: Whether this is the type of case that can be handled under the Expedited Trial Procedure of General Order No. 64 Attachment A. If all parties agree, they shall instead of this Statement, file an executed Agreement for Expedited Trial and a Joint Expedited Case Management Statement, in accordance with General Order No. 64 Attachments B and D.

17. <u>Scheduling</u>: Proposed dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.

18. <u>Trial</u>: Whether the case will be tried to a jury or to the court and the expected length of the trial.

19. <u>Disclosure of Non-party Interested Entities or Persons</u>: Whether each party has filed the "Certification of Interested Entities or Persons" required by Civil Local Rule 3-15. In addition, each party must restate in the case management statement the contents of its certification by identifying any persons, firms, partnerships, corporations (including parent corporations) or other entities known by the party to have either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding. In any proposed class, collective, or representative action, the required disclosure includes any person or entity that is funding the prosecution of any claim or counterclaim.

20. <u>Professional Conduct</u>: Whether all attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

21. Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**STANDING ORDER FOR CIVIL CASES BEFORE JUDGE JAMES DONATO**

**INTRODUCTION**

This Standing Order is a guide to counsel and parties on pretrial practices in civil cases before Judge Donato. Counsel are required to read and comply with this order, this Court's Standing Orders for Discovery in Civil Cases and Civil Jury Trials, and the Northern District's Civil Local Rules.

**SERVICE OF THIS ORDER**

1. The parties are reminded that this Standing Order is included in the "Supplementary Material" that must be served in accordance with Civil Local Rules 4-2 and 16-2.

**CASE MANAGEMENT CONFERENCES**

2. Civil case management conferences are held on Thursdays at 10:00 a.m. in Courtroom 11, 19th Floor, United States Courthouse, 450 Golden Gate Avenue, San Francisco, California.

3. The parties must file a joint case management statement addressing the standardized items required by the Standing Order for All Judges of the Northern District of California: Contents of Joint Case Management Statements. The joint statement must be filed **at least seven calendar days** prior to the case management conference. Failure to file a joint statement must be accompanied by a signed declaration explaining the grounds for that failure. Absent good cause, the parties may be subject to sanctions. If either party is not represented by

1

counsel, separate statements may be filed, but only after the parties have made a good faith effort to prepare a joint statement.

4. In proposing a case schedule, the parties should agree on a trial date and work backward from that date to ensure adequate time for dispositive and *Daubert* motions, class certification motions, expert discovery and other events. As a general rule, counsel should budget no more than 18 months between the initial case management conference and trial. Counsel requesting longer pretrial periods must be prepared to justify that request at the initial case management conference. A trial date typically will be assigned at the initial case management conference. Once assigned, the trial date will not be changed or continued absent good cause in the interest of justice. Counsel and parties should assume that the trial date will not be moved.

5. For parties with counsel, each party must be represented at the case management conference by **lead counsel** prepared to address all pertinent matters and with authority to enter stipulations and make admissions. Failure of lead counsel to appear may result in sanctions. For parties without counsel, the party is expected to appear.

6. **Telephonic appearances are rarely permitted at case management conferences or motion hearings, except in exceptional circumstances and with the Court's prior approval issued at least three court days before the appearance date.** A conflict with another court date scheduled after a date set by this Court is not an exceptional circumstance. If a party or counsel has a good-faith basis for making a request to appear by telephone, it should file the request on the docket. Do not call the Court's Courtroom Deputy with those requests.

7. Any request to reschedule a case management conference must be made in writing, by stipulation if possible, not less than 10 calendar days before the conference date. Good cause must be shown. The conference date will not be rescheduled unless the Court grants the request. Parties cannot change the date by stipulation.

8. Pursuant to Federal Rule of Civil Procedure 26(d)(1), formal discovery should not be served or initiated by any party until after the parties have conferred as required by FRCP 26(f), except by stipulation or court order, or as provided for in FRCP 26(d)(2) or other rules. The Court expects that as soon as any party reasonably anticipates or knows of litigation, it will take the

2

Case 2:20-cv-00797-RGK-JDE   Document 245   Filed 08/07/21   Page 114 of 153   Page
ID #:8852

necessary, affirmative steps to preserve evidence related to the issues presented by the action, including, without limitation, interdiction of any document destruction programs and any ongoing erasures of e-mails, voice mails, and other electronically-recorded material.

### ELECTRONIC CASE FILING – CHAMBERS COPIES

9. In addition to filing papers electronically, the parties are required to lodge for chambers **one** paper copy of the following: (a) complaints; (b) notices of removal; (c) case management conference statements; (d) stipulations; (e) all motion papers, including the opening, opposition, and reply briefs, as well as any supporting declarations and exhibits; and (f) discovery dispute letters that are filed pursuant to this Court's Standing Order for Discovery in Civil Cases. Counsel should not submit chambers copies of any other documents that are electronically filed.

10. All chambers copies must be **double-sided**, three-hole punched at the left margin and marked with the ECF stamp (case number, document number, date and page number). These printed copies should be marked "Chambers Copy -- Do Not File" and placed in an envelope clearly labeled with the judge's name and case number. The copies must be delivered in accordance with Civil Local Rule 5-1(e)(7). For voluminous filings, chambers would appreciate the use of binder clips rather than staples, or submission in three-ring binders. For documents with multiple attachments (*e.g.*, declarations with exhibits, requests for judicial notice and so on), please use side tabs that clearly separate each attached document. For pretrial materials, please follow this Court's Standing Order for Civil Jury Trials.

### SETTING MOTIONS FOR HEARING

11. The civil law and motion calendar is called on Thursdays at 10:00 a.m. in Courtroom 11. Counsel need not request a motion hearing date and may notice non-discovery motions for any Thursday (excepting holidays) at 10:00 a.m. consistent with the 35-day notice period in Civil Local Rule 7-2(a) or other appropriate timeline. The Court may vacate the hearing and rule on the papers, or reset the hearing date as its calendar requires.

12. Counsel typically will have up to 15 minutes of oral argument time per side. The Court generally uses argument to ask questions and counsel are expected to be fully prepared to

3

discuss applicable law and the facts in the case. Argument time will likely be extended for more complex cases and motions.

13. The Court has a strong commitment to supporting the development of our next generation of trial lawyers. Parties and senior counsel are encouraged to give newer practitioners the opportunity to argue in court. To that end, the Court will typically guarantee oral argument on any motion handled by a lawyer with 6 or fewer years of experience. The Court should be advised that a newer lawyer is doing the argument well in advance of the hearing date.

## FORM OF SUBMISSIONS

14. On summary judgment motions, joint statements of undisputed facts are not required but are helpful if completely agreed upon. Separate statements of "undisputed facts" may **not** be filed. *See* Civil L.R. 56-2.

15. Reply papers should not raise new points that could have been addressed in the opening motion or brief. Sur-replies are not permitted. *See* Civil L.R. 7-3(d).

16. The title of a submission must be sufficiently descriptive to alert the Court to the relief sought; for example, please do not bury a request for continuance in the body of a memorandum.

17. All submissions filed with the Court must include the date and time of the hearing or conference on the cover sheet.

18. **Except for summary judgment and class certification motions, opening and opposition briefs may not exceed 15 pages, and reply briefs may not exceed 10 pages.** For summary judgment and class certification motions, opening and opposition briefs may not exceed 25 pages, and reply briefs may not exceed 15 pages.

19. The parties should not ask the Court for an order where one is not needed, *e.g.*, stipulations of dismissal under FRCP 41(a)(1). Those requests will be disregarded.

20. The parties are reminded that they must inform the Court of any potentially related actions pending in this District or any other federal or state court in accordance with Civil Local Rules 3-12 and 3-13.

United States District Court
Northern District of California

4

## MOTION ADVICE

21. Counsel should use their best judgment in deciding whether and when to bring a motion. Not every case warrants a motion to dismiss or summary judgment. For summary judgment in particular, counsel should carefully evaluate the extent to which fact disputes are genuine and material. Summary judgment motions that involve disputed material facts will usually be denied promptly in a short order.

22. As effective lawyers know, persuasive written advocacy is focused, plainly stated and supported by accurate and reliable authority. Counsel should spare no effort to ensure that their papers are succinct and clear, and should present their arguments in descending order of strength. Arguments buried in footnotes or raised with little authority or discussion will generally not be considered by the Court. For example, an argument that the Court lacks personal jurisdiction over a defendant or that a party lacks standing should not be raised in a footnote or a short paragraph at the end of a brief. If counsel believes a serious question or issue should be decided by the Court, counsel should argue it appropriately.

23. All case citations and factual statements must be completely accurate. A citation to a case, statute or other authority is counsel's representation to the Court that the authority stands for the proposition asserted and is good law. A quotation of a case or other authority is counsel's representation that the quoted language is complete and present in the authority cited. Counsel must ensure that use of ellipses or elisions in quotes does not mislead the Court or misrepresent the substance of the holding or other authority. Counsel's representations of facts are subject to the same requirements of completeness and accuracy. Misrepresentations of law or fact, however subtle, may result in sanctions and a referral to the District's Standing Committee on Professional Conduct.

## DISCLOSURES

24. FRCP 26 requires certain automatic disclosures and requires them to be made in a timely manner. Under FRCP 37(c), materials that are undisclosed or disclosed late will likely be excluded from use at trial or summary judgment unless permitted otherwise by the Court.

United States District Court
Northern District of California

5

**SEALED DOCUMENTS**

25. Any party seeking to file a document under seal must carefully review and comply with Civil Local Rule 79-5, except as that Rule is modified here for civil cases before Judge Donato.

26. The declaration and proposed order required by Civil Local Rule 79-5(d)(1) must establish, with reference to appropriate authority, that each of the following requirements is met:

    a. The document or document portion is "privileged, protectable as a trade secret or otherwise entitled to protection under the law." Civil L.R. 79-5(b). (Note that "[r]eference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Civil L.R. 79-5(d)(1)(A).)

    b. The "strong presumption of access to judicial records" may be rebutted under the appropriate legal standard, *i.e.*, the "good cause" or "compelling reasons" standard. *See Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178-82 (9th Cir. 2006) (discussing "good cause" and "compelling reasons" standards with respect to dispositive and non-dispositive motions). The declaration and proposed order must identify the appropriate standard and articulate why the materials to be sealed satisfy that standard. The reasons provided must be specific to the portions of the document sought to be sealed; "[s]imply mentioning a general category of privilege, without any further elaboration or any specific linkage with the documents, does not satisfy the burden." *Id.* at 1184. Generic, non-specific reasons are not sufficient under either standard. *See id.* at 1180.

27. Any proposed order under Civil Local Rule 79-5(d)(1)(B) must include in the table for each item sought to be sealed the filer's reasons for seeking sealing of the material, along with citations to the relevant declarations.

28. Any declaration by a Designating Party under Civil Local Rule 79-5(e)(1) must include a **new proposed order in the tabular format required by Civil Local Rule 79-5(d)(1)(B)** that includes the Designating Party's reasons for sealing the material. In addition, any declaration by a Designating Party under Civil Local Rule 79-5(e)(1) that seeks less extensive

6

sealing than its associated administrative motions to seal must be accompanied by **revised redacted and unredacted versions of the documents sought to be sealed** that comply with the requirements of Civil Local Rule 79-5(d)(1)(C) and (D), including the requirement that the portions sought to be sealed must be clearly marked on the unredacted version.

29. Any declaration, whether under Civil Local Rule 79-5(d)(1)(A) or (e)(1), that claims confidentiality obligations to a non-party as a basis for sealing a document or a portion of a document must be served on the non-party as set forth in Civil Local Rule 79-5(e). The non-party must also be notified that it must comply with the procedures set forth in that rule for Designating Parties, except that the non-party will have four days from service of the declaration -- rather than four days from the filing of the administrative motion to seal -- to file a declaration under Civil Local Rule 79-5(e)(1).

30. All portions of documents sought to be sealed must be clearly marked on the unredacted versions of documents submitted to the Court, as required by Civil Local Rule 79-5(d)(1)(D). The Court emphasizes this requirement, because it is usually ignored.

31. For cases where voluminous or multiple administrative motions to seal would be filed if normal procedures were followed, parties (and any non-parties with potentially sealable information) must, upon the completion of briefing, jointly file a new, combined administrative motion to seal for all requests where sealing is unopposed. If any requests to seal are opposed, each party or non-party making an opposed request should file a single combined administrative motion to seal covering all of their opposed requests. If the parties anticipate that this paragraph will apply to a round of briefing, they may indicate in the initial motion to file under seal that accompanies a brief or other document as it is lodged under seal on the docket, that a more fulsome and revised motion to seal will be forthcoming after the completion of briefing pursuant to this paragraph of the Standing Order. The later combined motion to seal that is filed should clearly identify the docket numbers of the prior motions to seal that are superseded by the combined motion. If the Court determines that the parties should have followed this procedure but did not, it will deny the motions to seal without prejudice.

## COMMUNICATIONS WITH CHAMBERS

32. Please do not send any letters to the Court except for discovery disputes as detailed in the Court's Standing Order for Discovery in Civil Cases. When corresponding with the Court by letter, always identify the party you represent. **Do not messenger anything directly to chambers.** Deliveries must be directed to the Clerk's office and are never accepted by chambers personnel.

33. You may contact the Courtroom Deputy, Lisa Clark, at (415) 522-2066 with appropriate inquiries. Except for the letters described above, please do not attempt to make contact by telephone or any other ex parte means with chambers staff.

## COURTROOM CONDUCT

34. Counsel and parties are required to conduct themselves with the highest level of decorum and respect for each other and Court and chambers personnel while in the courtroom. Cell phones and all other electronic devices must be turned off; no texting, e-mailing, or other electronic communications are permitted. While sitting in the gallery, counsel and parties should avoid conversation unless absolutely necessary for the appearance. Once a case is called and counsel appear, all communications must be directed only to the Court. Counsel shall not address each other directly unless the Court expressly permits them to do so. All statements and citations made to the Court during oral argument will be held to the same standards stated above in Paragraph 23.

## CROSS REFERENCE TO OTHER STANDING ORDERS

35. The Court has separate standing orders for civil jury trials, discovery in civil cases, and patent cases. They are available for review at the website for the United States District Court for the Northern District of California at www.cand.uscourts.gov/jdorders.

**IT IS SO ORDERED.**

Dated: January 5, 2017

JAMES DONATO
United States District Judge

8

# EXHIBIT E

FILED

FILED FEB 18   PM 1:30

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

Jane Doe

11151 Valley Blvd #4886,

El Monte, CA 91734

626-208-9665

Plaintiff in Pro Se

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SACV20-00322-ODW(PJW)

No.

JANE DOE,

        Plaintiff,

  v.

COUNTY OF ORANGE; DON BARNES;
WILLIAM BAKER; JOE BALICKI;
MARK STICHTER; and DOES 1 - 10,
inclusive,

        Defendants.

**COMPLAINT FOR DAMAGES AND
DECLARATORY AND INJUNCTIVE
RELIEF**

**JURY TRIAL IS HEREBY DEMANDED**

Plaintiff Jane Doe alleges and complains the following, on information and belief except for information identified as being based on personal knowledge, which allegations are likely to have evidentiary support after a reasonable opportunity for further discovery.

## INTRODUCTION

1.    This is an action for declaratory and injunctive relief, damages, and punitive damages for violations of Plaintiff's constitutional rights resulting from application of the County of Orange's and the Sheriff's policies, practices, and customs concerning custody operations.

2.    Defendants' policies, practices, and customs violated Plaintiff's rights secured to

1

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

her by the Fourth and Fourteenth Amendments to the U.S. Constitution and entitle Plaintiff to recover damages under the Federal Civil Rights Act (42U.S.C. § 1983).

3.     Additionally, Plaintiff includes supplemental claims under California state law against Defendants: 1) for violation of California Penal Code § 4030 which requires all strip searches be conducted in an area of privacy and pre-approved in writing by a supervisor, and provides for minimum damages of $1,000 for each illegal search; and, 2) for violation of the Unruh Civil Rights Act (California Civil Code §§ 52 and 52.1) pursuant to which Plaintiff is entitled to recover a minimum of $4,000 for each violation.

## PARTIES

4.     Plaintiff, Jane Doe ("Plaintiff"), at all times herein mentioned, was a resident of the County of Los Angeles, State of California. She was a pretrial detainee in Women's Central Jail (the "Jail") in custody of Orange County Sheriff's Department ("OCSD"). Plaintiff was arrested in August 2019 by Santa Ana Police Department ("SAPD") on misdemeanor charges (vandalism under $400 and unlawful dissemination of private photos) that had nothing to do with contraband or weapon. Plaintiff has been subsequently indicted on those charges. OCSD has never charged Plaintiff with any jail infractions.

5.     Defendant, County of Orange ("the County"), is a municipal corporation located in the Central District of California. OCSD is a law enforcement agency funded and operated by the County. The County owns and, through OCSD, operates the Women's Central Jail (the "Jail") which is located at 44 Civic Center Plaza, Santa Ana, CA 92703. The County has responsibility for funding the operations of the said jail.

6.     Defendants Don Barnes, William Baker, Joe Balicki, Mark Stichter, and Does 1-10 are referred collectively as OCSD Officers/personnel. At all times relevant herein, OCSD Officers were acting under color of law, under the color of statutes, ordinances, regulations, policies, customs, practices and usages of Defendant the County, its Sheriff's department, and/or the State of California.

7.     At all times herein mentioned, Plaintiff is informed and believes, and thereon

2

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

alleges that individual Defendant Sheriff Don Barnes ("Barnes") is an elected public official who has responsibility for the security and custody operations of county jails, which include Women's Central Jail, and to protect the safety of persons in the jails. At all times relevant hereto, Plaintiff alleges Barnes served as the highest official for the OCSD and has at all times been personally involved in the formulation and implementation of policies at County Jails. As Sheriff of the County, Barnes holds the command and policy making position with regard to County Jails, including Women's Central Jail. Barnes has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the unconstitutional and inhumane conditions, actions, policies, customs and practices that prevail at the Jail, as described fully below. Barnes has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below.

8.     Defendant Assistant Sheriff William Baker ("Baker") is, and at all times relevant to this Complaint was, the Assistant Sheriff of the County in charge of custody operations which includes Women's Central Jail. As Assistant Sheriff of the County in charge of custody operations, Baker has at all times relevant to this Complaint held a command and policy making position with regard to County Jails, including Women's Central Jail. Baker has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at the Jail, as described fully below. Baker has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below.

9.     Defendant Joe Balicki ("Balicki") is, and at all times relevant to this Complaint was, the Commander in Charge of OCSD's custody operations which includes the Women's Central Jail. As the Commander in Charge of custody operations, Balicki has at all times relevant to this Complaint held a command and policy making position with regard to County Jails, including Women's Central Jail. Balicki has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions,

3

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

actions, policies, customs and practices that prevail at Women's Central Jail, as described fully below. Balicki has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below.

10. Defendant Mark Stichter ("Stichter") is, and at all times relevant to this Complaint was, the Captain of Women's Central Jail. As the captain with direct supervision over the Jail, Stichter is responsible for the daily conditions and operations of the Jail, including the training and supervision of floor deputies. Stichter is regularly, if not daily, on the premises at the Jail. It is his responsibility to be knowledgeable and familiar with the actual daily conditions and operations of the Jail. Stichter has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at the Jail, as described fully below. Stichter has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below.

11. The County and OCSD Officers are together responsible for the conditions of confinement and health and safety of persons incarcerated at the said jail by providing appropriate funding, oversight, and corrective action to ensure adequate conditions. They are also responsible for ensuring that jail policies and practices do not violate individuals' substantive and procedural due process rights.

12. Defendant DOES 1 through 10 are not known or identified at this time. On information and belief, Plaintiff alleges that each Doe is in some manner responsible for the wrongs alleged herein, and that each such Defendant advised, encouraged, participated in, ratified, directed, or conspired to do, the wrongful acts alleged herein. When the true names and capacities of said Defendants become known, Plaintiff will seek relief to amend this complaint to show their true identities in place of their fictitious names as DOES 1 through 10. Defendants, and each of them, were the agents, employees and servants of every other Defendant. Defendants acted in the course and scope of said agency, service and employment at all relevant times.

4

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

13. At all times relevant, each individual Defendant was acting within the course and scope of their employment as law enforcement officer of the County, and under the color of state law, and as the employee, agent and representative of each and every other Defendant.

14. Defendants, and each of them, did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

15. All Defendants are sued in their official capacities for declaratory and injunctive relief as to all claims. All Defendants are also sued for damages arising from violations of 42 U.S.C. §§ 1983 and 1985, and for violations of state law and California Constitution.

16. Defendants OCSD Officers are also sued in their individual capacities for their violations of Plaintiff's clearly established United States and California constitutional rights.

## JURISDICTION AND VENUE

17. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a) because this action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

18. The Court may award damages and grant declaratory relief for constitutional violations pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and/or Federal Rules of Civil Procedure 57 and 65.

19. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events that give rise to this action occurred within this district and the Defendants reside in this district and state.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

20. On or about April 6, 2019 Plaintiff was raped in South El Monte. Liliana Jara ("Jara") was a detective with Los Angeles County Sheriff's Department who was working on the rape investigation. Santa Ana Police Department ("SAPD") personnel set up with Jara so Jara lied to Plaintiff that she would conduct an interview with Plaintiff at City of Industry Station. On or about August 8, 2019 at around 10:00 am Plaintiff was arrested by SAPD personnel upon her

5

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

arrival at City of Industry Station on misdemeanor charges. At all times relevant herein, SAPD personnel had full knowledge that Plaintiff was a rape victim.

*Unlawful punishment*

21.    Plaintiff arrived at Women's Central Jail at around 10:50 am on August 8, 2019. The arresting police officer demanded pass code to Plaintiff's cell phone but Plaintiff refused to submit. Because Plaintiff did not memorize any phone numbers, while she requested for her cell phone to get friend or family's phone number the police officer denied her request because Plaintiff didn't submit her pass code. Therefore, Plaintiff was not able to arrange bail through friends or family and had to be housed as a pre-trial detainee which caused Plaintiff to spend four days in hell.

22.    After a brief interview Plaintiff was taken to an open area for check-up. Plaintiff told a deputy that she was on period and she would need to use the restroom. Plaintiff was ordered to sit down but she explained she could not sit down because her pad was full and if she sat down period blood would come out. The deputy didn't care and pushed Plaintiff's shoulder to force her to sit down.

23.    After Plaintiff changed her pad she told a deputy that she was cold to death and asked for blanket or clothing to keep warm but the deputy replied "It's JAIL. Don't come to jail next time." Plaintiff was only 100 lbs and wearing a T-shirt at the time. The jail facility was kept bone chillingly cold. It was worse than being in winter without heater. Plaintiff told herself "This is not jail. This is hell."

24.    Plaintiff told a female nurse that she was cold but the nurse laughed at Plaintiff and stated that she didn't feel cold. Then Plaintiff was held in a concrete icing cold holding cell shaking from head to toe.

25.    Later Plaintiff was transferred to another area and she told a male nurse that she was cold to death. Again, she was ignored. Deliberate indifference to Plaintiff's repeated requests demonstrates a willful rejection to issue blanket or clothing for Plaintiff to keep warm.

26.    Plaintiff repeatedly requested for food but her requests were denied by falsely being told three times she would get food later but she didn't get any food until the next day

6

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

morning.

27. Defendants' deliberate indifference to Plaintiff's need for life necessities was so wild spread.

*Strip search (seven times in four days)*

28. During initial mental health screening, OCSD personnel had full knowledge that Plaintiff was a victim of sexual assault and she was on medication. OCSD personnel knew or should have known about the risk to her mental health. However, between August 8 and 12, 2019 Plaintiff was strip searched for seven times:

1. Before being housed on August 8, 2019.

2. Before going up to the patio on August 10, 2019.

3. Upon return from the patio on August 10, 2019.

4. Before leaving for court on August 12, 2019.

5. Upon arrival at court on August 12, 2019.

6. Upon return from court with approval of release on own recognizance on August 12, 2019.

7. Right before being released on own recognizance on August 12, 2019.

29. The above searches were all conducted in open hall way, without privacy, under surveillance camera, and in the presence and view of other inmates. At each time of the search, OCSD personnel did not have probable cause or reasonable suspicion that Plaintiff was in the possession of contraband, any other substance or weapon that would justify or necessitate the strip searches.

30. On August 8, 2019 Plaintiff was given towels for shower. Plaintiff asked if she could skip shower because she didn't want to shower in the presence of strangers but OCSD personnel told Plaintiff that she had to shower. After a mandatory shower with no privacy (in the presence and view of OCSD personnel and other inmates), Plaintiff was required to change in jail uniform. After this mandatory shower Plaintiff didn't take any shower for four days until she got home.

31. The bra Plaintiff was given looked old and dirty so Plaintiff opt not to wear it. She

7

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

didn't expect she would be subjected to strip search later on. Plaintiff was not previously informed that she would be forced to undergo a strip search. Strip searches under such circumstances are particularly unwarranted.

32. Plaintiff was told to go upstairs with other inmates. Shoulder to shoulder, around 15 people lined up by the wall in front of several deputies in the hall way. Right before the first strip search Plaintiff was ordered to wear a bra but she was not allowed to do so by using the restroom. Plaintiff had to wear a bra in the open hallway under surveillance camera in the presence and view of around 20 people.

33. During the strip search, since Plaintiff was menstruating she had to pull down her underwear, lift up her period pad in her underwear so that OCSD personnel could inspect underneath the pad. While the pad was lifted up Plaintiff had to twist it in front of OCSD personnel so that it could be inspected if there was anything in the pad. She was not provided with a new period pad or allowed to use the restroom before putting her underwear with the used pad back on. All of these occurred in the open hallway in a group of inmates under surveillance camera.

34. During the first strip search Plaintiff didn't run her fingers through her hair properly so the deputy slapped her head.

35. On August 10, 2019 Plaintiff was allowed to get some fresh air and sunlight on the patio after breakfast. The patio was located on the top of the jail house with no outside access. Plaintiff was strip searched without any "reasonable suspicion" before she left for the patio with other cell mates in the hall way. After spending less than one hour on the patio Plaintiff came back down to her cell and she was strip searched again in a group without any "reasonable suspicion". Plaintiff told her cell mate, "Had I known I had to be strip searched I wouldn't have wanted to go up to the patio." Both strip searches were unnecessary and deprivation of Plaintiff's rights secured to her by United States and California constitution.

36. On August 12, 2019 before leaving for court Plaintiff was strip searched at jail. She was strip searched again without any "reasonable suspicion" upon her arrival at courthouse which means she was strip searched twice in 30 minutes. Between these two strip searches

8

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff was under constant supervision of OCSD personnel.

37. After a strip search at jail, when arriving at the courthouse, even though Plaintiff was menstruating she was told to pull down her underwear, bend forward at the waist, spread her legs, and cough multiple times until the officer was satisfied.

38. After returning from court Plaintiff became entitled to release as a result of her court appearance but she was strip searched any way. Even after Plaintiff was released on her own recognizance, right before leaving the jail she was strip searched without any "reasonable suspicion".

39. After Plaintiff had obtained court approval to be released on her own recognizance she was still subjected to two strip searches.

40. A rape victim has a special sense of privacy in her body. Involuntary exposure of her body in the presence of other people in open hallway under surveillance camera is especially demeaning and humiliating. Strip search inflicts serious psychological pain to sexual assault victims and causes them lasting and permanent harm. Seven times of strip searches have re-traumatized Plaintiff and resulted in suicide attempts.

41. During Plaintiff's four-day confinement as a pre-trial detainee, despite she was in serious psychiatric needs she was cut out of medication. Defendants did not stop there. Plaintiff was strip searched seven times.

*Over-crowding with long lock-in time and sleep deprivation*

42. Forty inmates, including Plaintiff, were placed in an approximately 800-square foot windowless cell with bunk beds, sharing one dayroom, two stand-up showers and four toilets. Each bunk bed was about one foot apart. The windowless dayroom was about 150 square foot which was located behind the toilets connected to the jail cell.

43. Plaintiff was locked in this cramped jail cell 24 hours of every day and was permitted no sunlight, fresh air, exercise, clocks, and environmental stimulation. Defendants only allowed Plaintiff and other inmates to go up to the patio less than one hour a week which was Plaintiff's only access to fresh air and sunlight. This only chance to get fresh air and sunlight subjected Plaintiff to two times of strip search. This also means Plaintiff spent more than 48

9

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

consecutive hours locked down.

44. In the cell the lights were never off. Even at night some of the lights were off but some of the lights were 24-hour on and the lighting was bright enough to read. Plaintiff and other inmates were assumed to be able to sleep with 24-hour lights in their cell.

45. There was an informal rule to prohibit flushing toilets when deputy was present because the noise of flushing toilet was extremely loud. Every night the entire night there were people using toilet every 30 minutes. The noise of flushing toilets was non-stop and extremely loud which caused Plaintiff to stay awake the entire night for consecutive four nights.

46. According to the Centers for Disease Control and Prevention, an adult between the ages of 18 and 60 needs 7 or more hours of sleep per night for good health. Not getting enough sleep is linked with many chronic diseases and conditions.

47. The daily sleep deprivation and disturbance had created significant negative impacts on Plaintiff's abilities to function at many levels. Such sleep deprivation caused more sensitivity to physical pain. Plaintiff was negatively impacted cognitively, functionally, and psychiatrically. Cognitive impairment has adversely impacted Plaintiff, as a pretrial detainee's, ability to assist in her legal defense. Plaintiff's overall health and immune systems has been negatively impacted resulting in health issues including dysfunctional menstrual bleeding.

48. As a direct result it imposed genuine privations and hardship, caused Plaintiff's suffering from deprivation of sleep and degeneration, and threatened her mental and physical well-being.

49. Defendants imposed these harsh conditions on Plaintiff who had not been convicted and was simply awaiting a court date which left Plaintiff feeling like worse than an animal.

50. Defendants have maintained a physical environment at the jail that caused harm and posed an unreasonable risk of serious harm to Plaintiff's health and safety by ignoring poor facility housing and maintenance problems.

51. Defendants, by its policy and practice of locking people in these inhumane conditions, subjected Plaintiff to serious psychological and physiological harm. Especially

10

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff was already experiencing perceptible harm, including PTSD, anxiety, depression, social withdrawal, paranoia, agitation, and suicidal ideation, and OCSD personnel was fully aware of that. Plaintiff, with preexisting mental illness, has been suffering from more acute symptoms as a result of these policies and practices.

*Harassing cell search during midnight*

52.     On or about August 12, 2019, in the early morning after midnight, Plaintiff and all other inmates were wakened up and locked up in the dayroom. Plaintiff and all other inmates' bedding were searched without reasonable suspicion. Cell search conducted after midnight was for no purpose but to harass.

*Release*

53.     Before getting back her own clothing Plaintiff was forced to be completely naked in the presence and view of around 10 people, including OCSD personnel and other inmates. Plaintiff was released around midnight but her cell phone was kept by SAPD. Plaintiff was released on the street without funds or other means to secure transportation to her residence in El Monte, California which was 40 miles away.

54.     On or about Aug 16, 2019 Plaintiff ended up in ER for dysfunctional menstrual bleeding. In Plaintiff's entire life it was her very first time to visit ER. On or about Aug 30, 2019 Plaintiff was transported to the hospital and put on suicide watch for five days.

55.     On Nov 28, 2019 Plaintiff attempted suicide by trying to overdose sleeping aid.

## FIRST CAUSE OF ACTION

### Fourteenth Amendment (42 U.S.C. § 1983) – Outright denials of life necessities

### Against all Defendants

56.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

57.     Under the Due Process Clause of Fourteen Amendment, pretrial detainees cannot be punished. They can only be detained to ensure their presence at trial. Plaintiff has a due process right to be free from unlawful punishment, severe restraints and hazards.

11

58. The "parameters" of detainees' rights concerning conditions of confinement are "coextensive" with Eighth Amendment protections. Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005). Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, ... the Eighth Amendment standard provides the benchmark for such claims. Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998). Therefore, the Eighth Amendment standard defines what is unlawful punishment of detainees.

59. The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care and reasonable safety" as well as "warmth [and] exercise."

60. The Eighth Amendment entitles prisoners "not to be confined in a cell at so low a temperature as to cause severe discomfort". Dixon v. Godinez, 114 F.3d 640, 644 (7th Cir. 1997). Less than two hours' exposure to subfreezing outdoor weather without hats and gloves violated the Eighth Amendment. Gordon v. Faber, 973 F.2d 686, 687-88 (8th Cir. 1992).

61. Food is one of the basic necessities of life protected by the Eighth Amendment. 12-hour deprivation of food in police lockup, if intentional, was "obviously" unlawful. Willis v. Bell, 726 F. Supp. 1118, 1121-22(N.D.Ill. 1989).

62. 20 plus hours without food along with 12 plus hours in bone chillingly cold environment constituted unlawful punishment because Plaintiff's repeated requests for food and clothing were intentionally denied by OCSD personnel. Plaintiff's life's necessities were denied due to OCSD personnel's intentional indifference to Plaintiff's fundamental rights.

## SECOND CAUSE OF ACTION

**Fourteenth Amendment (42 U.S.C. § 1983) – Overcrowding and sleep deprivation**

**Against all Defendants**

63. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

64. In May 2011, the U.S. Supreme Court ruled that overcrowding in California's prisons resulted in cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution.

12

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

65.     Since the Eighth Amendment standard defines what is unlawful punishment of detainees the overcrowding in Women's Central Jail of OCSD has resulted in unlawful punishment in violation of the Fourteenth Amendment to the U.S. Constitution due to Defendants' intentional indifference to Plaintiff and other detainees' fundamental rights.

66.     By Defendants' policies and practices described above, Defendants subjected Plaintiff to a substantial risk of serious harm and injury from the harmful and inhumane effects of daily insufficient sleep duration.

67.     These policies and practices have been, and continue to be, implemented by Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiff's deprivation of due process rights secured by the United States Constitution under the Fourteenth Amendments, are not rationally related to a legitimate nonpunitive governmental purpose or is excessive in relation to any such nonpunitive governmental purpose.

### THIRD CAUSE OF ACTION

**Fourth Amendment (42 U.S.C. § 1983) – Strip search**

**Against all Defendants**

68.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

69.     The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.

70.     Jordan v. Gardner, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc) (the "Fourth Amendment guarantees the right of the people to be secure against unreasonable searches, and its protections are not extinguished upon incarceration"); Thompson v. Souza, 111 F.3d 694, 699 (9th Cir. 1997) (same).

71.     Allegation of a strip search that was unnecessary because it immediately followed another strip search stated a Fourth Amendment claim. Hodges v. Stanley, 712 F.2d 34, 35 (2d Cir. 1983). A second-strip search was unconstitutional because the inmate was under constant

13

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

supervision of guards since the first search. Jean-Laurent v. Wilkenson, 540 F. Supp. 2d 501 (S.D.N.Y 2008)

72.     In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court created a balancing test for determining if a person's Fourth Amendment right to be free from unreasonable searches in the carceral context has been violated. Courts assess the constitutionality of a strip search by balancing "the need for the particular search against the invasion of personal rights that the search entails." Id. at 559. This requires courts to weigh "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. Applying this balancing test, California courts have held that a blanket strip search policy for arrestees **after returning from court** is unconstitutional. Craft v. County of San Bernardino, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (policy of strip searching all arrestees who are returned to a jail facility from court violates the Fourth Amendment).  As to arrestees returning from court entitled to release, blanket policies of conducting strip searches violates the Fourth Amendment, Article 1, § 1 of the California Constitution, and Article 1, § 13 of the California Constitution. Craft v. County of San Bernardino, 468 F. Supp. 2d 1172 (C.D. Cal. 2006).

73.     Strip search without privacy presented a factual issue of reasonableness. Estes-El v. State of New York, 552 F.Supp. 885, 889 (S.D.N.Y. 1982). In Lopez v. Youngblood, 609 F. Supp. 2d 1125 (E.D. Cal. 2009), the court held it was unconstitutional to strip search detainees in a group.

74.     And strip searches being conducted in an open setting is a form of gratuitous humiliation that raises constitutional questions. See, e.g., Vaughan v. Ricketts, 859 F.2d 736, 741-42 (9th Cir. 1988) (searched in an open hallway). Evidence of searches conducted publicly without reason and against prison rules supported a constitutional claim. Mays v. Springborn, 575 F.3d at 649-50.

75.     Defendants' policies, practices, and customs regarding the strip searches complained of herein violated Plaintiff's rights to due process and privacy under the Fourteenth Amendment, and directly and proximately damaged Plaintiff as herein alleged, entitling Plaintiff

14

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

to recover damages for said constitutional violations pursuant to 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

### Fourth Amendment (42 U.S.C. § 1983) – Harassing cell search

### Against all Defendants

76. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

77. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.

78. Cell search conducted during midnight for no purpose but to harass was not frivolous. Harassing cell search during midnight with no showing of misbehavior in jail constituted unreasonable search.

## FIFTH CAUSE OF ACTION

### Civil Conspiracy in Violation of 42 U.S.C. § 1985

### Against all Defendants

79. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

80. Defendants engaged in a conspiracy among themselves and with others for the purpose of depriving, directly or indirectly, Plaintiff's rights under the law in violation of 42 U.S.C. § 1985.

81. The acts of defendants were unnecessary, objectively unreasonable and malicious. Therefore, Defendants are liable to Plaintiff in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

## SIXTH CAUSE OF ACTION

### Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983)

### Against all Defendants

15

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

82.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

83.     Plaintiff is informed and believes, and based thereon alleges, that on Aug 8, 2019, and for some time prior thereto, Defendants, with deliberate indifference towards the civil rights of detainees, knowingly and willfully did maintain, enforce, and apply a custom, practice, policy and usage tending to encourage, promote, sanction, tolerate and ratify the abuse of authority, the denial of life necessities, overcrowding, and the use of strip searches and harassing cell search.

84.     Defendants also have several practices, customs, and/or policies that cause Plaintiff to be chronically deprived of the essential and human need for sleep.

85.     Defendants, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff, and other individuals similarly situated.

86.     By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendants acted with an intentional, reckless, and callous disregard for Plaintiff's constitutional rights. Defendants, each of their actions were willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

87.     Furthermore, the policies, practices, and customs implemented and maintained and still tolerated by Defendants, were affirmatively linked to and were a significantly influential force behind the injuries of Plaintiff.

88.     By reason of the aforementioned acts and omissions of Defendants, Plaintiff has suffered loss of trust, comfort, care, protection, and support. Accordingly, all Defendants, each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

**SEVENTH CAUSE OF ACTION**

16

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**Municipal Liability – Failure to Train and Supervise (42 U.S.C. § 1983)**

**Against all Defendants**

89.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

90.     While acting under the color of state law and within the course and scope of their employment, Defendants' practice, deprived Plaintiff's rights secured to her by the Fourth and Fourteenth Amendments, including her right to be free from unreasonable search and seizure.

91.     The training policies of the County were not adequate to train its personnel, including but not limited to, OCSD Officers, with regards to using searches. As a result, OCSD personnel, are not able to handle the usual and recurring situations with which they must deal. These inadequate training policies existed prior to the date of this incident and continue to this day.

92.     The COUNTY was aware that failure to implement some sort of training with regards to their officers' use of strip and cell searches, would result in continuing to have numerous unreasonable officers involved violation of pretrial detainees' constitutional rights annually.

93.     The policies, practices and customs described above are the official policies, practices and customs of Defendant the COUNTY, and are the direct and proximate cause of Plaintiff being subjected to known risks of serious harms in violation of the Fourth and Fourteenth Amendment. The policies, practices and customs described above include Defendant the COUNTY's failure to train its staff in the face of an obvious need for training to prevent the violations described above. In other words, Defendants' failure to train is so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury.

94.     By failing to achieve adequate training, OCSD Officers, acted with an intentional, reckless, and callous disregard for Plaintiff's constitutional rights. OCSD Officers, each of their actions was willful, wanton, oppressive, malicious, offensive, and unconscionable to any person of normal sensibilities.

95.     By reason of the aforementioned acts and omissions of OCSD Officers, Plaintiff

17

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

has suffered loss of trust, comfort, care, protection, and support.

## EIGHTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 7 – Denial of life necessities

### Against all Defendants

96. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

97. 20 plus hours without food along with 12 plus hours in bone chillingly cold environment constituted an impermissible imposition of punishment, especially Plaintiff's repeated requests for food and clothing were intentionally denied.

98. By the policies and practices described herein, Defendants had deprived Plaintiff's minimal civilized measure of life's necessities, and had violated her basic human dignity and her right to be free from punishment and unusual conditions under California Constitution.

99. The policies and practices complained of herein have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity.

100. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct. Defendants had been deliberately indifferent to Plaintiff's pain and suffering.

## NINTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 7 – Overcrowding and sleep deprivation

### Against all Defendants

101. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

102. Defendants, by deliberately preventing Plaintiff from being able to obtain adequate sleep both by limiting the available time for night time sleep with 24-hour light on policy and through overcrowding that interrupts, interferes, disrupts and disturbs night time sleep, imposed

18

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

an atypical, substantial, and different hardship on Plaintiff in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. By Defendants' policies and practices described above, Defendants subjected Plaintiff to a substantial risk of harm due to the denial of due process in relationship to the ordinary, human requirement of sleep. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiff's deprivation of rights secured by the California Constitution, Article I, Section 7.

103. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

## TENTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 13 – Strip search

### Against all Defendants

104. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

105. The unnecessary, demeaning, outrageous and intrusive strip searches to which Plaintiff was subjected violated Plaintiff's rights to be secure in her person against unreasonable searches and seizures, as guaranteed by Article I, § 13 of the California Constitution.

## ELEVENTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 13 – Harassing cell search

### Against all Defendants

106. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

107. The unnecessary, demeaning, and outrageous cell search to which Plaintiff was subjected violated Plaintiff's rights to be secure in her person against unreasonable searches and seizures, as guaranteed by Article I, § 13 of the California Constitution.

19

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## TWELFTH CAUSE OF ACTION

### Violation of Cal. Const. Art. I, § 1 – Right of Privacy

### Against all Defendants

108. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

109. Unlawful strip searches violate an individual's right to privacy under Article 1, Section 1 of the California Constitution. See White v. Davis, 13 Cal. 3d. 757 (1975); Hill v. NCAA, 7 Cal.4th 1 (1994); American Airlines, Inc. v. Superior Court, 114 Cal. App. 4th 881 (2003).

110. Plaintiff didn't even want to be naked in front of her mother, not to mention a bunch of strangers. Being forced to shower in the view of OCSD personnel and other inmates, being forced to wear a bra in the view of OCSD personnel and other inmates, being strip searched seven times without privacy, being forced to be completely naked before getting back her own clothing, all together not only violated Plaintiff's fundamental rights but also put Plaintiff through hell.

## THIRTEENTH CAUSE OF ACTION

### Violation of California Penal Code § 4030

### Against all Defendants

111. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

112. Defendants' policies, practices, and customs regarding the strip searches complained of herein violated rights secured to Plaintiff under California Penal Code § 4030 and directly and proximately damaged Plaintiff as herein alleged, entitling her to recover a minimum of $1,000 each pursuant to California Penal Code § 4030(o) in addition to other damages.

## FOURTEENTH CAUSE OF ACTION

### Violation of Unruh Civil Rights Act (Cal. Civil Code §§ 52 and 52.1)

20

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Against all defendants

113. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

114. Defendants' policies, practices, and customs regarding their bad acts as complained of herein has violated Plaintiff's rights to due process of law and freedom from unreasonable searches and seizures as secured by the California State Constitution, Article 1, § 1, § 7, and § 13, and directly and proximately damaged Plaintiff as herein alleged, entitling her to recover a minimum of $4,000 for each and every offense pursuant to California Civil Code § 52 and § 52.1, in addition to other damages.

## FIFTEENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### Against all Defendants

115. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

116. Plaintiff certainly didn't go into the Jail thinking she would be denied life necessities, strip searched, and harassed during midnight.

117. As a direct result of Defendants' unconstitutional policies and practice, Plaintiff is suffering and continues to suffer from debilitating psychological damage. She suffers from serious insomnia and chronic fatigue. She is preoccupied with fears of being strip searched again and nightmares of seeing herself dying in a freezing cell.

118. Now Plaintiff cannot read more than a few paragraphs without losing focus and needing to start over. She cannot maintain a normal life without interruption of suicidal thoughts, anxiety, memory loss, fear, and depression. From time to time she also has nightmares seeing herself die in jail.

119. Plaintiff feels numb and distant when she speaks to her family or spends time with her friends. She is no longer able to emotionally connect with her family and close friends.

120. As a direct and proximate result of Defendants' actions and inactions, Plaintiff

21

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

suffered injuries entitling her to receive compensatory and punitive damages against Defendants.

## DECLARATORY RELIEF SOUGHT

121. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

122. Plaintiff has no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiff has suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiff is granted the relief she requests.

123. Plaintiff respectfully prays for a declaratory judgment that declares that the conditions, acts, omissions, policies, and practices of Defendants and their agents, officials, and employees are in violation of the rights of Plaintiff under the Fourth and Fourteenth Amendments to the U.S. Constitution, Art. I, §§ 1, 7, 13 of the California Constitution, Cal. Civil Code § 51, and/or California common law.

## INJUNCTIVE RELIEF SOUGHT

124. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

125. Plaintiff prays that the Court issue a permanent injunction against Defendants ordering them to:

    a. Replace toilets that cause extreme loud flushing noise;

    b. Prohibit over-head light and loud noise for at least a 7-hour period each night;

    c. Provide all prisoners with the ability to have uninterrupted and undisturbed block of night time sleep of no less than 7 hours;

    d. Resolve overcrowding condition, provide sufficient space and out-of-cell time;

    e. Provide necessary privacy to all prisoners;

    f. Prohibit unlawful strip searches and harassing cell searches; and

    g. Properly train and supervise government employees concerning the unlawful

22

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

actions described above to prevent future violations.

### PRAYER

WHEREFORE, Plaintiff prays judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

1. For general damages according to proof;

2. For special damages according to proof;

3. For exemplary damages as provided by law, in an amount to be proved against each individual Defendant;

4. For interest;

5. For civil penalties pursuant to Civil Code § 52;

6. For attorney's fees pursuant to 42 U.S.C. § 1988 and Civil Code §§ 52 and 52.1;

7. For reasonable costs of this suit;

8. For treble damages under Civil Code § 52.1;

9. For such other and further relief as the Court may deem just, proper, and appropriate.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: Feb 18, 2020

_____

Jane Doe

Plaintiff in Pro Se

23

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## EXHIBITS TO COMPLAINT

## TABLE OF CONTENTS

| Exhibit # | Document | Pages |
|-----------|----------|-------|
| 1 | Rejection letter from County of Orange | 26 |

24

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

EXHIBIT 1



**COUNTY OF ORANGE**
## COUNTY EXECUTIVE OFFICE

OFFICE OF RISK MANAGEMENT

• Safety & Loss Prevention Program
• Workers' Compensation Program
• Liability Claims Management Program
• Administration & Financial Management
• Insurance/Contracts & Commercial Insurance
• ADA II Public Access Compliance

Telephone: (714) 285-5500
FAX: (714) 285-5599

February 10, 2020

P.O. Box 4886
El Monte CA

Re: Claimant:
    Date of Loss: 08/08/2019
    Claim Number: 20190910

Dear            :

Please be advised that investigation of the above-matter has been completed. Investigation disclosed no negligence on behalf of the County of Orange. In view of the facts, we have no recourse but to disclaim any liability on behalf of the County of Orange.

Notice is hereby given that the claim you presented on behalf of            on 12/26/2019, is rejected by operation of law.

WARNING: "Subject to certain exceptions, you have only six months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. See Government Code, Section 945.6."

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Sincerely,

Calvin Wong
Claims Representative

601 N. Ross Street, 5th Floor, Santa Ana, CA 92701 -- P.O. Box 327 Santa Ana, CA 92702

26